# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**AMERANTH, INC.**
**Patent Owner/Appellee**

**v.**                                          **Appeal Nos. 2016-2678**
                                                          **2016-2679**
**APPLE, INC. et al.**                          **2016-2680**
**Petitioner/Appellant**                        **2016-2681**

**Proceeding No: CBM2015-00080, CBM2015-00082,**
**CBM2015-00091, CBM2015-00099**

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the

Federal Circuit was timely filed September 21, 2016, in the United States

Patent and Trademark Office in connection with the above identified

Covered Business Method (CBM) Review proceeding. Pursuant to 35

U.S.C. § 143 a Certified List is this day being forwarded to the Federal

Circuit.

Respectfully submitted,

Under Secretary of Commerce for Intellectual
Property and Director of the United States
Patent and Trademark Office

Date: November 1, 2016    By: _____

Shane Walter
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the

foregoing has been served on Appellant and Appellee this 1st day of

November, 2016, as follows:

PETITIONER:
James M. Heintz
Robert C. Williams
Ryan Cobb
DLA PIPER LLP
AmeranthCBMService@dlapiper.com
robert.williams@dlapiper.com
ryan.cobb@dlapiper.com

Richard S. Zembek
Gilbert A. Greene
NORTON ROSE FULBRIGHT
richard.zembek@nortonrosefulbright.com
bert.greene@nortonrosefulbright.com

Bing Ai
Matthew C. Bernstein
Patrick McKeever
Yun L. Lu
PERKINS COIE LLP
Ai-ptab@perkinscoie.com
MBernstein@perkinscoie.com
PMcKeever@perkinscoie.com
LLu@perkinscoie.com

PATENT OWNER:
John W. Osborne
OSBORNE LAW LLC
josborne@osborneipl.com
Michael D. Fabiano
FABIANO LAW FIRM, P.C.
mdfabiano@fabianolawfirm.com

By: _____

Shane Walter
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>November 1, 2016</u>

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Covered Business Method Patent Review* proceeding identified below:

**APPLE, INC., et al.,**
**Petitioner,**
**v.**
**AMERANTH, INC.,**
**Patent Owner.**

**Case CBM2015-00080**
**Patent 6,384,850 B1**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Certifying Officer*



## Prosecution History for CBM2015-00080[1]

| Date | Document |
|------|----------|
| 02/19/2015 | Petition for Covered Business Method Review |
| 02/19/2015 | Power of Attorney |
| 02/19/2015 | Power of Attorney |
| 02/19/2015 | Power of Attorney |
| 03/10/2015 | Notice of Filing Date Accorded to Petition |
| 03/12/2015 | Power of Attorney |
| 03/12/2015 | Patent Owner's Mandatory Notices |
| 05/08/2015 | Order Conduct of the Proceedings |
| 06/04/2015 | Patent Owner's Preliminary Response |
| 06/05/2015 | Pro Hac Vice Admission - Williams |
| 06/24/2015 | Order - Pro Hac Vice Admission of - Williams |
| 07/08/2015 | Petitioner's Updated Mandatory Notices |
| 09/01/2015 | Decision - Institution of Covered Business Method Patent Review |
| 09/01/2015 | Scheduling Order |
| 09/01/2015 | Decision - Grant of Motion for Joinder |
| 09/29/2015 | Joint Notice of Stipulated Change to Trial Dates |
| 01/06/2016 | Patent Owner's Response |
| 01/13/2016 | Petitioner's Objections to Exhibits Submitted with Patent Owner's Response |
| 01/29/2016 | Notice of Deposition - Weaver |
| 01/29/2016 | Order Conduct of the Proceeding |
| 02/01/2016 | Corrected Patent Owner Response |
| 02/11/2016 | Transcript of 01-28-2016 Conference Call with Board |
| 03/18/2016 | Notice of Deposition - Turnbull |
| 03/23/2016 | Petitioner's Reply |
| 03/23/2016 | Updated Exhibit List |
| 03/30/2016 | Patent Owner's Objections to Evidence Submitted with Petitioner's Reply |
| 04/01/2016 | Order - Conduct of the Proceeding |
| 04/04/2016 | Patent Owner's Request for Oral Hearing |
| 04/05/2016 | Petitioner's Request for Oral Hearing |
| 04/05/2016 | Patent Owner's Sur-Reply Brief |
| 04/08/2016 | Petitioner's Motion to Exclude Evidence |
| 04/08/2016 | Updated Exhibit List |
| 04/08/2016 | Patent Owner's Motion to Exclude |
| 04/15/2016 | Transcript of 03-31-2016 Conference Call with Board |
| 04/20/2016 | Petitioner's Opposition to Patent Owner's Motion to Exclude |
| 04/20/2016 | Updated Exhibit List |

[1] CBM2015-00096 has been consolidated with this proceeding.

| 04/20/2016 | Patent Owner's Opposition to Petitioner Motion to Exclude |
| 04/27/2016 | Petitioner's Reply in Support of Motion to Exclude Patent Owner's Evidence |
| 04/27/2016 | Patent Owner's Reply In Support of Motion to Exclude |
| 05/02/2016 | Order - Trial Hearing |
| 05/06/2016 | Conduct of the Proceeding |
| 05/20/2016 | Transcript of 05-06-2016 Conference Call with Board |
| 06/23/2016 | Record of Oral Hearing |
| 08/26/2016 | Final Written Decision |

### Prosecution History for CBM2015-00096

| Date | Document |
| --- | --- |
| 03/03/2015 | Petition for Covered Business Method Review |
| 03/03/2015 | Power of Attorney |
| 03/24/2015 | Power of Attorney |
| 03/24/2015 | Patent Owner's Mandatory Notices |
| 03/25/2015 | Notice of Filing Date Accorded to Petition – Defective Petition |
| 04/01/2015 | Response to Notice of Defective Petition |
| 04/03/2015 | Supplemental Response to Notice of Defective Petition |
| 04/03/2015 | Corrected Petition for Covered Business Method Review |
| 04/03/2015 | Notice Accepting Corrected Petition |
| 04/07/2015 | Petitioner's Motion for Joinder |
| 05/08/2015 | Order Conduct of the Proceedings |
| 06/08/2015 | Patent Owner's Preliminary Response |
| 07/15/2015 | Petitioner's Supplemental Mandatory Notices |
| 09/01/2015 | Decision - Grant of Motion for Joinder |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>November 1, 2016</u>

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Covered Business Method Patent Review* proceeding identified below:

**APPLE, INC., et al.,**
**Petitioner,**
**v.**
**AMERANTH, INC.,**
**Patent Owner.**

**Case CBM2015-00082**
**Patent 6,871,325 B1**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Certifying Officer*



## Prosecution History for CBM2015-00082[2]

| Date | Document |
| --- | --- |
| 02/19/2015 | Petition for Covered Business Method Review |
| 02/19/2015 | Power of Attorney |
| 02/19/2015 | Power of Attorney |
| 02/19/2015 | Power of Attorney |
| 03/10/2015 | Notice of Filing Date Accorded to Petition |
| 03/12/2015 | Power of Attorney |
| 03/12/2015 | Patent Owner's Mandatory Notices |
| 05/08/2015 | Order Conduct of the Proceedings |
| 06/04/2015 | Patent Owner's Preliminary Response |
| 06/05/2015 | Pro Hac Vice Admission - Williams |
| 06/24/2015 | Order - Pro Hac Vice Admission of - Williams |
| 07/08/2015 | Petitioner's Updated Mandatory Notices |
| 09/01/2015 | Decision - Institution of Covered Business Method Patent Review |
| 09/01/2015 | Scheduling Order |
| 09/01/2015 | Decision - Grant of Motion for Joinder |
| 09/15/2015 | Patent Owner's Request for Rehearing of Institution Decisions |
| 09/29/2015 | Joint Notice of Stipulated Change to Trial Dates |
| 01/06/2016 | Patent Owner's Response |
| 01/13/2016 | Petitioner's Objections to Exhibits Submitted with Patent Owner's Response |
| 01/29/2016 | Notice of Deposition – Weaver |
| 01/29/2016 | Order Conduct of the Proceeding |
| 02/01/2016 | Corrected Patent Owner Response |
| 02/11/2016 | Transcript of 01-28-2016 Conference Call with Board |
| 03/18/2016 | Notice of Deposition – Turnbull |
| 03/21/2016 | Decision on Patent Owner's Request for Rehearing |
| 03/23/2016 | Petitioner's Reply |
| 03/23/2016 | Updated Exhibit List |
| 03/30/2016 | Patent Owner's Objections to Evidence Submitted with Petitioner's Reply |
| 04/01/2016 | Order - Conduct of the Proceeding |
| 04/04/2016 | Patent Owner's Request for Oral Hearing |
| 04/05/2016 | Petitioner's Request for Oral Hearing |
| 04/05/2016 | Patent Owner's Sur-Reply Brief |
| 04/08/2016 | Petitioner's Motion to Exclude Evidence |
| 04/08/2016 | Updated Exhibit List |
| 04/08/2016 | Patent Owner's Motion to Exclude |
| 04/15/2016 | Transcript of 03-31-2016 Conference Call with Board |
| 04/20/2016 | Petitioner's Opposition to Patent Owner's Motion to Exclude |

[2] CBM2015-00097 has been consolidated with this proceeding.

| 04/20/2016 | Updated Exhibit List |
| 04/20/2016 | Patent Owner's Opposition to Petitioner Motion to Exclude |
| 04/27/2016 | Petitioner's Reply in Support of Motion to Exclude Patent Owner's Evidence |
| 04/27/2016 | Patent Owner's Reply In Support of Motion to Exclude |
| 05/02/2016 | Order - Trial Hearing |
| 05/06/2016 | Conduct of the Proceeding |
| 05/20/2016 | Transcript of 05-06-2016 Conference Call with Board |
| 06/23/2016 | Record of Oral Hearing |
| 08/26/2016 | Final Written Decision |

## Prosecution History for CBM2015-00097

| Date | Document |
| --- | --- |
| 03/04/2015 | Petition for Covered Business Method Review |
| 03/04/2015 | Power of Attorney |
| 03/16/2015 | Notice of Filing Date Accorded to Petition – Defective Petition |
| 03/17/2015 | Response to Notice of Defective Petition |
| 03/20/2016 | Notice Accepting Corrected Petition |
| 03/24/2015 | Power of Attorney |
| 03/24/2015 | Patent Owner's Mandatory Notices |
| 04/07/2015 | Petitioner's Motion for Joinder |
| 05/08/2015 | Order Conduct of the Proceedings |
| 06/08/2015 | Patent Owner's Preliminary Response |
| 07/15/2015 | Petitioner's Supplemental Mandatory Notices |
| 09/01/2015 | Decision - Grant of Motion for Joinder |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>November 1, 2016</u>

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Covered Business Method Patent Review* proceeding identified below:

**STARBUCKS CORPORATION, APPLE, INC., EVENTBRITE INC., and**
**STARWOOD HOTELS &**
**RESORTS WORLDWIDE, INC.,**
**Petitioner,**
**v.**
**AMERANTH, INC.,**
**Patent Owner.**

**Case CBM2015-00091**
**Patent 6,384,850 B1**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Certifying Officer*



**Prosecution History for CBM2015-00091[3]**

| Date | Document |
|------|----------|
| 02/19/2015 | Petition for Covered Business Method Review |
| 02/19/2015 | Power of Attorney |
| 03/18/2015 | Notice of Filing Date Accorded to Petition |
| 03/20/2015 | Power of Attorney |
| 03/20/2015 | Patent Owner's Mandatory Notices |
| 05/14/2015 | Petitioner's Pro Hac Vice Motion |
| 06/15/2015 | Patent Owner's Preliminary Response |
| 07/08/2015 | Decision Petitioner's Motions for Pro Hac Vice Admission - Bernstein |
| 09/14/2015 | Institution Decision |
| 09/14/2015 | Scheduling Order |
| 09/22/2015 | Patent Owner's Request for Rehearing of Institution Decision |
| 10/13/2015 | Joint Notice of Stipulated Change to Trial Dates |
| 11/09/2015 | Decision - Request for Rehearing |
| 01/06/2016 | Patent Owner's Response |
| 01/13/2016 | Petitioner's Objections to Patent Owner's Evidence |
| 01/29/2016 | Order Conduct of the Proceeding |
| 02/01/2016 | Corrected Patent Owner's Response |
| 02/11/2016 | Transcript of 01-28-2016 Conference Call with Board |
| 03/23/2016 | Petitioner's Reply to Patent Owner's Response |
| 03/23/2016 | Updated Notice of Counsel |
| 03/30/2016 | Patent Owner's Objections to Evidence Submitted with Petitioner's Reply Brief |
| 04/01/2016 | Order - Conduct of the Proceeding |
| 04/04/2016 | Patent Owner's Request for Oral Hearing |
| 04/04/2016 | Patent Owner's Sur-Reply Brief |
| 04/08/2016 | Patent Owner's Motion to Exclude |
| 04/08/2016 | Petitioner's Motion to Exclude |
| 04/08/2016 | Petitioner's Request for Oral Argument |
| 04/14/2016 | Decision Granting Institution and Motion for Joinder |
| 04/15/2016 | Transcript of 03-31-2016 Conference Call with Board |
| 04/20/2016 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 04/20/2016 | Petitioner's Opposition to Patent Owner's Motion to Exclude |
| 04/27/2016 | Patent Owner's Reply In Support Of Patent Owner's Motion to Exclude |
| 04/27/2016 | Petitioner's Reply to Patent Owner's Opposition to Motion to Exclude |
| 05/02/2016 | Order - Trial Hearing |
| 05/06/2016 | Conduct of the Proceeding |
| 05/20/2016 | Transcript of 05-06-2016 Conference Call with Board |
| 06/23/2016 | Record of Oral Hearing |

[3] CBM2016-00007 has been consolidated with this proceeding.

| 09/13/2016 | Final Written Decision |

**Prosecution History for CBM2016-00007**

| Date | Document |
|------|----------|
| 10/14/2015 | Petition for Covered Business Method Review |
| 10/14/2015 | Motion for Joinder |
| 10/14/2015 | Power of Attorney |
| 10/14/2015 | Power of Attorney |
| 10/14/2015 | Power of Attorney |
| 11/04/2015 | Notice of Filing Date Accorded |
| 11/13/2015 | Power of Attorney |
| 11/16/2015 | Patent Owner's Mandatory Notices |
| 01/17/2016 | Patent Owner Preliminary Response |
| 04/14/2016 | Decision Granting Institution |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>**November 1, 2016**</u>

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Covered Business Method Patent Review* proceeding identified below:

**STARBUCKS CORPORATION, APPLE, INC., EVENTBRITE INC., and**
**STARWOOD HOTELS &**
**RESORTS WORLDWIDE, INC.,**
**Petitioner,**
**v.**
**AMERANTH, INC.,**
**Patent Owner.**

**Case CBM2015-00099**
**Patent 6,871,325 B1**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Certifying Officer*



**Prosecution History for CBM2015-00099[4]**

| Date | Document |
|------|----------|
| 02/19/2015 | Petition for Covered Business Method Review |
| 02/19/2015 | Power of Attorney |
| 03/18/2015 | Notice of Filing Date Accorded to Petition |
| 03/20/2015 | Power of Attorney |
| 03/20/2015 | Patent Owner's Mandatory Notices |
| 05/14/2015 | Petitioner's Pro Hac Vice Motion |
| 06/15/2015 | Patent Owner's Preliminary Response |
| 07/08/2015 | Decision Petitioner's Motions for Pro Hac Vice Admission - Bernstein |
| 09/14/2015 | Institution Decision |
| 09/14/2015 | Scheduling Order |
| 09/22/2015 | Patent Owner's Request for Rehearing of Institution Decision |
| 10/13/2015 | Joint Notice of Stipulated Change to Trial Dates |
| 11/09/2015 | Decision - Request for Rehearing |
| 01/06/2016 | Patent Owner's Response |
| 01/13/2016 | Petitioner's Objections to Patent Owner's Evidence |
| 01/29/2016 | Order Conduct of the Proceeding |
| 02/01/2016 | Corrected Patent Owner's Response |
| 02/11/2016 | Transcript of 01-28-2016 Conference Call with Board |
| 03/23/2016 | Petitioner's Reply to Patent Owner's Response |
| 03/23/2016 | Updated Notice of Counsel |
| 03/30/2016 | Patent Owner's Objections to Evidence Submitted with Petitioner's Reply Brief |
| 04/01/2016 | Order - Conduct of the Proceeding |
| 04/04/2016 | Patent Owner's Request for Oral Hearing |
| 04/04/2016 | Patent Owner's Sur-Reply Brief |
| 04/08/2016 | Patent Owner's Motion to Exclude |
| 04/08/2016 | Petitioner's Motion to Exclude |
| 04/08/2016 | Petitioner's Request for Oral Argument |
| 04/14/2016 | Decision Granting Institution and Motion for Joinder |
| 04/15/2016 | Transcript of 03-31-2016 Conference Call with Board |
| 04/20/2016 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 04/20/2016 | Petitioner's Opposition to Patent Owner's Motion to Exclude |
| 04/27/2016 | Patent Owner's Reply In Support Of Patent Owner's Motion to Exclude |
| 04/27/2016 | Petitioner's Reply to Patent Owner's Opposition to Motion to Exclude |
| 05/02/2016 | Order - Trial Hearing |
| 05/06/2016 | Conduct of the Proceeding |
| 05/20/2016 | Transcript of 05-06-2016 Conference Call with Board |
| 06/23/2016 | Record of Oral Hearing |

[4] CBM2016-00006 has been consolidated with this proceeding.

| 09/13/2016 | Final Written Decision |

**Prosecution History for CBM2016-00006**

| Date | Document |
|---|---|
| 10/14/2015 | Petition for Covered Business Method Review |
| 10/14/2015 | Motion for Joinder |
| 10/14/2015 | Power of Attorney |
| 10/14/2015 | Power of Attorney |
| 10/14/2015 | Power of Attorney |
| 11/04/2015 | Notice of Filing Date Accorded |
| 11/13/2015 | Power of Attorney |
| 11/16/2015 | Patent Owner's Mandatory Notices |
| 02/03/2016 | Patent Owner Preliminary Response |
| 04/14/2016 | Decision Granting Institution |

Trials@uspto.gov                                                    Paper 44
571-272-7822                                          Entered:  August 26, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE, INC., EVENTBRITE INC., STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., EXPEDIA, INC., FANDANGO, LLC,
HOTELS.COM, L.P., HOTEL TONIGHT, INC., HOTWIRE, INC.,
KAYAK SOFTWARE CORP., OPENTABLE, INC., ORBITZ, LLC, PAPA
JOHN'S USA, INC., STUBHUB, INC., TICKETMASTER, LLC, LIVE
NATION ENTERTAINMENT, INC., TRAVELOCITY.COM LP,
WANDERSPOT LLC, AGILYSYS, INC., DOMINO'S PIZZA, INC.,
DOMINO'S PIZZA, LLC, HILTON RESORTS CORPORATION,
HILTON WORLDWIDE, INC., HILTON INTERNATIONAL CO., MOBO
SYSTEMS, INC., PIZZA HUT OF AMERICA, INC., PIZZA HUT, INC.,
and USABLENET, INC.,
Petitioner,

v.

AMERANTH, INC.,
Patent Owner.
_____

Case CBM2015-00080[1]
Patent No. 6,384,850 B1
_____

Before MEREDITH C. PETRAVICK, RICHARD E. RICE, and
STACEY G. WHITE, *Administrative Patent Judges.*

PETRAVICK, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
Covered Business Method Patent Review
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*

---

[1] CBM2015-00096 has been consolidated with this proceeding.

CBM2015-00080
Patent 6,384,850 B1

# I.  INTRODUCTION

A number of entities including Apple, Inc. ("collectively, Petitioner") filed a Petition (Paper 1, "Pet.") requesting review under the transitional program for covered business method patents of claims 12–16 ("the challenged claims") of U.S. Patent No. 6,384,850 B1 (Ex. 1001, "the '850 patent").  On September 1, 2015, pursuant to 35 U.S.C. § 324, we instituted this trial as to claims 12–16 on one ground of unpatentability — claims 12–16 being unpatentable under 35 U.S.C. § 103 over DeLorme[1].  Paper 13, 30 ("Dec. to Inst.").  We did not institute as to any of the other grounds proposed in the Petition.  *Id.*

Ameranth, Inc. ("Patent Owner") filed a Corrected Patent Owner's Response (Paper 21, "PO Resp.") and Petitioner filed a Reply (Paper 24, "Pet. Reply").  Patent Owner filed a Sur-Reply.  Paper 30, ("PO Sur-Reply").

An oral hearing in this proceeding was held on May 10, 2016.  A transcript of the hearing is included in the record.  Paper 43, ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 12–16 of the '850 patent are unpatentable.

## A.  The '850 Patent

The '850 patent is titled "Information Management and Synchronous Communications System with Menu Generation" and issued on May 7,

---

[1] U.S. Patent No. 5,948,040 (issued Sept. 7, 1999) (Ex. 1024).

CBM2015-00080
Patent 6,384,850 B1

2002, based on Application No. 09/400,413, filed on September 21, 1999.
Ex. 1001, (54), (45), (21), (22).  There are two aspects to the system:  menu generation and synchronous communication.  *See, e.g.*, *id.* at col. 3, ll. 15–23.  The first aspect includes a "desktop software application that enables the rapid creation and building of a menu."  *Id.* at col. 3, ll. 15–17.  Claims 1–11, which are not challenged in this proceeding, are directed to this first aspect.

Claims 12–16, which are challenged in this proceeding, are directed to the second aspect of the system, synchronous communication.  *See id.* at col. 2, ll. 56–62, col. 3, ll. 1–5, col. 10, ll. 57–59.  The '850 patent discloses a synchronous communication system, which includes a computer workstation, a central database, multiple wireless handheld devices, a web server, and a web page.  *Id.* at col. 3, ll. 59–63, col. 6, l. 14.  The synchronous communication system, for example, can be used in the restaurant menu ordering context.  A menu database can be updated on a desktop PC can be synched with the menu databases on the wireless handheld device, web server, and web page by downloading the new menu database.  *Id.* at col. 8, ll. 45–62; *see also* col. 2, ll. 16–28, col. 9, l. 66–col. 10, l. 1.  The menu can then be used to place orders from the wireless handheld devices or through the internet.  *Id.* at col. 12, ll. 1–4.

In another aspect, a communications control module provides a single point of entry for all hospitality applications, on the central database, wireless handheld devices, web server and web pages, to communicate with one another.  *Id.* at col. 9, ll. 21–27, col. 11, ll. 24–30.

> This communications module is a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol. . . .

3

CBM2015-00080
Patent 6,384,850 B1

> The single point of entry works to keep all wireless handheld
> devices and linked [w]eb sites in synch with the backoffice
> server (central database) so that the different components are in
> equilibrium at any given time and an overall consistency is
> achieved.

*Id.* at col. 11, ll. 27–36.

> For example, a reservation made online would be
> automatically communicated to the backoffice server and then
> synchronized with all the wireless handheld devices wirelessly.
> Similarly, changes made on any of the wireless handheld
> devices would be reflected instantaneously on the backoffice
> server, [w]eb pages and the other handheld devices.

*Id.* at col. 2, ll. 26–32; *see also id.* at col. 11, ll. 36–42.

In a further aspect, third parties, such as point-of-sale companies,

affinity program companies, and internet content providers, can integrate

fully with the system through an application program interface. *Id.* at col. 2,

ll. 12–15, col. 11, ll. 15–19.

### B. Illustrative Claim

Claim 12 of the '850 patent is the only independent claim challenged

and is illustrative of the claims at issue. Claim 12 reads as follows:

> 12. An information management and synchronous
> communications system for use with wireless handheld
> computing devices and the internet comprising:
>
> > a. a central database containing hospitality applications
> > and data,
> >
> > b. at least one wireless handheld computing device on
> > which hospitality applications and data are stored,
> >
> > c. at least one [w]eb server on which hospitality
> > applications and data are stored,

4

CBM2015-00080
Patent 6,384,850 B1

      d.  at least one [w]eb page on which hospitality
      applications and data are stored,

      e.  an application program interface, and

      f.  a communications control module,

wherein applications and data are synchronized between the
central [database], at least one wireless handheld computing
device, at least one [w]eb server and at least one [w]eb page;
wherein the application program interface enables integration of
outside applications with the hospitality applications and
wherein the communications control module is an interface
between the hospitality applications and any other
communications protocol.

## C.  Related Proceedings

    Both Petitioner and Patent Owner identify numerous related ongoing

district court proceedings.  Pet. 2–4; Paper 7, 5–6.  The '850 patent is related

to U.S. Patent No. 6,871,325 B1, U.S. Patent No. 6,982,733 B1, and U.S.

Patent No. 8,146,077 B2.  These patents were or are the subject of the

following covered business method patent reviews:

| U.S. Patent No. | Previous CBM Reviews | Pending CBM Reviews |
|---|---|---|
| 6,384,850 B1 | CBM2014-00015 | CBM2015-00091<br>CBM2015-00096 |
| 6,871,325 B1 | CBM2014-00016 | CBM2015-00082<br>CBM2015-00097<br>CBM2015-00099 |
| 6,982,733 B1 | CBM2014-00013 | |
| 8,146,077 B2 | CBM2014-00014<br>CBM2015-00081<br>CBM2015-00095 | |

    In case CBM2014-00015, a Final Written Decision, determining

claims 1–11 to be unpatentable, was issued on March 20, 2015 and is on

appeal to the U.S. Court of Appeals for the Federal Circuit.

CBM2015-00080
Patent 6,384,850 B1

### D. *Patent Owner's Incorporated by Reference of Standing Arguments*

Patent Owner attempts to incorporate certain arguments made in its Preliminary Response (Paper 9) into the Patent Owner's Response.  PO Resp. 1 n.2 ("Patent Owner incorporates herein its Preliminary Response arguments regarding standing and preserves its right to appeal the Board's determination thereof.").  Our Rules prohibit incorporating arguments by reference.  37 C.F.R. § 42.6(a)(3) states:  "[a]rguments must not be incorporated by reference from one document into another document."  Incorporation by reference circumvents our Rule limiting the pages in the Patent Owner response to 80 pages.  *See* 37 C.F.R. § 42.24(b)(2).[2]

Further, the Patent Owner's Response provides no citations or otherwise clearly indicates what argument in the Preliminary Response Patent Owner is attempting to incorporation by reference.  *See* PO Resp. 1 n.2.  The Preliminary Response includes no arguments under a heading concerning "standing" or labeled otherwise.  The only mention of standing is in footnote 1 of the Preliminary Response, which states:  "Petitioner's standing argument merely references CBM2014-00016, and is thus insufficient.  PO submits that Petitioner was required to provide, in the Petition, the basis for standing."  *Id.*  As explained in our Institution Decision, we determined that the Petition sufficiently established that the '850 patent was eligible for covered business method patent review and that Patent Owner's arguments in footnote 1 of the Preliminary Response were unpersuasive.  *See* Paper 13, 11–14.

---

[2] Rule 42.24(b)(2) was amended, effective May 2, 2016.  The Corrected Patent Owner's Response, however, was filed February 1, 2016, prior to that date and, thus, we refer to the prior version of 37 C.F.R. § 42.24(b)(2).

CBM2015-00080
Patent 6,384,850 B1

Inasmuch as Patent Owner may be attempting to incorporate material from other portions of the Preliminary Response, such as the Introduction section, Patent Owner should not expect the Board to search the record and piece together the arguments and evidence necessary to support a standing argument not made in the Patent Owner's Response. *Cf. DeSilva v. DiLeonardi*, 181 F.3d 865, 866–67 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record."); *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 111–12 (2d Cir. 1999) ("Appellant's Brief is at best an invitation to the court to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for appellant.  We decline the invitation.").

Arguments that are not developed and presented in the Patent Owner Response, itself, are not entitled to consideration.  *See* Paper 14, 3. (cautioning Patent Owner "that any arguments for patentability not raised and fully briefed in the response will be deemed waived.").

## II.  ANALYSIS

### A.  Claim Construction

The Board interprets claims of unexpired patents using the broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.300(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation approach).

Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re*

CBM2015-00080
Patent 6,384,850 B1

*Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

### i. *"wireless handheld computing device"*

The challenged claims require "at least one wireless handheld computing device." Ex. 1001, claims 12–16. Patent Owner proposes that the term be construed as "a wireless computing device that is sized to be held in one's hand." PO Resp. 4 (citing Ex. 1032, 24 (district court construing order the term); Ex. 2019 ¶ 27 (Declaration of Dr. Alfred Weaver). Patent Owner also argues "sized to be held in one's hand" requires that the wireless handheld computing device is sized to be held in a single hand and precludes wireless computing devices that are held in two hands. *See* PO Resp. 27–28 ("the [wireless communication unit] in DeLorme is a 'two hand' portable device and is not sized as a wireless handheld device as properly construed"); *id.* at 28 n.14 (arguing that a device that needed a GPS at the time could not be held in a single hand).

Petitioner does not provide an explicit construction of the term "wireless handheld computing device," but argues that the term does not require that the device to be held in a single hand or preclude the device from being held in both hands. Pet. Reply 6.

To resolve the issues of patentability of the claims over DeLorme, it is not necessary for us to determine whether the broadest reasonable

CBM2015-00080
Patent 6,384,850 B1

construction of "wireless handheld computing device" requires that the device be held in a single hand or allows for the device to be held in two hands. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (stating that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"). Regardless, DeLorme explicitly discloses that its wireless communication unit ("WCU") 907 is handheld. Ex. 1024, col. 72, l. 1 ("WCU 907, typically hand-held 906"), col. 72, l. 31 ("handheld devices equipped with GPS 908"); *see also id.* at col. 7, l. 34, col. 16, ll. 40–49 (further describing wireless "handheld" device). Further, DeLorme discloses that WCU 907 could be a personal digital assistant ("PDA") and describes PDAs as "handheld" wireless devices. *Id.* at col. 71, l. 61–col. 72, l. 2, col. 75, ll. 33–45; *see* Ex. 1076, 53:12–25 (testimony of Dr. Weaver indicating that a PDA or smartphone is a wireless hand-held computing device). The '850 patent describes PDAs as an example of a wireless handheld device. Ex. 1001, col. 1, ll. 62–63, col. 13, l. 50. Given this, we determine that it is not necessary for us to determine whether the broadest reasonable construction of "wireless handheld computing device" requires that the device be held in a single hand or allows for the device to be held in two hands.

### ii. *"hospitality applications"*

The challenged claims require "hospitality applications," which are contained in the central database, and are stored on the wireless handheld computing device, Web server, and Webpage. Ex. 1001, claim 12. In the Institution Decision, we construed this term to mean "applications used to perform services or tasks in the hospitality industry." Dec. to Inst. 9. Patent

9

CBM2015-00080
Patent 6,384,850 B1

Owner agrees with this construction. PO Resp. 6–9. Petitioner does not contest this construction in its Reply.

Petitioner proposes that "applications" be construed to mean "sequences of instructions that can be executed on a computer that are designed to help people perform a specific task." Pet. 22. To support its proposed construction, Petitioner cites to the Microsoft Computer Dictionary, 4th ed., which defines "application" as "a program designed to assist in the performance of a specific task" and "program" as "[a] sequence of instructions that can be executed by a computer." Ex. 1034, 4, 10.

Patent Owner does not propose an explicit construction of "applications" but does state that "[i]t is clear from the specification, consistent with the ordinary meaning as would be understood by a POSA, that an application is a software program, not data." PO Resp. 32 n.15. This is consistent with Petitioner's proposed construction, which is based in-part on the definition of application, as a program.

Given the above, we determine that the broadest reasonable interpretation, in light of the specification of the '850 patent, of "hospitality applications" is a sequences of instructions that can be executed on a computer (i.e., a program) that are designed to assist in the performance of a specific task in the hospitality industry.

### iii. "synchronized"

The challenged claims require that "applications and data are synchronized between the central data base, at least one wireless handheld computing device, at least one Web server and at least one Web page." Ex. 1001, claim 12. In the Institution Decision, we construed synchronized to

CBM2015-00080
Patent 6,384,850 B1

mean "made, or configured to make, consistent." Dec. to Inst. 8–9. Patent Owner agrees with this construction. PO Resp. 6. Petitioner does not contest this construction in its Reply.

Absent from this construction is any temporal limitation that requires the devices to be consistent at all times. The absence of a temporal limitation is consistent with the specification of the '850 patent which describes the use of "batch processing that can be done periodically throughout the day to keep multiple sites in synch with the central database." Ex. 1001, col. 2, ll. 17–19; *see also* Tr. 53:17–23.

### iv. *"application program interface" that "enables integration of outside applications with the hospitality applications"*

The challenged claims require an "application program interface" that "enables integration of outside applications with the hospitality applications." Petitioner proposes that application program interface ("API") should be construed to be "a set of routines used by an application program to direct the performance of procedures by the computer's operating system or to communicate with another application program." Pet. 22 (citing Ex. 1034, 5 (Microsoft Computer Dictionary, 4th ed., definition of application program interface)).

Patent Owner proposes that the API is not a generic interface but an API that enable integration of outside applications with the hospitality applications. PO Resp. 7. Patent Owner proposes that "integration" should be construed to mean "combining of different activities, programs, or hardware components into a functional unit." *Id.* (citing Dec. to Inst. 11). Patent Owner also argues that integrating requires "integrating the different applications from **within** the applications themselves." PO Resp. 40.

11

CBM2015-00080
Patent 6,384,850 B1

Given the above, we determine that the broadest reasonable interpretation, in light of the specification of the '850 patent, of an API that enables integration of outside applications with the hospitality applications is a set of routines used by an application program that enables the combining of the outside applications with the hospitality applications into a functional unit by allow them to communicate with each other. We are not persuaded that integrating requires integrating the different applications from *within* the applications themselves. Such a limitation is not consistent with the '850 patent, which does not disclose integrating different applications from *within* the applications themselves.

    v.  *"communications control module" that "is an interface between the hospitality applications and any other communications protocol"*

The challenged claims require "a communications control module . . . wherein the communications control module is an interface between the hospitality applications and any other communications protocol." Ex. 1001, claim 12.

Petitioner proposes that "communications control module" be construed as "a device used as an intermediary in transferring communications to and from the host computer to which it is connected." Pet. 22 (citing Ex. 1034, 7 (Microsoft Computer Dictionary, 4th ed., definition of communications controller); Ex. 1002 ¶¶ 76–78).

Patent Owner proposes that "communications control module" should be construed as "a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol." PO Resp. 5–6 (quoting Ex. 1001, col. 4, ll. 9–13). Patent Owner argues that this is the correct construction because it is how the

communications control module is described in the '850 patent and how a district court construed the limitation in a related proceeding. PO Resp. 5–6 (citing Ex. 1033, 13).

Patent Owner also argues that "communication control module" should be construed in conjunction with the wherein clause "wherein the communications control module is an interface between the hospitality applications and any other communications protocol" to require "a server side software layer that provides an interface between the hospitality applications and communication protocols and which monitors and routes communications between different devices while concurrently using different protocols." PO Resp. 10–11 (citing Ex. 1001, col. 4, ll. 9–13; Ex. 1003, 13; Ex. 2019 ¶¶ 31, 39–42). Patent Owner again argues that this is the correct construction because it is how the communications control module is described in the '850 patent. PO Resp. 10–11.

Petitioner responds that Patent Owner's construction is not required by the language of the claims and improperly imports elements from the specification of the '850 patent into the claims. Pet. Reply 18.

As an initial matter, we are not persuaded by Patent Owner that we should wholesale adopt the construction of "communications control module" from a previous district court infringement action. The standard for claim construction in a district court infringement action is different than the standard applied by the Board. *See In re Morris*, 127 F.3d 1048, 1053–54 (Fed. Cir. 1997). In covered business method patent review proceedings, the Board applies the broadest reasonable construction consistent with the specification. 37 C.F.R. § 42.300(b).

CBM2015-00080
Patent 6,384,850 B1

We determine that the broadest reasonable construction, in light of the specification of the '850 patent, of "a communications control module . . . wherein the communications control module is an interface between the hospitality applications and any other communications protocol" is a device used as an intermediary in transferring communications to and from the host computer to which it is connected, wherein the device is an interface between the hospitality applications and any other communications protocol. This construction is consistent with the plain language of claim 12, which requires the communication control module to be an interface between the hospitality applications and any other communications protocol. This construction is also consistent with the description of the communication control module in the specification of the '850 patent, as a "control program [that] monitors and routes all communications [as] to the appropriate devices" in the '850 patent and as "a single point of entry for all hospitality application to communicate with one another wirelessly or over the Web." Ex. 1001, col. 9, ll. 21–22, col. 11, ll. 24–27.

This construction, unlike Patent Owner's proposed construction, does not import extraneous features from the Specification of the '850 patent into the claims. Although the specification of the '850 patent describes additional features of the communication control module, such as it is "a layer that sits on top of any communication protocol." The plain language of claim 12, does not require the claimed communication control module to have such features. If a feature is not necessary to give meaning to what the inventor means by a claim term, it would be "extraneous," and should not be read into the claim. *Renishaw PLC v. Marposs Societa' per Azioni*, 158

14

F.3d 1243, 1249 (Fed. Cir. 1998); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

We, thus, determine that the broadest reasonable construction, in light of the specification of the '850 patent, of "a communications control module . . . wherein the communications control module is an interface between the hospitality applications and any other communications protocol" is a device used as an intermediary in transferring communications to and from the host computer to which it is connected, wherein the device is an interface between the hospitality applications and any other communications protocol.

### vi.  other terms

Petitioner and Patent Owner propose constructions for various other claim terms. *See* Pet. 21–24; PO Resp. 4–8.  These claim terms, however, need no explicit construction.  *See Vivid Techs., Inc.*, 200 F.3d at 803.

### B.  Unpatentability Over DeLorme

Under 35 U.S.C. § 103, a claim is unpatentable if:

> the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.

The ultimate determination of obviousness under § 103 is a question of law based on underlying factual findings.  *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).  These underlying factual considerations consist of: (1) the "level of ordinary skill in the pertinent art," (2) the "scope and content of the prior art," (3) the "differences between the prior art and the

CBM2015-00080
Patent 6,384,850 B1

claims at issue," and (4) "secondary considerations" of non-obviousness such as "commercial success, long-felt but unsolved needs, failure of others, etc." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham*, 338 U.S. at 17–18).

Petitioner contends that claims 12–16 are unpatentable under 35 U.S.C. § 103 over DeLorme. Pet. 50–62. To support its contention, Petitioner provides explanations as to how the prior art meets each claim element. *Id.* Petitioner also cites the Declaration of Dr. Don Turnbull for support. *See* Ex. 1002 ¶¶ 180–237. Taking into account Patent Owner's argument and evidence (PO Resp. 1–4, 12–80; PO Sur-Reply 1–5), for the reasons discussed below, we determine that Petitioner has shown by a preponderance of the evidence that claims 12–16 are unpatentable under 35 U.S.C. § 103 over DeLorme.

### i. Overview of DeLorme

DeLorme is titled "Travel Reservation Information and Planning System," and issued on September 7, 1999, from an application filed on February 6, 1997. Ex. 1024, (54), (45), (22).

DeLorme discloses a computerized travel reservation information and planning system ("TRIPS") which generates travel plan information in the form of a "map ticket," in response to inquiries from consumers. *Id.* at Abstract. Figure 2 of DeLorme is reproduced below.

16

CBM2015-00080
Patent 6,384,850 B1



FIG 2

    Figure 2, reproduced above, is a block diagram of TRIPS.  *Id.* at col.

12, ll. 62–65.  The Interface and Interaction Bus at block 209 processes

consumer inquiries for planning travel.  *Id.* at col. 3, ll. 15–41.  The system

receives inquiries from consumers, as illustrated by block 205, for travel

related data (*id.* at col. 30, l. 66–col. 31, l. 14) and outputs, as illustrated by

block 227, digital displays, such as the preferred "map ticket," or electronic

communications containing such data, such as reservations and/or tickets for

accommodations or events (*id.* at col. 31, ll. 42–58; Fig. 1B).  TRIPS

includes subsystems (e.g., topical subsystem 213) that have geographical,

topical, temporal, and accounting data, organized in a relational database,

which is managed by software.  *Id.* at col. 17, ll. 7–13, col. 32, ll. 1–7; col.

30, ll. 58–65.  TRIPS also includes provider input/output 231 for third-party

providers of travel information and services.  *Id.* at col. 31, ll. 42–51.

CBM2015-00080
Patent 6,384,850 B1

DeLorme discloses multiple embodiments of TRIPS. In one embodiment, a user makes travel plans using TRIPS software on a desktop PC, which is connected to the Internet to provide access to updated TRIPS information and functions and communication with third-party providers. *Id.* at col. 13, ll. 48–52. Once installed, the TRIPS software interacts with online TRIPS services, and TRIPS map data, functions, and topical travel information can be updated and online reservations and ticket buys can be made. *Id.* at col. 14, ll. 9–42; *see also* col. 10, ll. 10–18, col. 10, ll. 22–32.

> Alternatively, all TRIPS functions, data and services can be provided entirely online (i.e.[,] without significant standalone software components)—for example, from a central TRIPS service bureau, (or by means of a TRIPS Internet World Wide Web Site). Such purely online TRIPS embodiments can be implemented utilizing recent advances in distributed applications, "agents" or online "applets" developed in Java, or equivalent computer languages—plus other state-of-the-art software enhancements for online or Internet usage.

*Id.* at col. 14, ll. 43–52.

DeLorme discloses that TRIPS can also work with hardware other than a desktop PC, such as "network work stations; . . . terminals linked to a central server, . . . or handheld personal digital assistant (PDA) portable computer devices typically equipped with a wireless communications and/or user location, e.g., Global Positioning System (GPS) capabilities." *Id.* at col. 14, l. 66–col. 15, l. 5; *see also id.* at col. 7, ll. 30–35, col. 16, ll. 41–49, col. 75, ll. 38–45 (describing other compact portable devices).

DeLorme discloses a "portable TRIPS embodiments" which can be used with the desktop PC setups. *Id.* at col. 71, ll. 61–962, col. 72, ll. 20–23. In this embodiment, a TRIPS user can make advanced travel plans and arrangements on a desktop PC and then transfer advanced travel plans to

18

CBM2015-00080
Patent 6,384,850 B1

TRIPS goods and server providers and wireless communication units ("WCU") to use the advance travel plan on a trip. *Id.* at col. 72, ll. 44–61.; *see also id.* at col. 12, ll. 10–16, col. 15, ll. 40–46, col. 16, ll. 37–55, col. 18, ll. 35–42, col. 72, ll. 26–36. The travel plans includes not only maps and travel information, but also tickets, reservations and other special offers for goods/services. *Id.* at col. 7, ll. 30–32; col. 17, ll. 18–36; *see also* Fig. 1B-3 (depicting advanced travel plans, which include a reservation confirmation for a restaurant).

The advanced travel plans on the WCU can be used for "in the field operations" such "as text/audio directions; GPS waypoint guidance; claiming, confirmation and/or verification of discount offers; selected user notes on scheduled events of interest (EOIs); even sounding an alarm . . . and various other timely, topical, locations and transactional travel information chores." *Id.* at col. 16, ll. 49–55. The WCU can also be used for making reservations on the go, which then "can be memorized in the TRIPS user's WCU 907 and/or transferred to, or put 'on file' with, the TRIPS online service Provider 904." *Id.* at col. 72, ll. 55–61.

### ii. Independent Claim 12

1. *"[a]n information management and synchronous communications system for use with wireless handheld computing devices and the internet"*

Petitioner contends that DeLorme's TRIPS discloses an information management and synchronous communication system for use with wireless handheld computing devices and the internet. Pet. 50–52 (citing Ex. 1002 ¶¶ 184–187). Patent Owner does not specifically dispute this contention.

After review of Petitioner's evidence and analysis, we are persuaded by that evidence and analysis that TRIPS is an information management and

CBM2015-00080
Patent 6,384,850 B1

synchronous communications system for use with wireless handheld computing devices and the internet. *See* Pet. 50–52. We, thus, determine that DeLorme discloses an information management and synchronous communications system for use with wireless handheld computing devices and the internet.

    2. *"a central database containing hospitality applications and data"*

        Petitioner contends that TRIPS's relational databases for storing hospitality data and the software for managing the data meets the claimed central database containing hospitality applications and data. Pet. 50–52 (citing Ex. 1002 ¶¶ 184–187). Patent Owner does not specifically dispute this contention, but does in another context argues that TRIPS is not a hospitality application (PO Resp. 40–41).

        After review of Petitioner's evidence and analysis, we are persuaded by that evidence and analysis that TRIPS's relational databases and software meets the claimed central database containing hospitality applications and data. *See* Pet. 50–52. As discussed above, the broadest reasonable construction of "hospitality application" is a sequence of instructions that can be executed on a computer (i.e., a program) that are designed to help people perform a specific task in the hospitality industry. DeLorme discloses, for example, that TRIPS processes user's inquires through a set of operations or sequences of functions that retrieve travel information, including reservations, from relational databases in TRIPS Subsystems. Ex. 1024, col. 17, ll. 7–13. This retrieval of travel information is a specific task in the hospitality industry.

CBM2015-00080
Patent 6,384,850 B1

We are persuaded by Petitioner's evidence and analysis that the
claimed central database containing hospitality applications and data, when
hospitality application is given its broadest reasonable construction, is met
by TRIPS's relational databases for storing hospitality data and the software
for managing the data. We, thus, determine that DeLorme discloses an
application program interface that enable integration of outside applications
with the hospitality applications.

### 3. "at least one wireless handheld computing device on which hospitality applications and data are stored"

Petitioner contends that WCU 907 of the portable TRIPS embodiment
meets the claimed wireless handheld computing device on which hospitality
applications and data are stored. Pet. 51, 53, Pet. Reply 6–10.

Patent Owner disagrees. PO Resp. 27–40. In addition to arguing that
the WCU 907 is not handheld (*id.* at 27–28, n.14), Patent Owner argues that
the WCU does not store an application and data used to perform services or
tasks in the hospitality industry. *Id.* Patent Owner's alleges that a
hospitality application must do more than exchange and store hospitality
data from a server. *Id.* According to Patent Owner, hospitality applications
and data must be locally resident (*see id.* at 28–30) and the applications must
"perform local operations via application software resident on the device
itself" (*id.* at 31).

We are persuaded by Petitioner's evidence and analysis that WCU
907 meets this claim element. *See* Pet. 51, 53, Pet. Reply 6–10. First, as
discussed above, WCU 907 is a wireless handheld computing device. *See*
Pet. Reply 6.

21

CBM2015-00080
Patent 6,384,850 B1

Second, giving "hospitality application" is given its broadest reasonable construction, WCU 907 has a hospitality applications stored thereon. As discussed above, the broadest reasonable construction of "hospitality application" is a sequence of instructions that can be executed on a computer (i.e., a program) that are designed to help people perform a specific task in the hospitality industry. DeLorme discloses that WCU is programmed to transmit data to and receive data back from a server. Ex. 1024, col. 72, ll. 13–19. As Patent Owner states, "the WCU is 'programmed' to transmit **data** to the server side and to receive **data** back from the server side (Exh. 1024 75:59 et seq.) . . . the server 'communicates with' pre-programmed software on the WCU." (PO Resp. 18 (citing Ex. 1024, col.75, ll. 59–65)) and an "application is a software program" (*id.* at 32 n.15). *See also* Pet. Reply 7. Further, DeLorme discloses that the WCU is programmed to perform other tasks, such as voice recognition of user inputs (Ex. 1024, col. 76, ll. 46–59) and processing data from a GPS receiver (*id.* at col. 75, ll. 46–59). DeLorme, thus, discloses a wireless handheld computing device on which hospitality applications are stored.

Third, WCU 907 has a hospitality data stored thereon. DeLorme discloses that a TRIPS user can make travel plans and arrangements on a desktop TRIPS setup, as depicted in Fig. 1A, and then transfer the output to TRIPS providers 904 "and/or . . . memory at 912 of an appropriate WCU 907." *Id.* at col. 72, ll. 44–61.; *see also id.* at col. 18, ll. 35–42, col. 72, ll. 26–36, (also disclosing that TRIPS output can be electronically transferred to WCU 907). The updated travel information is "committed to memory at [TIPS providers] 904 or [WCU] 907." *Id.* DeLorme, thus, discloses a wireless handheld computing device on which hospitality data are stored.

CBM2015-00080
Patent 6,384,850 B1

Patent Owner arguments that WCU 907 does not meet this claim element is not commensurate with the scope of the claim. When given its broadest reasonable interpretation this claim element does not require that the WCU 907 stores a hospitality application that does more than exchange data with a server nor does it require that the hospitality application and data be locally resident. Pet. Reply 7.

We are persuaded by Petitioner's evidence and analysis that WCU 907 meets the claimed wireless handheld computing device on which hospitality applications and data are stored. We, thus, determine that DeLorme discloses a wireless handheld computing device on which hospitality applications and data are stored. [3]

### 4. "at least one Web server on which hospitality applications and data are stored" and "at least one Web page on which hospitality applications and data are stored."

Petitioner contends that TRIPS includes a Web server on which hospitality applications and data are stored and a Web page on which hospitality applications and data are stored. Pet. 53–54 (citing Ex. 1002 ¶¶ 194–199). Patent Owner does not specifically dispute this contention.

After review of Petitioner's evidence and analysis, we are persuaded that TRIPS incudes a Web server on which hospitality applications and data are stored and a Web page on which hospitality applications and data are stored.

---

[3] Patent Owner also makes arguments directed "internet-only" embodiment DeLorme, which would include java applets installed on the WCU. PO Resp. 32–40; *see* Pet. Reply 8–11. We do not reach these arguments because as explained in analysis WCU 907 of the portable TRIPS embodiment meets the claimed limitation.

DeLorme discloses an embodiment in which all TRIPS function, data and service can be provided entirely online through, for example, a TRIPS Internet World Wide Web Site.  Ex. 1024, col. 14, ll. 43–47; *see also id.* at col. 51, ll. 13–22 (describing an Internet TRIPS).  The '850 patent, itself, discloses that the World Wide Web was an existing and known client-server system, that distributes Hypertext Mark-up Language ("HTML") documents for viewing in browsers on client computers.  Ex. 1001, col. 12, ll. 4–61.  DeLorme further discloses that online TRIPS embodiments can use distributed applications, agents, or online applets developed in Java.  *Id.* at col. 14, ll. 47–52.

We are persuaded by Petitioner's evidence and analysis that the online TRIPS embodiment disclose a Web server on which hospitality applications and data are stored and a Web page on which hospitality applications and data are stored.  We, thus, determine that DeLorme discloses a Web server on which hospitality applications and data are stored and a Web page on which hospitality applications and data are stored.

### 5. *"an application program interface" and "wherein the application program interface enables integration of outside applications with the hospitality applications"*

Petitioner contends that TRIPS's Provider Input/Output 231 meets the claimed API that enable integration of outside applications with the hospitality applications.  Pet. 54–55, 57; Pet. Reply 14–15.  According to Petitioner, TRIPS uses Provider Input/Output 231 to communicate and exchange data with outside applications.  Pet. Reply 15.

Patent Owner disagrees.  PO Resp. 40–42.  First, Patent Owner argues that this claim element requires that the outside applications be integrated

with the hospitality application "by integrating the different applications from **within** the applications themselves" and Provider Input/Output 231 does not integrate from within the applications themselves. *Id.* at 40 (emphasis original). Second, Patent Owner argues that TRIPS is not a hospitality application and, thus, there is not hospitality application to interface with the third-party providers. *Id.* at 40–41. According to Patent Owner, the claim element also preclude the third-party provider applications from being hospitality applications. *Id.* at 41–42.

We are persuaded by Petitioner's evidence and analysis that the claimed API when it is given the broadest reasonable construction, is met by Provider Input/Output 231. As discussed above, the broadest reasonable construction of "an application program interface . . . wherein the application program interface enables integration of outside applications with the hospitality applications" is a set of routines used by an application program that enables the combining of the outside applications with the hospitality applications into a functional unit by allow them to communicate with each other. DeLorme discloses that "TRIPS 203 further offers/brokers Provider Input/Output 231 to and from third-party providers of travel information and services—optimally in real time online." Ex. 1024, col. 31, ll. 42–44; *see also* Ex. 1024, col. 63, ll. 61–67 (further disclosing that TRIPS provides and brokers tickets, reservations, and other goods and services from third-party providers, using the Accounting Subsystem). DeLorme, thus, discloses an application program that enables the combining of the outside applications with the hospitality applications into a functional unit by allowing them to communicate with each other.

CBM2015-00080
Patent 6,384,850 B1

Patent Owner's argument that Provider Input/Output 231 does not meet this claim element is not commensurate with the scope of the claim. First, the claim does not require an API that integrates the applications from within applications. *See* Pet. Reply 14. Indeed, the '850 patent does not describe such an application program interface. Second, claim 12 does not preclude the outside applications from also being hospitality applications. *See* Pet. Reply 14–15. Finally, as discussed above with regards to the other claim elements, we have determined that TRIPS is a hospitality application.

We are persuaded by Petitioner's evidence and analysis that the claimed API, when it is given the broadest reasonable construction, is met by DeLorme's Interface and Interaction Bus 209. We, thus, determine that DeLorme discloses an API that enable integration of outside applications with the hospitality applications.

*6. "a communications control module" and "wherein the communications control module is an interface between the hospitality applications and any other communication protocol"*

Petitioner contends that the TRIPS's Interface and Interaction Bus 209 meets the claimed a communications control module that is an interface between the hospitality applications and any other communication protocol, except that DeLorme does not explicitly disclose that the communications control module is an interface between the hospitality applications and any other communication protocol. Pet. 50–51, 55–56 (citing Ex. 1002 ¶¶ 203–209). Petitioner argues, however, that a person of ordinary skill in the art would understand that because the Interface and Interaction Bus 209 is an interface between the retail consumer users and the various subsystems that comprise TRIPS and because the retail consumer users use different types of

26

CBM2015-00080
Patent 6,384,850 B1

devices, which would use different communication protocols, it would have been obvious to a person of ordinary skill to configure the Interface and Interaction Bus 209 to be an interface for different communication protocols. *See* Pet. 55–56, Pet. Reply 16–17.

Patent Owner argues that DeLorme's Interface and Interaction Bus 209 does not meet the claimed communications control module, when that term is construed according to Patent Owner's proposed construction, because it is

> (1) not a server-side software layer, (2) does not provide an interface between hospitality applications and communication protocols (3) does not monitor and route communications to different devices while concurrently using different protocols and (4) is not "a software layer that []sits on top of a communications protocol and acts as an interface between hospitality applications and the communications protocol" as stated by the specification.

PO Resp. 43–44.

We are persuaded by Petitioner's evidence and analysis that the claimed communication control module, when it is given the broadest reasonable construction, would have been obvious in view of DeLorme's Interface and Interaction Bus 209. As discussed above, the broadest reasonable construction of "a communications control module . . . wherein the communications control module is an interface between the hospitality applications and any other communications protocol" is a device used as an intermediary in transferring communications to and from the host computer to which it is connected, wherein the device is an interface between the hospitality applications and any other communications protocol. DeLorme describes the Interface and Interaction Bus 209 as a device that gives retail

27

users access to TRIPS Subsystem (Ex. 1024, col. 13, ll. 15–41) and depicts it as an interface between retail users 205 and third-party providers at 231 and TRIPS Subsystems 213, 217, 221, and 223 (*id.* at Fig. 9). DeLorme also describes that Main Menu 413 and Interaction Bus 414, which corresponds to the Interface and Interaction Bus 209, as coordinating the responses to alternate input means embedded in specialized TRIPS field or in-vehicle embodiments. Ex. 1024, col. 37, ll. 54–65. DeLorme, thus, discloses an intermediary in transferring communications to and from the host computer to which it is connected.

DeLorme does not explicitly disclose that the Interface and Interaction Bus 209 is an interface between different communication protocols. DeLorme, however, does describe the Interface and Interaction Bus 209 interfacing with different devices. *See, e.g.*, Ex. 1024, col. 14, l. 66–col. 15, l. 14 (describing different alternative end-user hardware platforms). The different devices would use different communication protocols. *See id.* at col. 37, ll. 54–56, (describing simplified input or remote queries), col. 14, l. 66–col. 15, l. 13 (describing internet based access); PO Resp. 9 ("third party systems such as POS system devices "clearly which operate with different protocols"); Ex. 1076, 176:17–177:12 (testimony of Dr. Weaver indicating that different devices operate with different protocols). In order for Interface and Interaction Bus 209 to interface with devices using different communication protocols, Interface and Interaction Bus 209 would be configured to interface with different communication protocols or it would be obvious for it to be configured as such, because it is advantageous for TRIPS to interface with different devices. *See* Ex. 1002 ¶ 209.

CBM2015-00080
Patent 6,384,850 B1

Patent Owner's argument that DeLorme's Interface and Interaction Bus 209 fails to meet this claim element is based upon its proposed construction (*see* PO Resp. 43–44), which we did not adopt.  For example, Patent Owner' argues that Interface and Interaction Bus 209 is not a software layer that sits on top of a communication protocol.  *Id.*  This argument is not persuasive because it is not commensurate with the scope of claim 12, when given its broadest reasonable construction.  *See* Pet. Reply 17–18.

We are persuaded by Petitioner's evidence and analysis that the claimed communication control module, when it is given the broadest reasonable construction, would have been obvious in view of DeLorme's Interface and Interaction Bus 209.  We, thus, determine that DeLorme's TRIPS system teaches the claimed communications control module that is an interface between the hospitality applications and any other communications protocol.

### 7.  *"wherein applications and data are synchronized between the central [database], at least one wireless handheld computing device, at least one Web server and at least one Web page"*

Petitioner contends that TRIPS teaches that applications and data are synchronized between the central database, at least one wireless handheld computing device, at least one Web server, and at least one Web page.  Pet. 56–57; Pet. Reply 1–13.  According to Petitioner, the claim does not preclude synchronizing application by synchronizing the data used by those application and TRIPS discloses synchronizing the data used by those applications.  Pet. Reply 1–13.

CBM2015-00080
Patent 6,384,850 B1

Patent Owner disagrees.  PO Resp. 13–17.  According to Patent Owner, DeLorme does not teach synchronizing applications between a wireless handheld computing device or any other device.  *Id.* at 13.  Patent Owner states that "[t]here is no teaching or suggestion in DeLorme of making ***applications*** consistent between a wireless handheld computing device and any of the other components of this limitation."  *Id.*  According to Patent Owner, this claim element requires more than data synchronization, — it requires "communication of application software code between the TRIPS host and WCU."  *Id.* at 14–19.

We are persuaded by the Petitioner that the claim element does not preclude synchronizing application by synchronizing the data used by those application and TRIPS discloses synchronizing the data used by those applications.  *See* Pet. 56–57; Pet. Reply 1–6; Ex. 1002 ¶ 83.  DeLorme contains numerous disclosures of transmitting updated data and function to various devices, including to WCU 907.  For example, DeLorme discloses that a TRIPS user can communicate and transfer data with other TRIPS systems, users, service provides, external databases, a central communication bureau, or other online services.  Ex. 1024, col. 10, ll. 19–33; *see also id.* at col. 10, ll. 47–58 (disclosing that TRIPS output can be downloaded to a PDA or GPS, an accommodations provider, other TRIPS users),  col. 14, ll. 24–26  (a user can "download updated TRIPS map data, *functions* and timely, topical travel information" (emphasis added)), col. 15, ll. 40–46, col. 16, ll. 5–11 ("TRIPS output also includes the online transmission of the user's reservation requests, ticket purchases . . . directly to third-party providers"), col. 16, ll. 40–59 ("the TRIPS user can transfer all or part of the output from a TRIPS travel planning session into a PDA . . .

[or] other compatible, small and highly portable computer devices"), col. 18, ll. 25–32, col. 31, ll. 53–56, col. 73, ll. 46–52, col. 72, ll. 12–17, col. 74, ll. 45–50.  In particular, DeLorme discloses that TRIPS travel plans, including "map ticket" outputs, can be partly or entirely transferred from a desktop PC to the memory of the WCU 907 and to third-party providers to facilitate later inquires en route (*id.* at col. 72, ll. 20–37) and also transferred to the relevant TRIPS provider to be put "on file" for further assistance during the actual trip (*id.* at col. 72, ll. 50–67).  DeLorme, thus, discloses that applications and data are synchronized between the central database, at least one wireless handheld computing device, at least one Web server, and at least one Web page.  *See* Ex. 1002 ¶¶ 210–212.

Patent Owner argument that DeLorme does not disclose synchronizing *applications* between a wireless handheld computing device or any other device, because DeLorme does not discloses communication of application software code between the TRIPS host and WCU is not commensurate with the scope of the claim.  The claim element does not require that the WCU's hospitality application be synchronized by the transmission of application software code.  *See* Ex. 1002 ¶ 83.  Indeed, the specification of the '850 patent does not disclose such.  As Patent Owner, itself, point out, the '850 patent discloses an example of synchronizing applications by transmitting an updated menu to the wireless handheld device.  PO Resp. 18.  The '850 patent describe the updated menu as "menu database" and describes the transmitting as downloading the database to the wireless handheld device and Web page.  Ex. 1001, col. 8, ll. 45–59, col. 8, l. 66–col. 10, l. 1.  This description of transmitting an updated menu database to a wireless handheld computing device is akin to DeLorme's

CBM2015-00080
Patent 6,384,850 B1

description of transmission of TRIPS advances travel planning information
to the WCU 907.

We are persuaded by Petitioner's evidence and analysis that
DeLorme, thus, discloses that applications and data are synchronized
between the central database, at least one wireless handheld computing
device, at least one Web server, and at least one Web page.

### 8.  Conclusion as to Obviousness of Claim 12

We determine that Petitioner has shown by a preponderance of the
evidence that claim 12 is unpatentable under 35 U.S.C. § 103.  In making
our determination and as discussed below, we considered Patent Owner's
arguments and evidence of secondary indicia of non-obviousness, but are not
persuaded by such that claim 12 is patentable over DeLorme.

### iii.  Claim 13

Claim 13 depends from claim 12 and additionally requires that

> the communications control module provides a single point of
> entry for all hospitality applications and wherein the single
> point of entry allows the synchronization of at least one
> wireless handheld computing device and at least one Web page
> with the central database so that at least one handheld device, at
> least one Web page and central database are consistent.

Ex. 1001, col. 16, ll. 23–30.

Petitioner contends that the Interface and Interaction Bus 209 is a
single point of entry for all hospitality applications.  Pet. 59–60 (citing Ex.
1002 ¶ 221); Pet. Reply 19–20.

Patent Owner argues that the Interface and Interaction Bus 209 is not
a single point of entry for all hospitality applications for many of the same

CBM2015-00080
Patent 6,384,850 B1

reasons as discussed above with regards to the communication control module claim element.  PO Resp. 46–48

For the same reasons as discussed above with regards to the communication control module claim element, we are persuaded by the Petitioner that DeLorme's Interface and Interaction Bus 209 is a single point of entry or a center of communication for all hospitality applications.  *See* Pet. 59–60; Pet. Reply 19–20; *see also* Ex. 1024, col. 31, ll. 15–41, col. 37, ll. 54–67, Figs. 2, 4 (disclosing and depicting that the Interface and Interaction Bus 209 coordinating communication between devices of the TRIPS system).

We determine that Petitioner has shown by a preponderance of the evidence that claim 13 is unpatentable under 35 U.S.C. § 103.  In making our determination and as discussed below, we considered Patent Owner's arguments and evidence of secondary indicia of non-obviousness, but are not persuaded by such that claim 13 patentable over DeLorme.

*iv.  Claims 14 and 15*

Claim 14 depends from claim 13 and additionally requires that "wherein information entered on at least one Web page and transmitted over the internet is automatically communicated to the central database and at least one wireless handheld computing device."  Ex. 1001, col. 16, ll. 31–36. Claim 15 also depends from claim 13 and additionally requires that "information entered on at least one wireless handheld computing device is automatically communicated to the central database and at least one Web page."  *Id.* at col. 16, ll. 37–41.

CBM2015-00080
Patent 6,384,850 B1

Petitioner contends that because the TRIPS database maintains all travel itinerary information, information entered on a TRIPS webpage on a user's PC would automatically be entered into the TRIPS database and would automatically be reflected in future downloads of that itinerary, including downloads to a wireless handheld device and vice versa. Pet. 60–61 (citing Ex. 1002 ¶¶ 227, 232); Pet. Reply 18–19, 20–21.

Patent Owner argues that automatic communication requires that the communication be entirely without human action. *See* PO Resp. 8, 49. According to Patent owner, any future downloading would require human action and thus the communication is not automatic. *Id.* at 50.

We are persuaded by Petitioner that TRIPS meets these claim elements. *See* Pet. 60–61, 18–19, 20–21. As explained by Petitioner's declarant Dr. Turnbull, providing updated information to TRIPS's database from a wireless handheld device or web page, which may then be reflected in future downloads of that information to a wireless handheld device or web page meets these claim elements. *See* Ex. 1002 ¶¶ 224–227. We agree with Petitioner that "even though DeLorme may download an itinerary to a WCU and/or a desktop PC in response to user action, that user action enables the updated itinerary to be sent without any explicit request for an update by the user (i.e., in an automated way)." Pet. Reply 20–21.

Patent Owner's argument that the automatic communication requires that the communication be entirely without human action is unreasonable in light of the '850 patent's specification. The '850 patent discloses an "automated download procedure," which transfers a menu database to the wireless handheld device by a user clicking on a "File>Download Database"

34

CBM2015-00080
Patent 6,384,850 B1

or a "Download Database icon" (Ex. 1001, col. 8, ll. 51–55; col. 9, l. 67–col. 10, l. 1.).

We determine that Petitioner has shown by a preponderance of the evidence that claims 14 and 15 are unpatentable under 35 U.S.C. § 103. In making our determination and as discussed below, we considered Patent Owner's arguments and evidence of secondary indicia of non-obviousness, but are not persuaded by such that claims 14 and 15 are patentable over DeLorme.

*v. Claim 16*

Claim 16 depends from claim 12 and additionally requires that "the applications and data are synchronized by digital data transmission between the central database, at least one wireless handheld computing device, at least one Web server and at least one Web page." Ex. 1001, col. 16, ll. 42–47.

Petitioner argues that the communication between the TRIPS central database, the wireless computing handheld device, and the Web server and the Web page are inherently digital or obviousness. Pet. 61–62 (citing Ex. 1002 ¶¶ 233–237; Ex. 1024 (col. 72, ll. 7–15). Patent Owner makes no argument specifically directed to the additional limitation required by claim 16. *See* PO Resp. 46–50 (arguing that the dependent claims contain additional elements distinguish them from the prior art, but not addressing the additional elements of dependent claim 16).

After review of Petitioner's evidence and analysis, we are persuaded by that evidence and analysis that TRIPS's applications and data are synchronized by digital data transmission between the central database, at

35

least one wireless handheld computing device, at least one Web server and at least one Web page. *See* Pet. 61–62. DeLorme's contains numerous disclosures that the TRIPS output is in a digital form and that the device in TRIPS are digital devices. *See, e.g.*, Ex. 1024, col. 7, l. 66–col. 8, l. 3, col. 12, ll. 9–13, col. 24, ll. 61–66.

We determine that Petitioner has shown by a preponderance of the evidence that claim 16 is unpatentable under 35 U.S.C. § 103. In making our determination and as discussed below, we considered Patent Owner's arguments and evidence of secondary indicia of non-obviousness, but are not persuaded by such that claim 16 is patentable over DeLorme.

### vi. Patent Owner's Secondary Consideration Arguments

Patent Owner contends that objective factors including praise, awards, commercial success, copying, failure of others, and licensing confirm the non-obviousness of all challenged claims of the '850 patent. PO Resp. 50–80; PO Sur-Reply 1–5. We have fully considered Patent Owner's arguments and evidence concerning objective indicia of non-obviousness, but are not persuaded that they outweigh the Petitioner's showing of obviousness.

### 1. Nexus

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17–18. To be relevant, evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). Thus, to be accorded substantial weight, there must be a nexus between the merits of the claimed

CBM2015-00080
Patent 6,384,850 B1

invention and the evidence of secondary considerations. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining nonobviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

Patent Owner contends that the invention of claims 12–16 are coextensive with its 21st Century Restaurant™ ("21CR") system and, thus, a nexus is established between the merits of the claimed invention and its evidence of praise, awards, commercial success, copying, failure of others, and licensing. PO Resp. 53–63 (citing *Teva Pharm., Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013) ("There is a 'presumption of a nexus' when a product is 'coextensive' with a patent claim."). Patent Owner argues that Figures 1 and 6 of the '850 patent, as original filed in the patent application, an annotated brochure of the 21CR system ("the 21CR Product Brochure"), and other articles and evidence establish that its 21CR system is coextensive with the invention of claims 12–16. PO Resp. 53–63.

Petitioner disagrees that the invention of claims 12–16 are coextensive with the 21CR system, because claims 12–16 have no elements directed to the menu wizard. Pet. Reply 21–23. According to Petitioner, the inventor of the '850 patent testifies that it was the menu wizard that was the "breakthrough." *Id.* at 21 (quoting Ex. 1012, 541).

We are not persuaded that the 21CR system is coextensive with the invention of claims 12–16. As pointed out above, there are two aspects to the system disclosed by the '850 patent: menu generation and synchronous communication. *See* Ex. 1001, col. 3, ll. 15–23. The first aspect includes a

37

"desktop software application that enables the rapid creation and building of a menu" (*id.* at col. 3, ll. 15–17) (i.e., a menu wizard) and is claimed in claims 1–11, which are not challenged in this proceeding. Claims 12–16, which are challenged in this proceeding, are directed to the second aspect of the system, synchronous communication and is devoid of elements directed to the menu wizard. *See id.* at col. 2, ll. 56–62; col. 3, ll. 1–5; col. 10, ll. 57–59.

Figure 6, as originally filed, depicts an alleged screen shot of a communications control window of the 21CR system and Figure 1, as originally filed, depicts a screen shot of the menu wizard the system. Ex. 1010, 55, 60; *see also* Ex. 1001, col. 4, l. 31–35, col. 4, ll. 49–51, col. 6, ll. 9–21, col. 9, ll. 29–40. Patent Owner alleges that the screen shots are of a live or operational 21CR system (PO Res. 54), but does not provide any evidence of such. Further, contrary to Patent Owner's argument that the 21CR system is coextensive with the invention of claims 12–16, originally filed Figure 1 depicts the menu wizard. Claims 12–16 are devoid of elements directed to the menu wizard. Figures 1 and 6, thus, do persuasively demonstrated that the 21CR system is coextensive with the invention of claims 12–16.

The 21CR Product Brochure contains annotations that purport to show that the 21CR system is coextensive with the invention of claims 12–16. Ex. 2024, 4–5. Based upon the annotated 21CR Product Brochure, Dr. Weaver testifies that there is a nexus between the merits of claims 12–16 (i.e., "synchronization, integration and consistency") and the 21CR system. *See* Ex. 2019 ¶¶ 102–105. The annotations, however, were not made by Dr. Weaver but by Patent Owner's counsel (Pet. Reply 22–23) and Dr. Weaver's

CBM2015-00080
Patent 6,384,850 B1

testimony indicates that he relied upon the annotations. *See* Ex. 2019 ¶ 105

("The annotated brochure further shows the correspondence of 21CR to

elements of specific challenged claims."). The annotations are merely

attorney argument unsupported by evidence and, thus, not persuasive. *In re*

*Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997) (stating that attorney

arguments and conclusory statements that are unsupported by factual

evidence are entitled to little probative value).

Patent Owner argues that "Dr. Weaver reviewed all of Ameranth's

'annotations' and confirmed them to be accurate and correct, again a normal

review activity of an expert." PO Sur-Reply 3. To the contrary, Dr.

Weaver's cross-examination testimony indicates that he relied upon

representations from Patent Owner's counsel that the '850 patent were based

on the 21CR product and didn't perform any independent investigation.

> Q. Okay. So is it fair to say that, as far as your analysis
> goes, you relied on representations from counsel that the '850
> and '325 patents were based on the 21CR products and you
> didn't perform an independent investigation as to whether that's
> correct?
> A. Correct.

Ex. 1076, 219:11–20; *see also id.* at 216:3–219:10, 229:2–8. The 21CR

Product Brochure and Dr. Weaver's testimony, thus, does not persuasively

demonstrate that the 21CR system is coextensive with the invention of

claims 12–16.

Further, as discussed in detail below, other evidence provided by the

Patent Owner suggests that the 21CR system is not coextensive with the

invention of claims 12–16. For example, Patent Owner states that

HostAlert, for which it won an award, is "a subset of the 21st Century

Restaurant™ system/technology, inclusive of waitlisting, table management

CBM2015-00080
Patent 6,384,850 B1

and reservations, but not including food and drink ordering." PO Resp. 69 (citing Ex. 2027). This indicates that the 21CR system includes features than additional to those of the challenged claims, such as matching a waiting party in a database to a newly available table in a restaurant, based on party size and longest wait-time or adding a customer to a sister restaurants waiting list. *See* Ex. 2027, 6.

In addition to arguing that the 21CR system is coextensive with the claims 12–16, Patent Owner argues that the evidence of secondary considerations has a nexus with the "synchronization, integration, and consistency" features of claims 12–16, which are required by the wherein clause of claim 12. *See* PO Sur-Reply 1; Ex. 2019 ¶ 102. In the analysis below, we address whether the evidence of secondary considerations has a sufficient a nexus with the merits of the claimed invention.

## 2. Licensing

Licenses taken under the patent in suit may constitute evidence of non-obviousness; however, only little weight can be attributed to such evidence if the patentee does not demonstrate "a nexus between the merits of the invention and the licenses of record." *GPAC Inc.*, 57 F.3d at 1580 (citations omitted).

Patent Owner contends that the patents in the '850 family have been licensed by 44[4] companies, "the majority of these licenses occurring outside of litigation." PO Resp. 63–64; PO Sur-Reply 4–5. To support its contention, Patent Owner provides its press releases, including its own,

---

[4] In its Sur-Reply, Patent Owner asserts 46 licenses of the patents of the '850 family. PO Sur-Reply 4.

announcing the licenses (Exs. 2003, 2025) and an amendment to a license with Agilysys, Inc. (Ex. 2025, 10–12). Patent Owner argues that that its press releases were jointly issued (PO Resp. 64) and that "[t]he majority of these licenses occurred outside of litigation" (*id.*).

Petitioner argues that the press releases do not show a nexus between the merits of the invention, do not state whether the '850 patent itself or the challenged claims were licensed, or whether litigation had been threatened. Pet. Reply 24.

We are persuaded by Petitioner that the press releases and the amendment to a license with Agilysys, Inc. does not sufficiently establish a nexus between the license and the merits of invention of claims 12–16. For example, the press release in Exhibit 2003 states in the first paragraph that Patent Owner "has entered into a strategic patent license agreement with PAR Technology Corporation" and disparately discusses at least four of Patent Owner's patents, this doesn't not sufficiently indicate whether the license is for the '850 patent or the challenged claims. Ex. 2003, 2. Further, although Patent Owner states that most of the licenses occurred outside of litigation, Patent Owner provides no evidence to show that the PAR Technology Corporation license or any of the other licenses occurred outside of litigation. Indeed, licensee Agilysys, Inc. is listed as a defendant in a related matter on Patent Owner's mandatory notices. Paper 7, 3. Without such evidence that the licenses occurred outside of litigation, Patent Owner's argument is merely attorney argument and entitled to little weight. *Geisler*, 116 F.3d at 1470.

We are not persuaded that the evidence sufficiently establishes a nexus between the licensing and the merits of the claimed invention. We,

CBM2015-00080
Patent 6,384,850 B1

thus, give little weight to Patent Owner's argument that evidence of licensing overcomes Petitioner's showing of obviousness.

### 3. Commercial Success

Patent Owner argues that evidence of "substantial, widespread commercial success" demonstrates the non-obviousness of the claims 12–16. PO Resp. 65–68; *see also id.* at 55–57. Patent Owner argues that "the measures of the claimed invention's commercial success are the partnerships and/or licenses of its products and co-existent intellectual property, as a result of its May 1999 launch at the NRA [(National Restaurant Association)] show." *Id.* at 66.

Petitioner argues that Patent Owner's evidence is insufficient to establish a nexus between the alleged copying and the merits of the claimed invention. Pet. Reply 21–23.

We are not persuaded that the evidence sufficiently establishes the alleged commercial success or that a nexus exists between the alleged commercial success and the merits of the claimed invention. For example, Patent Owner cites to the entirety of Exhibit 2026 to show that "[t]he 2004 and 2006 HT POS market reports and rankings show that Ameranth licensed 21CR to most of these leading POS companies, and achieved overwhelming market share." PO Resp. 66–67. Exhibit 2026 is two Hospitality Technology magazines ranking food service point-of-sale systems. The magazines do not show sufficiently that Patent Owner licensed its 21CR system to most of the leading point-of-sale companies or that Patent Owner achieved overwhelming market share. The magazines do not mention the 21CR system.

42

CBM2015-00080
Patent 6,384,850 B1

Patent Owner relies upon deposition testimony of Mr. John Harker to show commercial success, including "the incredible market reception that the 21CR system received at the May 1999 NRA show." PO Resp. 55–57 (citing Ex. 2022). For example, Mr. Harker testifies that tens of thousands walked by Ameranth's booth and hundreds stopped. Ex. 2022, 175:11–176:16. However, this does not sufficiently establish that the 21CR product captured a significant market share as a result of the May 1999 NRA show, commercial success of the 21CR product, or that merits of the challenged claims was the cause of the commercial success.

We are not persuaded that the evidence sufficiently establishes the alleged commercial success or that a nexus exists between the alleged commercial success and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of commercial success overcomes Petitioner's showing of obviousness.

### 4. Awards/Industry Praise

Industry praise for an invention may provide evidence of non-obviousness where the industry praise is linked to the claimed invention. *See Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l. LLC*, 618 F.3d 1294, 1305 (Fed. Cir. 2010); *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008).

First, according to Patent Owner, it was awarded four awards for its 21CR system and that these awards demonstrate the non-obviousness of the claims 12–16. PO Resp. 68–70; *see* PO Sur-Reply 4. Petitioner responds that the evidence concerning awards "lacks the requisite nexus because the

CBM2015-00080
Patent 6,384,850 B1

reasons for the awards are either non-specific . . . or for non-claimed features."  Pet. Reply 24.

The first award is the Innovation of the Year from the European Hospitality Solutions Technology Show in 1999.  PO Resp. 68.  Patent Owner asserts that the award was for its 21CR system but provides no other information concerning the award in its Petition.  *Id.* (citing Ex. 1012, 634–646[5]).  Pages 635–636 of Exhibit 1012 is Patent Owner's own press release concerning the award.  The press release indicates that the award was for its UltraPad™2700 and alleges that the UltraPad™2700 is the wireless hand-held computer of a number of Patent Owner's systems, including its 21CR system.  Ex. 1012, 635–636.  The press release, however, fails to show, sufficiently, a nexus between the award for the UltraPad™2700 and the merits of the invention of the challenged claim.  It does not sufficiently describe how the UltraPad™2700 is integrated or synchronized with the 21CR system or that the award for how the UltraPad™2700 is integrated or synced with the 21CR system.

The second award is the Moby Award from Mobile Insights and the third award is the 2001 Computerworld Honors Program and Collection.  PO Resp. 69 (citing Ex. 1012, 680–681, 694–695).  Pages 680–681 is Patent Owner's own press release concerning the Moby Award and pages 695 is a letter concerning the 2001 Computerworld Honors Program and Collection ("the Computerworld Honor").  According to the press release and letter, Patent Owner received these awards for the deployment of the 21CR system at the Improv Comedy Club in Dallas.  Ex. 1012, 681, 695.  The press

---

[5] Although Patent Owner cites to pages 634–646 of Exhibit 1012, pages 634, 637–646 contain no mention of the Innovation of the Year award.

CBM2015-00080
Patent 6,384,850 B1

releases state that the Moby Award "specifically recognizes the wireless handheld computer ticket authorization and seating assignment application" (*id.* at 681), and the letter states that the honor was for a "case study" of the Ameranth Wireless's Improv Comedy Club Solution but does not specifically mention any feature of the solution. The press release and letter fails to show, sufficiently, a nexus been the Moby Award and the Computerworld Honor and the merits of the invention of the challenged claim. A ticket authorization and seating assignment application is not a feature of the invention of the challenged claims.

> With regards to the third award, the Patent Owner argues:

> Noteworthy in this award was the express confirmation that the innovations, reflected in the challenged claims as illustrated above, were not available from any other company. Thus the award was not based upon technology available from others. This award also shows that Tom Castillo, owner of the Improv, based his selection of Ameranth on the actual 21CR System demonstrated to him, at the May 1999 NRA show, thus confirming nexus of this award to that product/technology as it existed and was publicly shown/demonstrated **in May 1999**.

PO Resp. 69. The letter, however, contains no indication that the alleged innovations, reflected in the challenged claims, were not available from any other company or any mention of Tom Castillo or the basis of his selection.

The fourth award is a Microsoft Retail Application Developer (R.A.D.) Award for Patent Owner's HostAlert system. *See id.*; Ex. 2027, 6. Patent Owner alleges that HostAlert is "a subset of the 21st Century Restaurant™ system/technology, inclusive of waitlisting, table management and reservations, but not including food and drink ordering." *Id.* (citing Ex. 2027). Patent Owner, however, provides no evidence to support its assertion that HostAlert is a subset of its 21CR system or that the subset includes the

CBM2015-00080
Patent 6,384,850 B1

features of the challenged claims. To the contrary, the article relied upon by Patent Owner indicates that HostAlert includes additional features than those of the challenged claims, such as matching a waiting party in a database to a newly available table in a restaurant, based on party size and longest wait-time or adding a customer to a sister restaurants waiting list. Ex. 2027, 6.

Second, Patent Owner argues that overwhelming industry praise for the 21CR system is evidence of non-obviousness. PO Resp. 70–72. Patent Owner states that "[t]he hospitality market press and numerous nationally renowned publications including the Wall Street Journal, Time Magazine and Harvard Business review have praised [the 21CR system]." *Id.* at 70. Patent Owner, however, does not provide a citation to any Wall Street Journal, Time Magazine, or Harvard Business Review article in the record. Patent Owner, further, argues that for the Computerworld Honor, Microsoft founder Bill Gates personally nominated Ameranth with the praise that "Ameranth is one of the leading pioneers of the information age for the betterment of mankind." PO Resp. 71 (citing Ex. 1012, 694–695). Page 694–695 of Exhibit 1012, however, contains no mention of Bill Gates or the alleged quotation. We cannot consider evidence not adequately cited to in the record[6] or not provide in the record. Without such evidence, Patent Owner's argument is merely attorney argument and entitled to little weight.

Patent Owner also argues that Marriott's vice-president Steve Glen, Harvard Business School Press, and other evidence praises the 21CR system. PO Resp. 71–72 (e.g., quoting Ex. 1012, 646–48 ("the Marriot Letter"), Ex. 2028, 35 ("the Harvard Book")). This evidence is not

---

[6] Exhibit 1012 contains 1154 pages. It is not readily apparent that the article is contained elsewhere in Exhibit 1012.

persuasive. For example, the Marriott Letter and the Harvard Book praise features of the 21CR system that are not features of the challenged claims, such as "laser bar-code scanning of customer frequency cards," "wait-list management functions" (Ex. 1012, 647) and "payment processing" (Ex. 2028, 35).

Patent Owner also argues that alleged praise from its licensees in its own press releases demonstrate that the invention is nonobvious. PO Resp. 64–65. For the same reasons discusses above, Patent Owner has not sufficiently demonstrated a nexus between the praise in the press releases the merits of the claimed invention.

Patent Owner has not sufficiently shown that the four awards and the alleged industry praise are linked to the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of awards and industry praise overcomes Petitioner's showing of obviousness.

### 5. Copying

"[C]opying by a competitor may be a relevant consideration in the secondary factor analysis." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (citing *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984). "[A] nexus between the copying and the novel aspects of the claimed invention must exist for evidence of copying to be given significant weight in an obviousness analysis." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012) (internal quotation omitted).

Patent Owner alleges that multiple entities have copied it 21CR system and this copying is evidence of nonobviousness. PO Resp. 72–78;

CBM2015-00080
Patent 6,384,850 B1

*see also* PO Sur-Reply 5.  To support its allegation Patent Owner points to numerous statements from competitors and the testimony of Dr. Weaver.  *Id.*

Petitioner argues that Patent Owner's evidence is insufficient to establish a nexus between the alleged copying and the merits of the claimed invention.  Pet. Reply 24–25.

We are not persuaded that the evidence sufficiently establishes the alleged copying or that a nexus exists between the alleged copying and the merits of the claimed invention.  Patent Owner cites to statements made by employees of competitors, who allegedly had knowledge of the 21CR system, and articles to show copying.  PO Resp. 72–78 (citing, for example, Ex. 2009).  This evidence, however, fails to establish copying or a nexus between the alleged copies and the merits of the claimed invention.  For example, Patent Owner cites articles that discuss Starbucks' "mobile order and pay" system (Ex. 2009) and "ordering ahead and new payment features" (Ex. 2008).  The articles, however, do not sufficiently describes Starbucks' mobile order and pay system as having the claimed synchronization, integration, and consistency features required by the wherein clause of claim 12 (i.e., the claimed communication control module and application program interface).

Further, Patent Owner relies upon the testimony of Dr. Weaver to show the Starbucks' system and certain pizza chains copied the relevant "synchronization, integration, and consistency" features of the challenged claims.  Ex. 2019 ¶¶ 131, 135.  We do not find Dr. Weaver's testimony to be persuasive or helpful.  Dr. Weaver testifies that his opinion is based upon the evidence cited by Patent Owner and Starbucks' own materials on its "Mobile Order & Pay" system (*id.* ¶ 131) and his "review of their systems including

48

their mobile apps" (*id.* ¶ 135). As discussed in the paragraph above, the evidence cited by Patent Owner does not sufficiently describe Starbucks' mobile order and pay system or the pizza chain's systems to establish that these systems are copies of the 21CR system. Further, Dr. Weaver's testimony that he reviewed Starbucks' and the pizza chain's systems is conclusory with little or no elaboration on those systems. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *see also Rohm and Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) (nothing requires a fact finder to credit the inadequately explained testimony of an expert).

We are not persuaded that the evidence sufficiently establishes the alleged copying or that a nexus exists between the alleged copying and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of copying overcomes Petitioner's showing of obviousness.

### 6. Failure of Others

Patent Owner must show that any evidence of long-felt need "demonstrates both that a demand existed for the patented invention, and that others tried but failed to satisfy that demand." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1082 (Fed. Cir. 2012).

Patent Owner argues that many companies tried but failed to achieve synchronization and integration with point-of-sale systems and other third party systems and this failure by others is evidence of nonobviousness. PO

CBM2015-00080
Patent 6,384,850 B1

Resp. 72–80.  To support its allegation, Patent Owner points to numerous statements from employees of other companies and the testimony of Dr. Weaver.  *Id.*

Petitioner argues that the evidence is insufficient to establish that others tried but failed and to establish a nexus between the alleged copying and the merits of the claimed invention.  Pet. Reply 25.

We are not persuaded that the evidence sufficiently establishes the alleged long-felt need and failure of others or that a nexus exists between the alleged long-felt need and failure of others and the merits of the claimed invention.  Petitioner cites to numerous exhibits as allegedly showing the failure of others.  PO Resp. 72–78.  For example, Exhibit 2001 is an email from a Food.com employee discussing a license agreement with Patent Owner and specifying the product and services it requires.  This, however, does not sufficiently show that Food.com tried but failed to satisfy a demand for the patented invention.  In addition, Patent Owner states that "Food.com admitted it needed Ameranth's technology in its public release on July 16, 1999" (PO Resp. 78) but provides no citation to such a release in the record. We cannot consider evidence not adequately cited to in the record or not provide in the record.  *DeSilva*, 181 F.3d at 866–67 ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record.")  Without such evidence, Patent Owner's argument is merely attorney argument and entitled to little weight.

We are not persuaded that the evidence sufficiently establishes the alleged failure of others or that a nexus exists between the alleged copying and the merits of the claimed invention.  We, thus, give little weight to

CBM2015-00080
Patent 6,384,850 B1

Patent Owner's argument that evidence of failure of others overcomes
Petitioner's showing of obviousness.


*7. Conclusion as to Secondary Considerations*

Patent Owner's evidence fails to demonstrate a sufficient nexus
between the claimed invention and any of the alleged secondary
considerations.  Patent Owner also fails to sufficiently demonstrate
commercial success, licensing, copying, and long-felt-but-unmet need for
the claimed invention.  We, thus, determine that the proffered evidence of
objective indicia of non-obviousness is insufficient to outweigh the evidence
of obviousness in this case.


## III.  MOTIONS TO EXCLUDE

Both Petitioner and Patent Owner filed motions to exclude evidence.
Patent Owner moves to exclude certain paragraphs of Exhibit 1070 and the
entirety of Exhibits 1071, 1072, 1073, 1078, 1079, 1080, 1081, and 1082.
Paper 33.  We do not rely on these exhibits in reaching our Decision and,
thus, dismiss Patent Owner's motion to exclude these exhibits as moot.

Petitioner moves to exclude the entirety of Exhibits 2021, 2023, 2025,
2027, 2030–2051, and 2053–2056 and with the annotated portions of Exhibit
2024.  Paper 31.  We also dismiss Petitioner's motion to exclude these
exhibits.  Petitioner's motion to exclude theses exhibits are moot because we
have found this evidence insufficient regardless of their admissibility.

CBM2015-00080
Patent 6,384,850 B1

## IV.  CONCLUSION

We conclude Petitioner has proven, by a preponderance of the evidence, that claims 12–16 of the '850 patent are unpatentable under 35 U.S.C. § 103 over DeLorme.

Patent Owner's Motion to Exclude Evidence is dismissed; and

Petitioner's Motion to Exclude Evidence is dismissed.

This is a final written decision of the Board under 35 U.S.C. § 328(a). Parties to the proceeding seeking judicial review of this decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

## V.  ORDER

Accordingly, it is hereby:

ORDERED that claims 12–16 of U.S. Patent No. 6,384,850 B1 are *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Exclude Evidence is *dismissed*; and

FURTHER ORDERED that Petitioner's Motion to Exclude Evidence is *dismissed.*

CBM2015-00080
Patent 6,384,850 B1


FOR PETITIONER:

James M. Heintz
Robert C. Williams
Ryan Cobb
DLA PIPER LLP
AmeranthCBMService@dlapiper.com
robert.williams@dlapiper.com
ryan.cobb@dlapiper.com


FOR PATENT OWNER:

John W. Osborne
OSBORNE LAW LLC
josborne@osborneipl.com

Michael D. Fabiano
FABIANO LAW FIRM, P.C.
mdfabiano@fabianolawfirm.com

CBM2015-00080
CBM2015-00096

Date:  September 21, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE, INC., EVENTBRITE INC., STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., EXPEDIA, INC., FANDANGO, LLC,
HOTELS.COM, L.P., HOTEL TONIGHT, INC., HOTWIRE, INC.,
KAYAK SOFTWARE CORP., OPENTABLE, INC., ORBITZ, LLC, PAPA
JOHN'S USA, INC., STUBHUB, INC., TICKETMASTER, LLC, LIVE
NATION ENTERTAINMENT, INC., TRAVELOCITY.COM LP,
WANDERSPOT LLC, AGILYSYS, INC., DOMINO'S PIZZA, INC.,
DOMINO'S PIZZA, LLC, HILTON RESORTS CORPORATION,
HILTON WORLDWIDE, INC., HILTON INTERNATIONAL CO., MOBO
SYSTEMS, INC., PIZZA HUT OF AMERICA, INC., PIZZA HUT, INC.,
and USABLENET, INC.,
Petitioner

v.

AMERANTH, INC.
Patent Owner
_____

Case CBM2015-00080[1]
U.S. Patent No. 6,384,850
_____

**PATENT OWNER AMERANTH'S NOTICE OF APPEAL**

_____

[1] CBM2015-00096 has been consolidated with this proceeding.

CBM2015-00080
CBM2015-00096

## PATENT OWNER AMERANTH'S NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Ameranth, Inc. (Patent Owner), hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision in Case CBM2015-00080 and CBM2015-00096 that was entered on August 26, 2016 (Paper 44), and from all underlying findings, orders, decisions, rulings, and opinions in those Covered Business Method proceedings before the Patent Trial and Appeal Board.

Patent Owner further states, per 37 C.F.R. § 90.2(a)(3)(ii), that the issues presented on this appeal include, but are not limited to:  The decision of the Patent Trial and Appeal Board in the underlying proceedings that claims 12-16 of U.S. Patent No. 6,384,850 B1 are unpatentable under 35 U.S.C. § 103, along with any appealable finding, conclusion, or determination related in any way to that decision, and any other appealable issues decided adversely to Patent Owner in any orders, decisions, rulings, or opinions in CBM2015-00080 and/or CBM2015-00096.

A copy of this Notice of Appeal is being concurrently filed with the Patent Trial and Appeal Board, and three copies of this Notice of Appeal, plus the required docketing fees, are being filed with the Clerk's Office of the United States Court of Appeals for the Federal Circuit.

1

September 21, 2016

Respectfully Submitted,

/John W. Osborne/
John W. Osborne
Lead Counsel for Patent Owner
USPTO Reg. No. 36,231
OSBORNE LAW LLC
33 Habitat Lane
Cortlandt Manor, NY 10567
josborne@osborneipl.com
Tel.:  914-714-5936
Fax:  914-734-7333

Michael D. Fabiano
Back-up Counsel for Patent Owner
USPTO Reg. No. 44,675
FABIANO LAW FIRM, P.C.
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
mdfabiano@fabianolawfirm.com
Tel.:  619-742-9631

## CERTIFICATE OF FILING AND SERVICE

I certify that true and correct copies of the foregoing PATENT OWNER

AMERANTH'S NOTICE OF APPEAL were submitted, as set forth below, on

September 21, 2016.

**1 copy, via hand delivery to:**

    Director of the U.S. Patent and Trademark Office
    c/o Office of the General Counsel, United States Patent and Trademark Office
    Madison Building East, Room 10-B-20
    600 Dulany Street
    Alexandria, VA  22314

**1 copy, via hand delivery, plus filing fee, to:**

    Clerk of Court, U.S. Court of Appeals for the Federal Circuit
    717 Madison Place, N.W.
    Washington, DC  20439

**1 copy, electronically via PTAB End-to-End System to:**

    Patent Trial and Appeal Board, U.S. Patent and Trademark Office

**1 copy each, via email, per agreement of the parties, to:**

| | |
|---|---|
| James M. Heintz<br>DLA PIPER LLP (US)<br>11911 Freedom Drive, Suite 300<br>Reston, VA 20190-5602<br>jim.heintz@dlapiper.com | Robert C. Williams<br>DLA PIPER LLP (US)<br>401 B Street, Suite 1700<br>San Diego, CA 92101<br>robert.williams@dlapiper.com |
| Richard S. Zembek<br>NORTON ROSE FULBRIGHT<br>1301 McKinney, Suite 5100<br>Houston, TX 77010<br>richard.zembek@nortonrosefulbright.com | Gilbert A. Greene<br>NORTON ROSE FULBRIGHT<br>98 San Jacinto Boulevard, Suite 1100<br>Austin, TX 78701<br>bert.greene@nortonrosefulbright.com |

September 21, 2016                      */s/ Michael D. Fabiano /*

                                        Michael D. Fabiano

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE, INC., EVENTBRITE INC., STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., EXPEDIA, INC., FANDANGO, LLC,
HOTELS.COM, L.P., HOTEL TONIGHT, INC., HOTWIRE, INC.,
KAYAK SOFTWARE CORP., OPENTABLE, INC., ORBITZ, LLC, PAPA
JOHN'S USA, INC., STUBHUB, INC., TICKETMASTER, LLC, LIVE
NATION ENTERTAINMENT, INC., TRAVELOCITY.COM LP,
WANDERSPOT LLC, AGILYSYS, INC., DOMINO'S PIZZA, INC.,
DOMINO'S PIZZA, LLC, HILTON RESORTS CORPORATION,
HILTON WORLDWIDE, INC., HILTON INTERNATIONAL CO., MOBO
SYSTEMS, INC., PIZZA HUT OF AMERICA, INC., PIZZA HUT, INC.,
and USABLENET, INC.,
Petitioner,

v.

AMERANTH, INC.,
Patent Owner.

———————

Case CBM2015-00082[1]
Patent No. 6,871,325 B1

———————

Before MEREDITH C. PETRAVICK, RICHARD E. RICE, and
STACEY G. WHITE, *Administrative Patent Judges.*

PETRAVICK, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
Covered Business Method Patent Review
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*

———————

[1] CBM2015-00097 has been consolidated with this proceeding.

CBM2015-00082
Patent 6,871,325 B1

# I. INTRODUCTION

A number of entities including Apple, Inc. ("collectively, Petitioner") filed a Petition (Paper 1, "Pet.") requesting review under the transitional program for covered business method patents of claims 11–15 ("the challenged claims") of U.S. Patent No. 6,871,325 B1 (Ex. 1003, "the '325 patent"). On September 1, 2015, pursuant to 35 U.S.C. § 324, we instituted this trial as to claims 11, 13, and 15[1] on one ground of unpatentability — claims 11, 13, and 15 being unpatentable under 35 U.S.C. § 103 over DeLorme[2]. Paper 13, 30 ("Dec. to Inst."). We did not institute as to any of the other grounds proposed in the Petition. *Id.*

Ameranth, Inc. ("Patent Owner") filed a Corrected Patent Owner's Response (Paper 22, "PO Resp.") and Petitioner filed a Reply (Paper 26, "Pet. Reply"). Patent Owner filed a Sur-Reply. Paper 32, ("PO Sur-Reply").

An oral hearing in this proceeding was held on May 10, 2016. A transcript of the hearing is included in the record. Paper 43 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 11, 13, and 15 of the '325 patent are unpatentable.

---

[1] The Institution Decision mistakenly included claim 12 in the instituted ground. *See* Paper 25, 3. Claim 12 was not challenged in the ground based upon DeLorme.

[2] U.S. Patent No. 5,948,040 (issued Sept. 7, 1999) (Ex. 1024).

*A. The '325 Patent*

The '325 patent is titled "Information Management and Synchronous Communications System with Menu Generation" and issued on March 22, 2005, based on Application No. 10/015,729, filed, on November 1, 2001. Ex. 1003, (54), (45), (21), (22). Application No. 10/015,729 claims priority to Application No. 09/400,413, which matured into U.S. Patent No. 6,384,850. There are two aspects to the system: menu generation and synchronous communication. *See, e.g.*, *id.* at col. 3, ll. 20–28. The first aspect includes a "desktop software application that enables the rapid creation and building of a menu." *Id.* at col. 3, ll. 20–22. Claims 1–10, which are not challenged in this proceeding, are directed to this first aspect.

Claims 11–15, some of which are challenged in this proceeding, are directed to the second aspect of the system, synchronous communication. *See id.* at col. 2, ll. 61–67, col. 3, ll. 1–5, col. 11, ll. 3–8. The '325 patent discloses a synchronous communication system, which includes a computer workstation, a central database, multiple wireless handheld devices, a web server, and a web page. *Id.* at col. 3, l. 64–col. 4, l. 1, col. 6, l. 24. A communications control module provides a single point of entry for all hospitality applications, on the central database, wireless handheld devices, web server and web pages, to communicate with one another. *Id.* at col. 9, ll. 35–41, col. 11, ll. 37–43.

> This communications module is a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol. . . . The single point of entry works to keep all wireless handheld devices and linked [w]eb sites in synch with the backoffice server (central database) so that the different components are in equilibrium at any given time and an overall consistency is achieved.

3

CBM2015-00082
Patent 6,871,325 B1

*Id*. at col. 11, ll. 40–49.

> For example, a reservation made online would be automatically communicated to the backoffice server and then synchronized with all the wireless handheld devices wirelessly. Similarly, changes made on any of the wireless handheld devices would be reflected instantaneously on the backoffice server, [w]eb pages and the other handheld devices.

*Id*. at col. 2, ll. 31–37.

Third parties, such as point-of-sale companies, affinity program companies, and internet content providers, can integrate fully with the system through an application program interface. *Id.* at col. 2, ll. 16–20; col. 11, ll. 28–32.

## B. Illustrative Claim

Claims 11 and 13 are independent. Claim 15 depends from claims 11, 12, and 13. Claim 11 of the '325 patent is illustrative of the claims at issue. Claim 11 reads as follows:

> **11**. An information management and synchronous communications system for use with wireless handheld computing devices and the internet comprising:
>
> a. a central database containing hospitality applications and data,
>
> b. at least one wireless handheld computing device on which hospitality applications and data are stored,
>
> c. at least one [w]eb server on which hospitality applications and data are stored,
>
> d. at least one [w]eb page on which hospitality application and data are stored,
>
> e. an application program interface, and
>
> f. a communications control module,

CBM2015-00082
Patent 6,871,325 B1

> wherein application and data are synchronized between the central [database], at least one wireless handheld computing device, at least one [w]eb server and at least one [w]eb page, wherein the application program interface enables integration of outside applications with the hospitality applications and wherein the communications control module is an interface between the hospitality applications and any other communications protocol, wherein the synchronized data relates to orders.

Independent claim 13 is substantially the same as claim 11, except that the last limitation "wherein the synchronized data relates to reservations."

## C. Related Proceedings

Both Petitioner and Patent Owner identify numerous related ongoing district court proceedings.  Pet. 2–4; Paper 7, 5–6.  The '325 patent is related to U.S. Patent No. 6,384,850 B1 ("the '850 patent"), U.S. Patent No. 6,982,733 B1, and U.S. Patent No. 8,146,077 B2.  These patents were or are the subject of the following covered business method patent reviews:

| U.S. Patent No. | Previous CBM Reviews | Pending CBM Reviews |
| --- | --- | --- |
| 6,384,850 B1 | CBM2014-00015 | CBM2015-00080<br>CBM2015-00091<br>CBM2015-00096 |
| 6,871,325 B1 | CBM2014-00016 | CBM2015-00097<br>CBM2015-00099 |
| 6,982,733 B1 | CBM2014-00013 | |
| 8,146,077 B2 | CBM2014-00014<br>CBM2015-00081<br>CBM2015-00095 | |

In case CBM2014-00016, a Final Written Decision, determining claims 1–10 to be unpatentable, was issued on March 20, 2015 and is on appeal to the U.S. Court of Appeals for the Federal Circuit.

CBM2015-00082
Patent 6,871,325 B1

### D. *Patent Owner's Incorporated by Reference of Standing Arguments*

Patent Owner attempts to incorporate certain arguments made in its Preliminary Response (Paper 9) into the Patent Owner's Response. PO Resp. 1 n.4 ("Patent Owner incorporates herein its Preliminary Response arguments regarding standing and preserves its right to appeal the Board's determination thereof"). Our Rules prohibit incorporating arguments by reference. 37 C.F.R. § 42.6(a)(3) states: "[a]rguments must not be incorporated by reference from one document into another document." Incorporation by reference circumvents our Rule limiting the pages in the Patent Owner response to 80 pages. *See* 37 C.F.R. § 42.24(b)(2).[3]

Further, the Patent Owner's Response does not provide citations or otherwise clearly indicate what argument in the Preliminary Response Patent Owner is attempting to incorporate by reference. *See* PO Resp. 1 n.4. The Preliminary Response includes no arguments under a heading concerning "standing" or labeled otherwise. The only mention of standing is in footnote 1 of the Preliminary Response, which states: "Petitioner's standing argument merely references CBM2014-00016, and is thus insufficient. PO submits that Petitioner was required to provide, in the Petition, the basis for standing." As explained in our Institution Decision, we determined that the Petition sufficiently established that the '325 patent was eligible for covered business method patent review and that Patent Owner's arguments in

---

[3] Rule 42.24(b)(2) was amended, effective May 2, 2016. The Corrected Patent Owner's Response, however, was filed February 1, 2016, prior to that date and, thus, we refer to the prior version of 37 C.F.R. § 42.24(b)(2).

footnote 1 of the Preliminary Response were unpersuasive. *See* Paper 13, 11–16.

Inasmuch as Patent Owner may be attempting to incorporate material from other portions of the Preliminary Response, such as the Introduction section, Patent Owner should not expect the Board to search the record and piece together the arguments and evidence necessary to support a standing argument not made in the Patent Owner's Response. *Cf. DeSilva v. DiLeonardi*, 181 F.3d 865, 866–67 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record"); *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 111–12 (2d Cir. 1999) ("Appellant's Brief is at best an invitation to the court to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for appellant. We decline the invitation").

Arguments that are not developed and presented in the Patent Owner Response, itself, are not entitled to consideration. *See* Paper 14, 3. (cautioning Patent Owner "that any arguments for patentability not raised in the response will be deemed waived").

## II. ANALYSIS

### A. Claim Construction

The Board interprets claims of unexpired patents using the broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.300(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation approach).

CBM2015-00082
Patent 6,871,325 B1

Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

### i. *"wireless handheld computing device"*

The challenged claims require "at least one wireless handheld computing device." Ex. 1003, claims 11, 13. Patent Owner proposes that the term be construed as "a wireless computing device that is sized to be held in one's hand." PO Resp. 4 (citing Ex. 1032, 24 (district court order construing the term); Ex. 2019 ¶ 27 (Declaration of Dr. Alfred Weaver)). Patent Owner also argues "sized to be held in one's hand" requires that the wireless handheld computing device is sized to be held in a single hand and precludes "wireless computing devices that are held in two hands. *See* PO Resp. 30–31 ("the [wireless communication unit] in DeLorme is a 'two hand' portable device and is not sized as a wireless handheld device as properly construed"), *id.* at 31 n.17 (arguing that a device that needed a GPS at the time could not be held in a single hand).

Petitioner does not provide an explicit construction of the term "wireless handheld computing device," but argues that the term does not

CBM2015-00082
Patent 6,871,325 B1

require the device to be held in a single hand or preclude the device from being held in both hands.  Pet. Reply 6.

To resolve the issues of patentability of the claims over DeLorme, it is not necessary for us to determine whether the broadest reasonable construction of "wireless handheld computing device" requires that the device be held in a single hand or allows for the device to be held in two hands.  *See Vivid Techs., Inc. v. Am. Sci.& Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (stating that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy").  Regardless, DeLorme explicitly discloses that its wireless communication unit ("WCU") 907 is handheld.  Ex. 1024, col. 72, l. 1 ("WCU **907**, typically hand-held **906**"), col. 72, l. 31 ("handheld devices equipped with GPS **908**"); *see also id.* at col. 7, l. 34, col. 16, ll. 40–49 (further describing a wireless "handheld" device).  Further, DeLorme discloses that WCU 907 could be a personal digital assistant ("PDA") and describes PDAs as "handheld" wireless devices.  *Id.* at col. 71, l. 61–col. 72, l. 2, col. 75, ll. 33–45; *see* Ex. 1076, 53:12–25 (testimony of Dr. Weaver indicating that a PDA or smartphone is a wireless hand-held computing device).  The '325 patent describes PDAs as an example of a wireless handheld device.  Ex. 1003, col. 13, l. 63.  Given this, we determine that it is not necessary for us to determine whether the broadest reasonable construction of "wireless handheld computing device" requires that the device be held in a single hand or allows for the device to be held in two hands.

### ii. *"hospitality applications"*

The challenged claims require "hospitality applications," which are contained in the central database, and are stored on the wireless handheld computing device, web server, and webpage. Ex. 1003, claims 11, 13. In the Institution Decision, we construed this term to mean "applications used to perform services or tasks in the hospitality industry." Dec. to Inst. 9. Patent Owner agrees with this construction. PO Resp. 7. Patent Owner also states "[t]o properly establish the boundaries of the hospitality market, however, as would be understood by a POSA, the 'travel, tourism and transportation' industries are broader than and outside the 'hospitality industry' itself." *Id.* at 7 (internal citation omitted).

Petitioner does not contest this construction in its Reply.

Petitioner proposes that "applications" be construed to mean "sequences of instructions that can be executed on a computer that are designed to help people perform a specific task." Pet. 22. To support its proposed construction, Petitioner cites to the *Microsoft Computer Dictionary* (4th ed.), which defines "application" as "[a] program designed to assist in the performance of a specific task" and "program" as "[a] sequence of instructions that can be executed by a computer." Ex. 1034, 4, 10.

Patent Owner does not propose an explicit construction of "applications" but does state that "[i]t is clear from the specification, consistent with the ordinary meaning as would be understood by a POSA, that an application is a software program, not data." PO Resp. 35 n.18. This is consistent with Petitioner's proposed construction, which is based in-part on the definition of application, as a program.

10

CBM2015-00082
Patent 6,871,325 B1

Given the above, we determine that the broadest reasonable interpretation, in light of the specification of the '325 patent, of "hospitality applications" is a sequence of instructions that can be executed on a computer (i.e., a program) and that is designed to assist in the performance of a specific task in the hospitality industry.

We are not persuaded by Patent Owner that the hospitality industry excludes travel, tourism, and transportation. However, to resolve the issues of patentability of the claims over DeLorme, it is not necessary for us to construe hospitality industry. *See Vivid Techs*, 200 F.3d at 803 (stating that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"). Regardless, DeLorme discloses that TRIPS can be used for buying event tickets and making restaurant or hotel reservations. *E.g., see* Ex. 1024, col. 21, ll. 8–17, col. 31, ll. 42–51, col. 77, ll. 60–67, Fig. 1B-3. The '325 patent describes frequent customer ticketing and restaurant reservations as tasks in the hospitality application. Ex. 1003, col. 5, ll. 17–20, claim 5. Patent Owner's also argues reservations, with regards to claim 13, include hotel reservations. *See* PO Resp. 14 ("within the hospitality industry e.g. restaurants/hotels and event ticketing").

Given this, we determine that it is not necessary for us to determine whether the broadest reasonable construction of "hospitality applications" excludes tasks performed in the travel, tourism, and transportation industries.

CBM2015-00082
Patent 6,871,325 B1

### iii. "synchronized"

The challenged claims require that "application and data are synchronized between the central [database], at least one wireless handheld computing device, at least one [w]eb server and at least one [w]eb page." Ex. 1003, claims 11, 13.  In the Institution Decision, we construed synchronized to mean "made, or configured to make, consistent."  Dec. to Inst. 8–9.  Patent Owner agrees with this construction.  PO Resp. 6–7. Petitioner does not contest this construction in its Reply.

Absent from this construction is any temporal limitation that requires the devices to be consistent at all times.  The absence of a temporal limitation is consistent with the specification of the '325 patent which describes the use of "batch processing that can be done periodically throughout the day to keep multiple sites in synch with the central database." Ex. 1003, col. 2, ll. 22–23; *see also* Tr. 53:17–23.

### iv. "application program interface" that "enables integration of outside applications with the hospitality applications"

The challenged claims require an "application program interface" that "enables integration of outside applications with the hospitality applications."  Petitioner proposes that application program interface ("API") should be construed to be "a set of routines used by an application program to direct the performance of procedures by the computer's operating system or to communicate with another application program." Pet. 22 (citing Ex. 1034, 5 (*Microsoft Computer Dictionary* (4th ed.), definition of application program interface)).

Patent Owner proposes that the API is not a generic interface but an API that enable integration of outside applications with the hospitality

CBM2015-00082
Patent 6,871,325 B1

applications.  PO Resp. 8.  Patent Owner proposes that "integration" should
be construed to mean "combining of different activities, programs, or
hardware components into a functional unit."  *Id.* at 7–8 (citing Dec. to Inst.
11).  Patent Owner also argues that integrating requires "integrating the
different applications from **within** the applications themselves."  PO Resp.
43–44.

Given the above, we determine that the broadest reasonable
interpretation, in light of the specification of the '325 patent, of an API that
enables integration of outside applications with the hospitality applications is
a set of routines used by an application program that enables the combining
of the outside applications with the hospitality applications into a functional
unit by allowing them to communicate with each other.  We are not
persuaded that integrating requires integrating the different applications
from *within* the applications themselves.  Such a limitation is not consistent
with the '325 patent, which does not disclose integrating different
applications from *within* the applications themselves.

*v. "communications control module" that "is an interface between the
    hospitality applications and any other communications protocol"*

The challenged claims require "a communications control module . . .
wherein the communications control module is an interface between the
hospitality applications and any other communications protocol."  Ex. 1003,
claims 11, 13.

Petitioner proposes that "communications control module" be
construed as "a device used as an intermediary in transferring
communications to and from the host computer to which it is connected."

13

CBM2015-00082
Patent 6,871,325 B1

Pet. 23 (citing Ex. 1034, 7 (*Microsoft Computer Dictionary* (4th ed.), definition of communications controller), Ex. 1002 ¶¶ 76–78).

Patent Owner proposes that "communications control module" should be construed as "a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol." PO Resp. 6 (quoting Ex. 1001, col. 4, ll. 9–13). Patent Owner argues that this is the correct construction because it is how the communications control module is described in the related '850 patent and how a district court construed the limitation in a related proceeding. PO Resp. 5–6 (citing Ex. 1033, 13).

Patent Owner also argues that "communication control module" should be construed in conjunction with the wherein clause "wherein the communications control module is an interface between the hospitality applications and any other communications protocol" to require "a server-side software layer that provides an interface between the hospitality applications and communication protocols and which monitors and routes communications between different devices while concurrently using different protocols." PO Resp. 10. Patent Owner again argues that this is the correct construction because it is how the communications control module is described in the '325 patent. PO Resp. 8–11.

Petitioner responds that Patent Owner's construction is not required by the language of the claims and improperly imports elements from the specification of the '325 patent into the claims. Pet. Reply 18.

As an initial matter, we are not persuaded by Patent Owner that we should wholesale adopt the construction of "communications control module" from a previous district court infringement action. The standard for

14

CBM2015-00082
Patent 6,871,325 B1

claim construction in a district court infringement action is different than the standard applied by the Board. *See In re Morris,* 127 F.3d 1048, 1053–54 (Fed. Cir. 1997). In covered business method patent review proceedings, the Board applies the broadest reasonable construction consistent with the specification. 37 C.F.R. § 42.300(b).

We determine that the broadest reasonable construction, in light of the specification of the '325 patent, of "a communications control module . . . wherein the communications control module is an interface between the hospitality applications and any other communications protocol" is a device used as an intermediary in transferring communications to and from the host computer to which it is connected, wherein the device is an interface between the hospitality applications and any other communications protocol. This construction is consistent with the plain language of claims 11 and 13, which requires the communication control module to be an interface between the hospitality applications and any other communications protocol. This construction is also consistent with the description of the communication control module in the specification of the '325 patent as "a communications control program [that] monitors and routes all communications to the appropriate devices" and as "a single point of entry for all hospitality applications to communicate with one another wirelessly or over the [w]eb." Ex. 1003, col. 9, ll. 35–36, col. 11, ll. 38–40.

This construction, unlike Patent Owner's proposed construction, does not import extraneous features from the specification of the '325 patent into the claims. The specification of the '325 patent describes additional features of the communication control module, such as it is "a layer that sits on top of any communication protocol." Ex. 1003, col. 11, ll. 40–43. The

CBM2015-00082
Patent 6,871,325 B1

plain language of claims 11 and 13, however, do not require the claimed communication control module to have such features.  If a feature is not necessary to give meaning to what the inventor means by a claim term, it would be "extraneous," and should not be read into the claim.  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

We, thus, determine that the broadest reasonable construction, in light of the specification of the '325 patent, of "a communications control module . . . wherein the communications control module is an interface between the hospitality applications and any other communications protocol" is a device used as an intermediary in transferring communications to and from the host computer to which it is connected, wherein the device is an interface between the hospitality applications and any other communications protocol.

### vi. "relates to orders"

Claim 11 recites "wherein the synchronized data relates to orders." Patent Owner argues that this claim element must be construed to mean relating to ordering a restaurant meal, as we allegedly construed this term in the Institution Decision.  PO Resp. 12–13 (citing Dec. to Inst. 13, 24).

Petitioner disagrees and argues that "relates to orders" is broader than restaurant meal orders.  Pet. Reply. 19.  According to Petitioner, the '325 patent describes ordering in a wider variety of contexts, including the ordering of merchandise.  *Id.*  (citing Ex. 1003, col. 12, l. 57–col. 13, l. 9, col. 12, ll. 30–35).

CBM2015-00082
Patent 6,871,325 B1

We determine that the broadest reasonable construction, in light of the specification of the '325 patent, of "relates to orders" is not limited to ordering a restaurant meal or precludes other types of orders. Nothing in the plain language of claim 11 limits the claimed ordering to restaurant meal ordering. Further, the '325 patent describes ordering in a wider variety of contexts, including the ordering of merchandise or tickets. Ex. 1003, col. 12, l. 57–col. 13, l. 9, col. 12, ll. 30–35.

Contrary to Patent Owner's argument, ordering was not construed in the Institution Decision. *See* Dec. to Inst. 6–11. The statements Patent Owner relies upon points out, in different context, that the '325 patent describes restaurant meal ordering but do not construe the claimed ordering to be only restaurant meal ordering. *See id.* at 13, 24.

*vii. other terms*

Petitioner and Patent Owner propose constructions for various other claim terms. *See* Pet. 21–24, PO Resp. 4–8. These claim terms, however, need no explicit construction. *See Vivid Techs., Inc.*, 200 F.3d at 803.

*B. Unpatentability Over DeLorme*

Under 35 U.S.C. § 103, a claim is unpatentable if:

the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. . . .

The ultimate determination of obviousness under § 103 is a question of law based on underlying factual findings. *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012) (citing *Graham v. John Deere Co.*, 383

CBM2015-00082
Patent 6,871,325 B1

U.S. 1, 17–18 (1966)).  These underlying factual considerations consist of: (1) the "level of ordinary skill in the pertinent art," (2) the "scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) "secondary considerations" of non-obviousness such as "commercial success, long-felt but unsolved needs, failure of others, etc."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham,* 338 U.S. at 17–18).

Petitioner contends that claims 11, 13, and 15 are unpatentable under 35 U.S.C. § 103 over DeLorme.  Pet. 51–63.  To support its contention, Petitioner provides explanations as to how the prior art meets each claim element.  *Id.*  Petitioner also cites the Declaration of Dr. Don Turnbull for support.  *See* Ex. 1002 ¶¶ 419–473.  Taking into account Patent Owner's argument and evidence (PO Resp. 1–3, 14–80, PO Sur-Reply 1–5), for the reasons discussed below, we determine that Petitioner has shown by a preponderance of the evidence that claims 11, 13, and 15 are unpatentable under 35 U.S.C. § 103 over DeLorme.

### *i. Overview of DeLorme*

DeLorme is titled "Travel Reservation Information and Planning System," and issued on September 7, 1999, from an application filed on February 6, 1997.  Ex. 1024, [54], [45], [22].

DeLorme discloses a computerized travel reservation information and planning system ("TRIPS") which generates travel plan information in the form of a "map ticket," in response to inquiries from consumers.  *Id*. at Abstract.  Figure 2 of DeLorme is reproduced below.

18

CBM2015-00082
Patent 6,871,325 B1



FIG 2

Figure 2, reproduced above, is a block diagram of TRIPS. *Id*. at col.

12, ll. 62–65. The Interface and Interaction Bus at block 209 processes

consumer inquiries for planning travel. *Id*. at col. 3, ll. 15–41. The system

receives inquiries from consumers, as illustrated by block 205, for travel

related data (*id*. at col. 30, l. 66–col. 31, l. 14) and outputs, as illustrated by

block 227, digital displays, such as the preferred "map ticket," or electronic

communications containing such data, such as reservations and/or tickets for

accommodations or events (*id*. at col. 31, ll. 42–58, Fig. 1B). TRIPS

includes subsystems (e.g., topical subsystem 213) that have geographical,

topical, temporal, and accounting data, organized in a relational database,

which is managed by software. *Id*. at col. 17, ll. 7–13, col. 32, ll. 1–7, col.

30, ll. 58–65. TRIPS also includes provider input/output 231 for third-party

providers of travel information and services. *Id*. at col. 31, ll. 42–51.

CBM2015-00082
Patent 6,871,325 B1

DeLorme discloses multiple embodiments of TRIPS. In one embodiment, a user makes travel plans using TRIPS software on a desktop PC, which is connected to the Internet to provide access to updated TRIPS information and functions and communication with third-party providers. *Id.* at col. 13, ll. 48–52. Once installed, the TRIPS software interacts with online TRIPS services, and TRIPS map data, functions, and topical travel information can be updated and online reservations and ticket buys can be made. *Id.* at col. 14, ll. 9–42; *see also* col. 10, ll. 10–18, col. 10, ll. 22–32.

> Alternatively, all TRIPS functions, data and services can be provided entirely online (i.e.[,] without significant standalone software components)—for example, from a central TRIPS service bureau, (or by means of a TRIPS Internet World Wide [w]eb Site). Such purely online TRIPS embodiments can be implemented utilizing recent advances in distributed applications, "agents" or online "applets" developed in Java, or equivalent computer languages—plus other state-of-the-art software enhancements for online or Internet usage.

*Id*. at col. 14, ll. 43–52.

DeLorme discloses that TRIPS can also work with hardware other than a desktop PC, such as "network work stations; . . . terminals linked to a central server, . . . or handheld personal digital assistant (PDA) portable computer devices typically equipped with a wireless communications and/or user location, e.g., Global Positioning System (GPS) capabilities." *Id.* at col. 14, l. 66–col. 15, l. 5; *see also id*. at col. 7, ll. 30–35, col. 16, ll. 41–49, col. 75, ll. 38–45 (describing other compact portable devices).

DeLorme discloses "portable TRIPS embodiments" that can be used with the desktop PC setups. *Id.* at col. 71, ll. 61–62, col. 72, ll. 20–23. In these embodiments, a TRIPS user can make advanced travel plans and arrangements on a desktop PC and then transfer advanced travel plans to

CBM2015-00082
Patent 6,871,325 B1

TRIPS goods and server providers and wireless communication units ("WCU") to use the advance travel plan on a trip. *Id.* at col. 72, ll. 44–61; *see also id.* at col. 12, ll. 10–16, col. 15, ll. 40–46, col. 16, ll. 37–55, col. 18, ll. 35–42, col. 72, ll. 26–36. The travel plans include not only maps and travel information, but also tickets, reservations and other special offers for goods/services. *Id.* at col. 7, ll. 30–32; col. 17, ll. 18–36; *see also* Fig. 1B-3 (depicting advanced travel plans, which include a reservation confirmation for a restaurant).

        The advanced travel plans on the WCU can be used for "in the field" operations such as "text/audio directions; GPS waypoint guidance; claiming, confirmation and/or verification of discount offers . . . ; selected user notes on scheduled events of interest (EOIs); even sounding an alarm . . . and various other timely, topical, locational and transactional travel information chores." *Id.* at col. 16, ll. 49–59. The WCU can also be used for making reservations on the go, which then ". . . can be memorized in the TRIPS user's WCU 907 and/or transferred to, or put 'on file' with, the TRIPS online service Provider 904." *Id.* at col. 72, ll. 55–61.


### ii. Independent Claims 11 and 13

*1. "[a]n information management and synchronous communications system for use with wireless handheld computing devices and the internet"*

        Petitioner contends that DeLorme's TRIPS discloses an information management and synchronous communication system for use with wireless handheld computing devices and the internet. Pet. 50–53 (citing Ex. 1002 ¶¶ 422–25). Patent Owner does not specifically dispute this contention.

CBM2015-00082
Patent 6,871,325 B1

After review of Petitioner's evidence and analysis, we are persuaded by that evidence and analysis that TRIPS is an information management and synchronous communications system for use with wireless handheld computing devices and the internet. *See* Pet. 50–53. We, thus, determine that DeLorme discloses an information management and synchronous communications system for use with wireless handheld computing devices and the internet.

   2. *"a central database containing hospitality applications and data"*

Petitioner contends that TRIPS's relational databases for storing hospitality data and the software for managing the data meets the claimed central database containing hospitality applications and data. Pet. 53 (citing Ex. 1002 ¶¶ 426–28). Patent Owner does not specifically dispute this contention, but does in another context argues that TRIPS is not a hospitality application (PO Resp. 44).

After review of Petitioner's evidence and analysis, we are persuaded by that evidence and analysis that TRIPS's relational databases and software meets the claimed central database containing hospitality applications and data. *See* Pet. 53. As discussed above, the broadest reasonable construction of hospitality application is a sequences of instructions that can be executed on a computer (i.e., a program) that are designed to help people perform a specific task in the hospitality industry. DeLorme discloses, for example, that TRIPS processes user's inquires through a set of operations or sequences of functions that retrieve travel information, including reservations, from relational databases in TRIPS Subsystems. Ex. 1024, col.

CBM2015-00082
Patent 6,871,325 B1

17, ll. 7–13.  This retrieval of travel information is a specific task in the hospitality industry.

We are persuaded by Petitioner's evidence and analysis that the claimed central database containing hospitality applications and data, when a hospitality application is given its broadest reasonable construction, is met by TRIPS's relational databases for storing hospitality data and the software for managing the data.  We, thus, determine that DeLorme discloses an application program interface that enables integration of outside applications with the hospitality applications.

### 3. *"at least one wireless handheld computing device on which hospitality applications and data are stored"*

Petitioner contends that WCU 907 of the portable TRIPS embodiment meets the claimed wireless handheld computing device on which hospitality applications and data are stored.  Pet. 53–54, Pet. Reply 8–14.

Patent Owner disagrees.  PO Resp. 30–36.  In addition to arguing that the WCU 907 is not handheld (*id.* at 30–31 n.17), Patent Owner argues that the WCU does not store an application and data used to perform services or tasks in the hospitality industry.  *Id.*  Patent Owner's alleges that a hospitality application must do more than exchange and store hospitality data from a server.  *Id.*  According to Patent Owner, hospitality applications and data must be locally resident (*see id.* at 34–36) and the applications must "perform local operations via application software <u>resident on the device itself</u> . . . " (*id.* at 34).

We are persuaded by Petitioner's evidence and analysis that WCU 907 meets this claim element.  *See* Pet. 53–54, Pet. Reply 8–14.  First, as

discussed above, WCU 907 is a wireless handheld computing device. *See*
Pet. Reply 6.

Second, giving "hospitality application" its broadest reasonable
construction, WCU 907 has a hospitality application stored thereon. As
discussed above, the broadest reasonable construction of "hospitality
application" is a sequences of instructions that can be executed on a
computer (i.e., a program) that are designed to help people perform a
specific task in the hospitality industry. DeLorme discloses that WCU is
programmed to transmit data to and receive data back from a server. Ex.
1024, col. 72, ll. 13–19. As Patent Owner states, "the WCU is
'programmed' to transmit data to the server side and to receive data back
from the server side (Exh. 1024 75:59 et seq.) . . . the server 'communicates
with' pre-programmed software on the WCU" (PO Resp. 21) and an
"application is a software program" (*id.* at 35 n.18). *See also* Pet. Reply 7.
Further, DeLorme discloses that the WCU is programmed to perform other
tasks, such as voice recognition of user inputs (Ex. 1024, col. 76, ll. 46–59)
and processing data from a GPS receiver (*id.* at col. 75, ll. 46–59).
DeLorme, thus, discloses a wireless handheld computing device on which
hospitality applications are stored.

Third, WCU 907 has a hospitality data stored thereon. DeLorme
discloses that a TRIPS user can make travel plans and arrangements on a
desktop TRIPS setup, as depicted in Figure 1A, and then transfer the output
to TRIPS providers 904 ". . . and/or . . . memory at 912 of an appropriate
WCU 907. . . . " *Id.* at col. 72, ll. 44–61; *see also id.* at col. 18, ll. 35–42,
col. 72, ll. 26–36, (also disclosing that TRIPS output can be electronically
transferred to WCU 907). The updated travel information is "committed to

CBM2015-00082
Patent 6,871,325 B1

memory at [TRIPS providers] 904 or [WCU] 907." *Id. at* col. 72, ll. 65–66. DeLorme, thus, discloses a wireless handheld computing device on which hospitality data are stored.

Patent Owner's argument that WCU 907 does not meet this claim element is not commensurate with the scope of the claim. When given its broadest reasonable interpretation, this claim element does not require that the WCU 907 stores a hospitality application that does more than exchange data with a server nor does it require that the hospitality application and data be locally resident. Pet. Reply 7–8.

We are persuaded by Petitioner's evidence and analysis that WCU 907 meets the claimed wireless handheld computing device on which hospitality applications and data are stored. We, thus, determine that DeLorme discloses a wireless handheld computing device on which hospitality applications and data are stored.[4]

### 4. *"at least one [w]eb server on which hospitality applications and data are stored" and "at least one [w]eb page on which hospitality applications and data are stored."*

Petitioner contends that TRIPS includes a web server on which hospitality applications and data are stored and a web page on which hospitality applications and data are stored. Pet. 54–55 (citing Ex. 1002 ¶¶

---

[4] Patent Owner also makes arguments directed to an "internet-only" embodiment of DeLorme that would include java applets installed on the WCU. PO Resp. 22–30; *see* Pet. Reply 8–11. We do not reach these arguments because as explained in our analysis of WCU 907, the portable TRIPS embodiment meets the claimed limitation.

CBM2015-00082
Patent 6,871,325 B1

432–37).  Patent Owner does not specifically dispute this contention in its
Patent Owner's Response.

After review of Petitioner's evidence and analysis, we are persuaded
that TRIPS incudes a web server on which hospitality applications and data
are stored and a web page on which hospitality applications and data are
stored.

DeLorme discloses an embodiment in which all TRIPS function, data
and service can be provided entirely online through, for example, a TRIPS
Internet World Wide Web Site.  Ex. 1024, col. 14, ll. 43–47; *see also id.* at
col. 51, ll. 13–22 (describing an Internet TRIPS).  The '325 patent, itself,
discloses that the World Wide Web was an existing and known client-server
system, that distributes Hypertext Mark-up Language ("HTML") documents
for viewing in browsers on client computers.  Ex. 1003, col. 12, ll. 17–20.
DeLorme further discloses that online TRIPS embodiments can use
distributed applications, agents, or online applets developed in Java.  Ex.
1024, col. 14, ll. 47–52.

We are persuaded by Petitioner's evidence and analysis that the online
TRIPS embodiment discloses a web server on which hospitality applications
and data are stored and a web page on which hospitality applications and
data are stored.  We, thus, determine that DeLorme discloses a web server
on which hospitality applications and data are stored and a web page on
which hospitality applications and data are stored.

CBM2015-00082
Patent 6,871,325 B1

*5. "an application program interface" and "wherein the application program interface enables integration of outside applications with the hospitality applications"*

Petitioner contends that TRIPS's Provider Input/Output 231 meets the claimed API that enable integration of outside applications with the hospitality applications.  Pet. 54–55, 57, Pet. Reply 14–15.  According to Petitioner, TRIPS uses Provider Input/Output 231 to communicate and exchange data with outside applications.  Pet. Reply 15.

Patent Owner disagrees.  PO Resp. 40–42.  First, Patent Owner argues that this claim element requires that the outside applications be integrated with the hospitality application "by integrating the different applications from **within** the applications themselves" and Provider Input/Output 231 does not integrate from within the applications themselves.  *Id.* at 40. Second, Patent Owner argues that TRIPS is not a hospitality application and, thus, there is no hospitality application to interface with the third-party providers.  *Id.* at 40–41.  According to Patent Owner, the claim element also precludes the third-party provider applications from being hospitality applications.  *Id.* at 41–42.

We are persuaded by Petitioner's evidence and analysis that the claimed API when it is given the broadest reasonable construction, is met by Provider Input/Output 231.  As discussed above, the broadest reasonable construction of "an application program interface . . . wherein the application program interface enables integration of outside applications with the hospitality applications" is a set of routines used by an application program that enables the combining of the outside applications with the hospitality applications into a functional unit by allowing them to communicate with each other.  DeLorme discloses that "TRIPS 203 further

27

CBM2015-00082
Patent 6,871,325 B1

offers/brokers Provider Input/Output 231 to and from third-party providers of travel information and services—optimally in real time online." Ex. 1024, col. 31, ll. 42–44; *see also id.* at col. 63, ll. 61–67 (further disclosing that TRIPS provides and brokers tickets, reservations, and other goods and services from third-party providers, using the Accounting Subsystem). DeLorme, thus, discloses an application program that enables the combining of the outside applications with the hospitality applications into a functional unit by allowing them to communicate with each other.

Patent Owner's argument that Provider Input/Output 231 does not meet this claim element is not commensurate with the scope of the claim. First, the claim does not require an API that integrates the applications from within applications. *See* Pet. Reply 14. Indeed, the '325 patent does not describe such an application program interface. *See* Ex. 1003, col. 11, 28–32 (describing an API that enables others to fully integrate with computerized hospitality applications).Second, claim 12 does not preclude the outside applications from also being hospitality applications. *See* Pet. Reply 14–15. Finally, as discussed above with regards to the other claim elements, we have determined that TRIPS is a hospitality application.

We are persuaded by Petitioner's evidence and analysis that the claimed API, when it is given the broadest reasonable construction, is met by DeLorme's Interface and Interaction Bus 209. We, thus, determine that DeLorme discloses an API that enables integration of outside applications with the hospitality applications.

CBM2015-00082
Patent 6,871,325 B1

### 6. *"a communications control module" and "wherein the communications control module is an interface between the hospitality applications and any other communications protocol"*

Petitioner contends that DeLorme's Interface and Interaction Bus 209 meets the claimed communications control module that is an interface between the hospitality applications and any other communication protocol, except that DeLorme does not explicitly disclose that the communications control module is an interface between the hospitality applications and any other communication protocol.  Pet. 56–58 (citing Ex. 1002 ¶¶ 441–47). Petitioner argues, however, that a person of ordinary skill in the art would understand that because the Interface and Interaction Bus 209 is an interface between the retail consumer users and the various subsystems that comprise TRIPS and because the retail consumer users use different types of devices, which would use different communication protocols, it would have been obvious to a person of ordinary skill to configure the Interface and Interaction Bus 209 to be an interface for different communication protocols. *See* Pet. 57–58, Pet. Reply 15–19.

Patent Owner argues that DeLorme's Interface and Interaction Bus 209 does not meet the claimed communications control module, when that term is construed according to Patent Owner's proposed construction, because it is

> (1) not a server-side software layer, (2) does not provide an interface between hospitality applications and communication protocols (3) does not monitor and route communications to different devices while concurrently using different protocols and (4) is not "a software layer that []sits on top of a communications protocol and acts as an interface between hospitality applications and the communications protocol" as stated by the specification.

29

CBM2015-00082
Patent 6,871,325 B1

PO Resp. 45–49.

We are persuaded by Petitioner's evidence and analysis that the claimed communication control module, when it is given the broadest reasonable construction, would have been obvious in view of DeLorme's Interface and Interaction Bus 209. As discussed above, the broadest reasonable construction of "a communications control module . . . wherein the communications control module is an interface between the hospitality applications and any other communications protocol" is a device used as an intermediary in transferring communications to and from the host computer to which it is connected, wherein the device is an interface between the hospitality applications and any other communications protocol. DeLorme describes the Interface and Interaction Bus 209 as a device that gives retail users access to TRIPS Subsystem (Ex. 1024, col. 13, ll. 15–41) and depicts it as an interface between retail users 205 and third-party providers at 231 and TRIPS Subsystems 213, 217, 221, and 223 (*id.* at Fig. 9). DeLorme also describes Main Menu 413 and Interaction Bus 414, which corresponds to the Interface and Interaction Bus 209, as coordinating the responses to alternate input means embedded in specialized TRIPS field or in-vehicle embodiments. *Id.* at col. 37, ll. 54–65. DeLorme, thus, discloses an intermediary in transferring communications to and from the host computer to which it is connected.

DeLorme does not explicitly disclose that the Interface and Interaction Bus 209 is an interface between different communication protocols. DeLorme, however, does describe the Interface and Interaction Bus 209 interfacing with different devices. *E.g., see id.* at col. 14, l. 66–col. 15, l. 14 (describing different alternative end-user hardware platforms). The different

devices would use different communication protocols.  *See id.* at col. 37, ll. 54–56, (describing simplified input or remote queries), col. 14, l. 66–col. 15, l. 13 (describing internet based access); PO Resp. 9 ("third party systems such as POS system devices (clearly which operate with different protocols"), Ex. 1076, 176:17–177:12 (testimony of Dr. Weaver indicating that different devices operate with different protocols).  In order for Interface and Interaction Bus 209 to interface with devices using different communication protocols, Interface and Interaction Bus 209 would be configured to interface with different communication protocols or it would be obvious for it to be configured as such, because it is advantageous for TRIPS to interface with different devices.  *See* Ex. 1002 ¶ 447.

Patent Owner's argument that DeLorme's Interface and Interaction Bus 209 fails to meet this claim element is based upon its proposed construction (*see* PO Resp. 45–49), which we did not adopt.  For example, Patent Owner' argues that Interface and Interaction Bus 209 is not a software layer that sits on top of a communication protocol.  *Id.* at 45–49.  This argument is not persuasive because it is not commensurate with the scope of claim 12, when given its broadest reasonable construction.  *See* Pet. Reply 15–19.

We are persuaded by Petitioner's evidence and analysis that the claimed communication control module, when it is given the broadest reasonable construction, would have been obvious in view of DeLorme's Interface and Interaction Bus 209.  We, thus, determine that DeLorme's TRIPS system teaches the claimed communications control module that is an interface between the hospitality applications and any other communications protocol.

*7. "wherein applications and data are synchronized between the central [database], at least one wireless handheld computing device, at least one [w]eb server and at least one [w]eb page"*

Petitioner contends that TRIPS teaches that applications and data are synchronized between the central database, at least one wireless handheld computing device, at least one web server, and at least one web page.  Pet. 58–59, Pet. Reply 1–6.  According to Petitioner, the claim does not preclude synchronizing applications by synchronizing the data used by those applications, and TRIPS discloses synchronizing the data used by those applications.  Pet. Reply 1–6.

Patent Owner disagrees.  PO Resp. 16–22.  According to Patent Owner, DeLorme does not teach synchronizing applications between a wireless handheld computing device or any other device.  *Id.* at 16.  Patent Owner states that "[t]here is no teaching or suggestion in DeLorme of making applications consistent between a wireless handheld computing device and any of the other components of this limitation."  *Id.* at 16.  According to Patent Owner, this claim element requires more than data synchronization, — it requires "communication of application software code between the TRIPS host and WCU."  *Id.* at 21–22.

We are persuaded by the Petitioner that this claim element does not preclude synchronizing applications by synchronizing the data used by those applications and TRIPS discloses synchronizing the data used by those applications.  *See* Pet. 58–59, Pet. Reply 1–6, Ex. 1002 ¶¶ 448–50.  DeLorme contains numerous disclosures of transmitting updated data and function to various devices, including to WCU 907.  For example, DeLorme discloses that a TRIPS user can communicate and transfer data with other

TRIPS systems, users, service provides, external databases, a central
communication bureau, or other online services. Ex. 1024, col. 10, ll. 19–
33; *see also id.* at col. 10, ll. 47–58 (disclosing that TRIPS output can be
downloaded to a PDA or GPS, an accommodations provider, other TRIPS
users), col. 14, ll. 24–26 (a user can "download updated TRIPS map data,
*functions* and timely, topical travel information") (emphasis added), col. 15,
ll. 40–46, col. 16, ll. 5–11 ("TRIPS output also includes the online
transmission of the user's reservation requests, ticket purchases . . . directly
to third-party providers . . . "), col. 16, ll. 40–59 ("the TRIPS user can
transfer all or part of the output from a TRIPS travel planning session into a
PDA . . . [or] other compatible, small and highly portable computer
devices"), col. 18, ll. 25–32, col. 31, ll. 53–56, col. 73, ll. 46–52, col. 72, ll.
12–17, col. 74, ll. 45–50. In particular, DeLorme discloses that TRIPS
travel plans, including "map ticket" outputs, can be partly or entirely
transferred from a desktop PC to the memory of the WCU 907 and to third-
party providers to facilitate later inquires en route (*id.* at col. 72, ll. 20–37)
and also transferred to the relevant TRIPS provider to be put "on file" for
further assistance during the actual trip (*id.* at col. 72, ll. 50–67). DeLorme,
thus, discloses that applications and data are synchronized between the
central database, at least one wireless handheld computing device, at least
one web server, and at least one web page. *See* Ex. 1002 ¶¶ 448–50.

Patent Owner's argument that DeLorme does not disclose
synchronizing *applications* between a wireless handheld computing device
or any other device, because DeLorme does not disclose communication of
application software code between the TRIPS host and WCU is not
commensurate with the scope of the claim. The claim element does not

CBM2015-00082
Patent 6,871,325 B1

require that the WCU's hospitality application be synchronized by the transmission of application software code. *See* Ex. 1002 ¶ 448. Indeed, the specification of the '325 patent does not disclose such. As Patent Owner, itself, point out, the '325 patent discloses an example of synchronizing applications by transmitting an updated menu to the wireless handheld device. PO Resp. 21–22. The '325 patent describes the updated menu as a "menu database" and describes the transmitting as downloading the database to the wireless handheld device and [w]eb page. Ex. 1003, col. 10, ll. 9–14. This description of transmitting an updated menu database to a wireless handheld computing device is akin to DeLorme's description of transmission of TRIPS advanced travel planning information to the WCU 907.

We are persuaded by Petitioner's evidence and analysis that DeLorme, thus, discloses that applications and data are synchronized between the central database, at least one wireless handheld computing device, at least one web server, and at least one web page.

### 8. *"wherein the synchronized data relates to orders" and "wherein the synchronized data relates to reservations"*

Claim 11 recites "wherein the synchronized data relates to orders," and Claim 12 recites "wherein the synchronized data relates to waitlists."

Petitioner contends that in TRIPS the synchronized data relates to orders and reservations. Pet. 61–62 (citing Ex. 1024, col. 32, ll. 42–51, Ex. 1002 ¶¶ 469–70).

Patent Owner disagrees. PO Resp. 49–51. Patent Owner argues that claim 11 requires the order to be restaurant orders and DeLorme does not discloses data related to restaurant orders. *Id.* Patent Owner does not contest that DeLorme discloses data related to reservations. *See id.*

34

CBM2015-00082
Patent 6,871,325 B1

We are persuaded by Petitioner's evidence and analysis that DeLorme discloses synchronizing data related to orders, when orders is given the broadest reasonable construction, and DeLorme discloses synchronizing data related to reservations. As discussed above, the broadest reasonable construction of orders does not require the orders to be restaurant orders or preclude the order from being, for example, event ticketing orders. DeLorme discloses that TRIPS can be used for event ticketing and that the ticket data is part of the TRIPS output. *E.g.,* Ex. 1024, col. 1, ll. 43–46, col. 12, ll. 40–43, col. 31, ll. 42–51. DeLorme also disclosed that TRIPS can be used for making restaurant or hotel reservations and that the reservation confirmation is part of the TRIPS output. *E.g., id.* at col. 21, ll. 8–17, col. 31, ll. 42–51, col. 77 , ll. 60–67, Fig. 1B-3.

We are persuaded by Petitioner's evidence and analysis that DeLorme, thus, discloses that TRIPS synchronized data relates to orders and reservations.

### 9. Conclusion as to Obviousness of Claims 11 and 13

We determine that Petitioner has shown by a preponderance of the evidence that claims 11 and 13 are unpatentable under 35 U.S.C. § 103. In making our determination and as discussed below, we considered Patent Owner's arguments and evidence of secondary indicia of non-obviousness, but are not persuaded by such that claims 11 and 13 are patentable over DeLorme.

CBM2015-00082
Patent 6,871,325 B1

### iii. Dependent Claim 15

Claim 15 depends from claims 11, 12, or 13 and additionally recites "wherein the data is sent to a wireless paging device."

Petitioner challenges claim 15 as it depends from claims 11 and 13. Petitioner contends that TRIPS includes communication with a wireless paging device. Pet. 63 (citing Ex. 1024, col. 75, ll. 33–45, Ex. 1002 ¶¶ 472–73). Patent Owner does not specifically dispute this contention in the Patent Owner's Response.

After review of Petitioner's evidence and analysis, we are persuaded by the evidence and analysis that TRIPS discloses that the data is sent to a wireless paging device. *See* Pet. 50–53, Ex. 1024, col. 75, ll. 39–41 (disclosing that a "two-way pager can perform the functions of WCU 907"). We, thus, determine that DeLorme discloses TRIPS sending data to a wireless paging device.

We determine that Petitioner has shown by a preponderance of the evidence that claim 15 is unpatentable under 35 U.S.C. § 103. In making our determination and as discussed below, we considered Patent Owner's arguments and evidence of secondary indicia of non-obviousness, but are not persuaded by such that claim 15 is patentable over DeLorme.

### iv. Patent Owner's Secondary Consideration Arguments

Patent Owner contends that objective factors including praise, awards, commercial success, copying, failure of others, and licensing confirm the non-obviousness of all challenged claims of the '325 patent. PO Resp. 50–80, PO Sur-Reply 1–5. We have fully considered Patent Owner's arguments

and evidence concerning objective indicia of non-obviousness, but are not persuaded that they outweigh the Petitioner's showing of obviousness.

### 1. Nexus

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17–18. To be relevant, evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). Thus, to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining nonobviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

Patent Owner contends that the invention of claims 11, 13, and 15 are coextensive with its 21st Century Restaurant™ ("21CR") system and, thus, a nexus is established between the merits of the claimed invention and its evidence of praise, awards, commercial success, copying, failure of others, and licensing. PO Resp. 55–64 (citing *Teva Pharm., Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013) ("There is a 'presumption of a nexus' when a product is 'coextensive' with a patent claim"). Patent Owner argues that Figures 1 and 6 of the '850 patent, as original filed in the patent application, an annotated brochure of the 21CR system ("the 21CR Product

CBM2015-00082
Patent 6,871,325 B1

Brochure"), and other articles and evidence establish that its 21CR system is coextensive with the invention of claims 11, 13, and 15. PO Resp. 55–64.

Petitioner disagrees that the invention of claims 11, 13, and 15 are coextensive with the 21CR system, because claims 11, 13, and 15 have no elements directed to the menu wizard. Pet. Reply 21. According to Petitioner, the inventor of the '325 patent testifies that it was the menu wizard that was the "break-through." *Id.* at 21 (quoting Ex. 1012, 541).

We are not persuaded that the 21CR system is coextensive with the invention of claims 11, 13, and 15. As pointed out above, there are two aspects to the system disclosed by the '325 patent: menu generation and synchronous communication. *See* Ex. 1003, col. 3, ll. 20–28. The first aspect includes a ". . . desktop software application that enables the rapid creation and building of a menu . . . " (*id.* at col. 3, ll. 20–28) (i.e., a menu wizard) and is claimed in claims 1–10, which are not challenged in this proceeding. Claims 11–15, some of which are challenged in this proceeding, are directed to the second aspect of the system, synchronous communication, and are devoid of elements directed to the menu wizard. *See id.* at col. 2, ll. 61–67, col. 3, ll. 1–5, col. 11, ll. 3–8.

Figure 6, as originally filed, depicts an alleged screen shot of a communications control window of the 21CR system and Figure 1, as originally filed, depicts a screen shot of the menu wizard of the system. *See* Ex. 1010, 55, 60 (corresponding figures from the related '850 patent). Patent Owner alleges that the screen shots are of a live or operational 21CR system (PO Resp. 55), but does not provide any evidence of such. Further, contrary to Patent Owner's argument that the 21CR system is coextensive with the invention of claims 11, 13, and 15, originally filed Figure 1 depicts

CBM2015-00082
Patent 6,871,325 B1

the menu wizard.  Claims 11, 13, and 15 are devoid of elements directed to the menu wizard.  Figures 1 and 6, thus, do not persuasively demonstrate that the 21CR system is coextensive with the invention of claims 11, 13, and 15.

The 21CR Product Brochure contains annotations that purport to show that the 21CR system is coextensive with the invention of claims 11, 13, and 15.  Ex. 2024, 4–5.  Based upon the annotated 21CR Product Brochure, Dr. Weaver testifies that there is a nexus between the merits of claims 11, 13, and 15 (i.e., "synchronization, integration and consistency") and the 21CR system.  *See* Ex. 2019, 102–05.  The annotations, however, were not made by Dr. Weaver but by Patent Owner's counsel (Pet. Reply 21–22) and Dr. Weaver's testimony indicates that he relied upon the annotations.  *See* Ex. 2019, 105 ("The annotated brochure further shows the correspondence of 21CR to elements of specific claims").  Dr. Weaver's cross-examination testimony indicates that he relied upon representations from Patent Owner's counsel that the '325 patent was based on the 21CR product and didn't perform any independent investigation.

> Q. Okay. So is it fair to say that, as far as your analysis goes, you relied on representations from counsel that the '850 and '325 patents were based on the 21CR products and you didn't perform an independent investigation as to whether that's correct?
>
> A. Correct.

Ex. 1076, 219:11–20; *see also id.* at 216:3–219:10, 229:2–8.  The annotations are merely attorney argument unsupported by evidence and, thus, not persuasive.  *In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997) (stating that attorney arguments and conclusory statements that are unsupported by factual evidence are entitled to little probative value).  The

CBM2015-00082
Patent 6,871,325 B1

21CR Product Brochure and Dr. Weaver's testimony, thus, does not persuasively demonstrate that the 21CR system is coextensive with the invention of claims 11, 13, and 15.

Further, as discussed in detail below, other evidence provided by the Patent Owner suggests that the 21CR system is not coextensive with the invention of claims 11, 13, and 15.  For example, Patent Owner states that HostAlert, for which it won an award, is "a subset of the 21st Century Restaurant™ system/technology, inclusive of waitlisting, table management and reservations, but not including food and drink ordering."  PO Resp. 70 (citing Ex. 2027).  This indicates that the 21CR system includes additional features than those of the challenged claims, such as matching a waiting party in a database to a newly available table in a restaurant, based on party size and longest wait-time or adding a customer to a sister restaurant's waiting list.  *See* Ex. 2027, 6.

In addition to arguing that the 21CR system is coextensive with claims 11, 13, and 15, Patent Owner argues that the evidence of secondary considerations has a nexus with the "synchronization, integration, and consistency" features of claims 11, 13, and 5, which are required by the wherein clause of claims 11 and 13.  *See* PO Sur-Reply 1, Ex. 2019 ¶ 102.  In the analysis below, we address whether the evidence of secondary considerations has a sufficient nexus with the merits of the claimed invention.

## 2. Licensing

Licenses taken under the patent in suit may constitute evidence of non-obviousness; however, only little weight can be attributed to such

CBM2015-00082
Patent 6,871,325 B1

evidence if the patentee does not demonstrate "a nexus between the merits of the invention and the licenses of record." *In re GPAC Inc*., 57 F.3d at 1580 (internal quotation and citations omitted).

Patent Owner contends that the patents in the '325 family have been licensed by 44[5] companies, "the majority of these licenses occurring outside of litigation." PO Resp. 64–66, PO Sur-Reply 4. To support its contention, Patent Owner provides press releases, including its own, announcing the licenses (Exs. 2003, 2025) and an amendment to a license with Agilysys, Incorporated (Ex. 2025, 10–12). Patent Owner argues that that its press releases were jointly issued (PO. Resp. 65) and that majority of these licenses occurred outside of litigation (PO Sur-Reply 4).

Petitioner argues that the press releases do not show a nexus between the merits of the invention, do not state whether the '325 patent itself or the challenged claims were licensed, or whether litigation had been threatened. Pet. Reply 24.

We are persuaded by Petitioner that the press releases and the amendment to a license with Agilysys, Incorporated do not sufficiently establish a nexus between the license and the merits of invention of claims 11, 13, and 15. For example, because the press release in Exhibit 2003 states in the first paragraph that Patent Owner "has entered into a strategic patent license agreement with PAR Technology Corporation" and disparately discusses at least four of Patent Owner's patents, the press does not sufficiently indicate whether the license is for the '325 patent or the challenged claims. Ex. 2003, 2. Further, although Patent Owner states that

---

[5] In its Sur-Reply, Patent Owner asserts 46 licenses of the patents of the '325 family. PO Sur-Reply 4.

CBM2015-00082
Patent 6,871,325 B1

most of the licenses occurred outside of litigation, Patent Owner provides no evidence to show that the PAR Technology Corporation license or any of the other licenses occurred outside of litigation. Indeed, licensee Agilysys, Incorporated is listed as a defendant in a related matter on Patent Owner's mandatory notices. Paper 7, 4. Without such evidence that the licenses occurred outside of litigation, Patent Owner's argument is merely attorney argument and entitled to little weight. *In re Geisler,* 116 F.3d at 1470.

We are not persuaded that the evidence sufficiently establishes a nexus between the licensing and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of licensing overcomes Petitioner's showing of obviousness.

### 3. Commercial Success

Patent Owner argues that evidence of ". . . substantial, widespread commercial success" demonstrates the non-obviousness of claims 12–16. PO Resp. 66–68; *see also id.* at 56–59. Patent Owner argues that "the measures of the claimed invention's 'commercial success' are the partnerships and/or licenses of its products and co-existent intellectual property, as a result of its May 1999 launch at the [National Restaurant Association ("NRA")] show." *Id.* at 66–67.

Petitioner argues that Patent Owner's evidence is insufficient to establish a nexus between the alleged commercial success and the merits of the claimed invention. Pet. Reply 21–23.

We are not persuaded that the evidence sufficiently establishes the alleged commercial success or that a nexus exists between the alleged commercial success and the merits of the claimed invention. For example,

CBM2015-00082
Patent 6,871,325 B1

Patent Owner cites to the entirety of Exhibit 2026 to show that "[t]he 2004 and 2006 HT POS market reports and rankings show that Ameranth licensed 21CR to most of these leading POS companies, and achieved overwhelming market share." PO Resp. 67. Exhibit 2026 consists of two Hospitality Technology magazines ranking food service point-of-sale systems. The magazines do not show sufficiently that Patent Owner licensed its 21CR system to most of the leading point-of-sale companies or that Patent Owner achieved overwhelming market share. The magazines do not mention the 21CR system.

Patent Owner relies upon deposition testimony of Mr. John Harker to show commercial success, including "the incredible market reception that the 21CR system received at the May 1999 NRA show." PO Resp. 56–58 (citing Ex. 2022). For example, Mr. Harker testifies that tens of thousands walked by Ameranth's booth and hundreds stopped. Ex. 2002, 175:11–176:16. However, this does not sufficiently establish that the 21CR product captured a significant market share as a result of the May 1999 NRA show, commercial success of the 21CR product, or that the merits of the challenged claims were the cause of the commercial success.

We are not persuaded that the evidence sufficiently establishes the alleged commercial success or that a nexus exists between the alleged commercial success and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of commercial success overcomes Petitioner's showing of obviousness.

CBM2015-00082
Patent 6,871,325 B1

*4. Awards/Industry Praise*

Industry praise for an invention may provide evidence of non-obviousness where the industry praise is linked to the claimed invention. *See Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC,* 618 F.3d 1294, 1305 (Fed. Cir. 2010); *Asyst Techs., Inc. v. Emtrak, Inc.,* 544 F.3d 1310, 1316 (Fed. Cir. 2008).

First, according to Patent Owner, it was awarded four awards for its 21CR system and that these awards demonstrate the non-obviousness of claims 11, 13, and 15. PO Resp. 68–70; *see* PO Sur-Reply 2. Petitioner responds that the evidence concerning awards "lacks the requisite nexus because the reasons for the awards are either non-specific . . . or for non-claimed features." Pet. Reply 23.

The first award is the Innovation of the Year from the European Hospitality Solutions Technology Show in 1999. PO Rep. 69. Patent Owner asserts that the award was for its 21CR system but provides no other information concerning the award in its Patent Owner Response. *Id.* (citing Ex. 1012, 634–646[6]). Pages 635–36 of Exhibit 1012 is Patent Owner's own press release concerning the award. The press release indicates that the award was for its UltraPad™2700 and alleges that the UltraPad™2700 is the wireless hand-held computer of a number of Patent Owner's systems, including its 21CR system. Ex. 1012, 635–36. The press release, however, fails to show, sufficiently, a nexus between the award for the UltraPad™2700 and the merits of the invention of the challenged claim. It

---

[6] Although Patent Owner cites to pages 634–46 of Exhibit 1012, pages 634, 637–46 contain no mention of the Innovation of the Year award.

44

does not sufficiently describe how the UltraPad™2700 is integrated or synchronized with the 21CR system or that the award is for how the UltraPad™2700 is integrated or synced with the 21CR system.

The second award is the Moby Award from Mobile Insights and the third award is the 2001 Computerworld Honors Program and Collection. PO Resp. 69 (citing Ex. 1012, 680–81, 694–95). Pages 680–81 is Patent Owner's own press release concerning the Moby Award and page 695 is a letter concerning the 2001 Computerworld Honors Program and Collection ("the Computerworld Honor"). According to the press release and letter, Patent Owner received these awards for the deployment of the 21CR system at the Improv Comedy Club in Dallas. Ex. 1012, 681, 695. The press releases state that the Moby Award "specifically recognizes the wireless handheld computer ticket authorization and seating assignment application" (*id.* at 681), and the letter states that the honor was for a "case study" of the Ameranth Wireless's Improv Comedy Club Solution but does not specifically mention any feature of the solution. The press release and letter fails to show, sufficiently, a nexus between the Moby Award and the Computerworld Honor and the merits of the invention of the challenged claim. A ticket authorization and seating assignment application is not a feature of the invention of the challenged claims.

> With regards to the third award, the Patent Owner argues:

> Noteworthy in this award was the express confirmation that the innovations, reflected in the challenged claims as illustrated above, were <u>not available from any other company</u>. This award also shows that Tom Castillo, owner of the Improv, based his selection of Ameranth on the actual 21CR System demonstrated to him, at the May 1999 NRA show, thus confirming nexus of

this award to that product/technology, as it existed and was
policy shown/demonstrated in May 1999.

PO Resp. 69. The letter, however, contains no indication that the alleged
innovations, reflected in the challenged claims, were not available from any
other company or any mention of Tom Castillo or the basis of his selection.

The fourth award is a Microsoft Retail Application Developer
(R.A.D.) Award for Patent Owner's HostAlert system. *See* PO Resp. 70, Ex.
2027, 6. Patent Owner alleges that HostAlert is "a subset of the 21st Century
Restaurant™ system/technology, inclusive of waitlisting, table management
and reservations, but not including food and drink ordering." *Id.* (citing Ex.
2027). Patent Owner, however, provides no evidence to support its assertion
that HostAlert is a subset of its 21CR system or that the subset includes the
features of the challenged claims. To the contrary, the article relied upon by
Patent Owner indicates that HostAlert includes additional features than those
of the challenged claims, such as matching a waiting party in a database to a
newly available table in a restaurant, based on party size and longest wait-
time or adding a customer to a sister restaurant's waiting list. Ex. 2027, 6.

Second, Patent Owner argues that overwhelming industry praise for
the 21CR system is evidence of non-obviousness. PO Resp. 70–72. Patent
Owner states that "[t]he hospitality market press and numerous nationally
renowned publications including the Wall Street Journal, Time Magazine
and Harvard Business review have praised [the 21CR system]." PO Resp.
70–71. Patent Owner, further, argues that for the Computerworld Honor,
Microsoft founder Bill Gates personally nominated Ameranth with the praise
that "Ameranth is one of the leading pioneers of the information again for
the betterment of mankind." PO Resp. 71 (citing Ex. 1012, 694–95). Page
694–95 of Exhibit 1012, however, contains no mention of Bill Gates or the

CBM2015-00082
Patent 6,871,325 B1

alleged quotation.  We cannot consider evidence not adequately cited to in the record[7] or not provided in the record.  Without such evidence, Patent Owner's argument is merely attorney argument and entitled to little weight.

Patent Owner also argues that Marriott's vice-president Steve Glen, Harvard Business School Press, and other evidence praises the 21CR system.  PO Resp. 71–72 (e.g., quoting Ex. 1012, 646–48 ("the Marriot Letter"), Ex. 2028, 35 ("the Harvard Book").  This evidence is not persuasive.  For example, the Marriott Letter and the Harvard Book praise features of the 21CR system that are not features of the challenged claims, such as "laser bar-code scanning of customer frequency cards," "wait-list management functions" (Ex. 1012, 647) and "payment processing" (Ex. 2028, 35).

Patent Owner also argues that alleged praise from its licensees in its own press releases demonstrate that the invention is nonobvious.  PO Resp. 65.  For the same reasons discusses above, Patent Owner has not sufficiently demonstrated a nexus between the praise in the press releases the merits of the claimed invention.

Patent Owner has not sufficiently shown that the four awards and the alleged industry praise are linked to the merits of the claimed invention.  We, thus, give little weight to Patent Owner's argument that evidence of awards and industry praise overcomes Petitioner's showing of obviousness.

---

[7]  Exhibit 1012 contains 1154 pages.  It is not readily apparent that the article is contained elsewhere in Exhibit 1012.

### 5. Copying

"[C]opying by a competitor may be a relevant consideration in the secondary factor analysis." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (citing *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984). "[A] nexus between the copying and the novel aspects of the claimed invention must exist for evidence of copying to be given significant weight in an obviousness analysis." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012) (internal quotation and citation omitted).

Patent Owner alleges that multiple entities have copied it 21CR system and this copying is evidence of nonobviousness. PO Resp. 72–78; *see also* PO Sur-Reply 4–5. To support its allegation, Patent Owner points to numerous statements from competitors and the testimony of Dr. Weaver. *Id.*

Petitioner argues that Patent Owner's evidence is insufficient to establish a nexus between the alleged copying and the merits of the claimed invention. Pet. Reply 24–25.

We are not persuaded that the evidence sufficiently establishes the alleged copying or that a nexus exists between the alleged copying and the merits of the claimed invention. Patent Owner cites to statements made by employees of competitors, who allegedly had knowledge of the 21CR system, and articles to show copying. PO Resp. 72–78 (e.g., citing Ex. 2009). This evidence, however, fails to establish copying or a nexus between the alleged copying and the merits of the claimed invention. For example, Patent Owner cites articles that discuss Starbucks' "mobile order

and pay" system (Ex. 2009) and "ordering ahead and new payment features" (Ex. 2008). The articles, however, do not sufficiently describes Starbucks' mobile order and pay system as having the claimed synchronization, integration, and consistency features required by the wherein clause of claims 11 and 13 (i.e., the claimed communication control module and application program interface).

Further, Patent Owner relies upon the testimony of Dr. Weaver to show the Starbuck's system and certain pizza chains copied the relevant "synchronization, integration, and consistency" features of the challenged claims. Ex. 2019 ¶¶ 131, 135. We do not find Dr. Weaver's testimony to be persuasive or helpful. Dr. Weaver testifies that his opinion is based upon the evidence cited by Patent Owner and Starbucks' own materials on its "Mobile Order & Pay" system (*id.* ¶ 131) and his "review of their systems including their mobile apps" (*id.* ¶ 135). As discussed in the paragraph above, the evidence cited by Patent Owner does not sufficiently describe Starbucks' mobile order and pay system or the pizza chain's systems to establish that these systems are copies of the 21CR system. Further, Dr. Weaver's testimony that he reviewed Starbucks' and the pizza chain's systems is conclusory with little or no elaboration on those systems. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight"); *see also Rohm and Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) (nothing requires a fact finder to credit the inadequately explained testimony of an expert).

We are not persuaded that the evidence sufficiently establishes the alleged copying or that a nexus exists between the alleged copying and the

merits of the claimed invention.  We, thus, give little weight to Patent

Owner's argument that evidence of copying overcomes Petitioner's showing

of obviousness.

### 6. Failure of Others

Patent Owner must show that any evidence of long-felt need

"demonstrates both that a demand existed for the patented invention, and

that others tried but failed to satisfy that demand."  *In re Cyclobenzaprine

Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063,

1082 (Fed. Cir. 2012).

Patent Owner argues that many companies tried but failed to achieve

synchronization and integration with point-of-sale systems and other third

party systems and this failure by others is evidence of nonobviousness.  PO

Resp. 78–80.  To support its allegation, Patent Owner points to numerous

statements from employees of other companies and the testimony of Dr.

Weaver.  *Id.*

Petitioner argues that the evidence is insufficient to establish that

others tried but failed and to establish a nexus between the alleged failure of

others and the merits of the claimed invention.  Pet. Reply 25.

We are not persuaded that the evidence sufficiently establishes the

alleged long-felt need and failure of others or that a nexus exists between the

alleged long-felt need and failure of others and the merits of the claimed

invention.  Petitioner cites to numerous exhibits as allegedly showing the

failure of others.  PO Resp. 78–80.  For example, Exhibit 2001 is an email

from a Food.com employee discussing a license agreement with Patent

Owner and specifying the product and services it requires.  This, however,

CBM2015-00082
Patent 6,871,325 B1

does not sufficiently show that Food.com tried but failed to satisfy a demand for the patented invention.  In addition, Patent Owner states that "Food.com admitted it needed Ameranth's technology in its public release on July 16, 1999" (PO Resp. 78) but provides no citation to such a release in the record. We cannot consider evidence not adequately cited to in the record or not provided in the record.  *DeSilva*, 181 F.3d at 866–67 ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record").  Without such evidence, Patent Owner's argument is merely attorney argument and entitled to little weight.

We are not persuaded that the evidence sufficiently establishes the alleged failure of others or that a nexus exists between the alleged failure of others and the merits of the claimed invention.  We, thus, give little weight to Patent Owner's argument that evidence of failure of others overcomes Petitioner's showing of obviousness.

*7. Conclusion as to Secondary Considerations*

Patent Owner's evidence fails to demonstrate a sufficient nexus between the claimed invention and any of the alleged secondary considerations.  Patent Owner also fails to sufficiently demonstrate commercial success, licensing, copying, and long-felt-but-unmet need/failure of others for the claimed invention.  We, thus, determine that the proffered evidence of objective indicia of non-obviousness is insufficient to outweigh the evidence of obviousness in this case.

CBM2015-00082
Patent 6,871,325 B1

## III. MOTIONS TO EXCLUDE

Both Petitioner and Patent Owner filed motions to exclude evidence. Patent Owner moves to exclude certain paragraphs of Exhibit 1070 and the entirety of Exhibits 1071, 1072, 1073, 1078, 1079, 1080, 1081, and 1082. Paper 35. We do not rely on these exhibits in reaching our Decision and, thus, dismiss Patent Owner's motion to exclude these exhibits as moot.

Petitioner moves to exclude the entirety of Exhibits 2021, 2023, 2025, 2027, 2030–51, and 2053–56 and with the annotated portions of Exhibit 2024. Paper 33. We also dismiss Petitioner's motion to exclude these exhibits. Petitioner's motion to exclude theses exhibits is moot because we have found this evidence insufficient regardless of its admissibility.

## IV. CONCLUSION

We conclude Petitioner has proven, by a preponderance of the evidence, that claims 11, 13, and 15 of the '325 patent are unpatentable under 35 U.S.C. § 103 over DeLorme.

Patent Owner's Motion to Exclude Evidence is dismissed; and

Petitioner's Motion to Exclude Evidence is dismissed.

This is a Final Written Decision of the Board under 35 U.S.C. § 328(a). Parties to the proceeding seeking judicial review of this decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

## V. ORDER

Accordingly, it is hereby:

ORDERED that claims 11, 13, and 15 of U.S. Patent No. 6,871,325 B1 are *unpatentable*;

CBM2015-00082
Patent 6,871,325 B1

FURTHER ORDERED that Patent Owner's Motion to Exclude Evidence is *dismissed*; and

FURTHER ORDERED that Petitioner's Motion to Exclude Evidence is *dismissed.*

CBM2015-00082
Patent 6,871,325 B1

FOR PETITIONER:

James M. Heintz
Robert C. Williams
DLA PIPER LLP
AmeranthCBMService@dlapiper.com
robert.williams@dlapiper.com


FOR PATENT OWNER:

John W. Osborne
OSBORNE LAW LLC
josborne@osborneipl.com

Michael D. Fabiano
FABIANO LAW FIRM, P.C.
mdfabiano@fabianolawfirm.com

CBM2015-00082
CBM2015-00097

Date: September 21, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE, INC., EVENTBRITE INC., STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., EXPEDIA, INC., FANDANGO, LLC,
HOTELS.COM, L.P., HOTEL TONIGHT, INC., HOTWIRE, INC.,
KAYAK SOFTWARE CORP., OPENTABLE, INC., ORBITZ, LLC, PAPA
JOHN'S USA, INC., STUBHUB, INC., TICKETMASTER, LLC, LIVE
NATION ENTERTAINMENT, INC., TRAVELOCITY.COM LP,
WANDERSPOT LLC, AGILYSYS, INC., DOMINO'S PIZZA, INC.,
DOMINO'S PIZZA, LLC, HILTON RESORTS CORPORATION,
HILTON WORLDWIDE, INC., HILTON INTERNATIONAL CO., MOBO
SYSTEMS, INC., PIZZA HUT OF AMERICA, INC., PIZZA HUT, INC.,
and USABLENET, INC.,
Petitioner

v.

AMERANTH, INC.
Patent Owner
_____

Case CBM2015-00082[1]
U.S. Patent No. 6,871,325 B1
_____

**PATENT OWNER AMERANTH'S NOTICE OF APPEAL**

_____

[1] CBM2015-00097 has been consolidated with this proceeding.

CBM2015-00082
CBM2015-00097

## PATENT OWNER AMERANTH'S NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Ameranth, Inc. (Patent Owner), hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision in Case CBM2015-00082 and CBM2015-00097 that was entered on August 26, 2016 (Paper 47), and from all underlying findings, orders, decisions, rulings, and opinions in those Covered Business Method proceedings before the Patent Trial and Appeal Board.

Patent Owner further states, per 37 C.F.R. § 90.2(a)(3)(ii), that the issues presented on this appeal include, but are not limited to: The decision of the Patent Trial and Appeal Board in the underlying proceedings that claims 11, 13, and 15 of U.S. Patent No. 6,871,325 B1 are unpatentable under 35 U.S.C. § 103, along with any appealable finding, conclusion, or determination related in any way to that decision, and any other appealable issues decided adversely to Patent Owner in any orders, decisions, rulings, or opinions in CBM2015-00082 and/or CBM2015-00097.

A copy of this Notice of Appeal is being concurrently filed with the Patent Trial and Appeal Board, and three copies of this Notice of Appeal, plus the required docketing fees, are being filed with the Clerk's Office of the United States Court of Appeals for the Federal Circuit.

September 21, 2016                    Respectfully Submitted,

/John W. Osborne/
John W. Osborne
Lead Counsel for Patent Owner
USPTO Reg. No. 36,231
OSBORNE LAW LLC
33 Habitat Lane
Cortlandt Manor, NY 10567
josborne@osborneipl.com
Tel.: 914-714-5936
Fax: 914-734-7333

Michael D. Fabiano
Back-up Counsel for Patent Owner
USPTO Reg. No. 44,675
FABIANO LAW FIRM, P.C.
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
mdfabiano@fabianolawfirm.com
Tel.: 619-742-9631

CBM2015-00082
CBM2015-00097

## CERTIFICATE OF FILING AND SERVICE

I certify that true and correct copies of the foregoing PATENT OWNER

AMERANTH'S NOTICE OF APPEAL were submitted, as set forth below, on

September 21, 2016.

**1 copy, via hand delivery to:**

Director of the U.S. Patent and Trademark Office
c/o Office of the General Counsel, United States Patent and Trademark Office
Madison Building East, Room 10-B-20
600 Dulany Street
Alexandria, VA  22314

**1 copy, via hand delivery, plus filing fee, to:**

Clerk of Court, U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC  20439

**1 copy, electronically via PTAB End-to-End System to:**

Patent Trial and Appeal Board, U.S. Patent and Trademark Office

**1 copy each, via email, per agreement of the parties, to:**

| | |
|---|---|
| James M. Heintz<br>DLA PIPER LLP (US)<br>11911 Freedom Drive, Suite 300<br>Reston, VA 20190-5602<br>jim.heintz@dlapiper.com | Robert C. Williams<br>DLA PIPER LLP (US)<br>401 B Street, Suite 1700<br>San Diego, CA 92101<br>robert.williams@dlapiper.com |
| Richard S. Zembek<br>NORTON ROSE FULBRIGHT<br>1301 McKinney, Suite 5100<br>Houston, TX 77010<br>richard.zembek@nortonrosefulbright.com | Gilbert A. Greene<br>NORTON ROSE FULBRIGHT<br>98 San Jacinto Boulevard, Suite 1100<br>Austin, TX 78701<br>bert.greene@nortonrosefulbright.com |

September 21, 2016

*/s/ Michael D. Fabiano /*
Michael D. Fabiano

3

Trials@uspto.gov                                                    Paper 38
Tel: 571-272-7822                                        Entered: September 13, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

STARBUCKS CORPORATION, APPLE, INC., EVENTBRITE INC., and
STARWOOD HOTELS &
RESORTS WORLDWIDE, INC.,
Petitioner,

v.

AMERANTH, INC.,
Patent Owner.
_____

Case CBM2015-00091[1]
Patent 6,384,850 B1
_____

Before MEREDITH C. PETRAVICK, RICHARD E. RICE, and
STACEY G. WHITE, *Administrative Patent Judges.*

WHITE, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
Covered Business Method Patent Review
*35 U.S.C. § 328 and 37 C.F.R. § 42.73*

_____

[1] Case CBM2016-00007 has been joined with this proceeding.

CBM2015-00091
Patent 6,384,850 B1

# I. INTRODUCTION

## A. Background

Starbucks Corporation filed a Petition (Paper 1, "Pet.") requesting covered business method patent review of claims 12–16 ("challenged claims") of U.S. Patent No. 6,384,850 B1 (Ex. 1001, "the '850 patent") pursuant to § 18 of the Leahy-Smith America Invents Act ("AIA").  Ameranth, Inc. ("Patent Owner") filed a Preliminary Response.  Paper 7 ("Prelim. Resp.").

Pursuant to 35 U.S.C. ¶ 324, we instituted this trial on the following grounds (Paper 9, "Dec."):

| References | Basis | Claims Challenged |
|---|---|---|
| Brandt[2] and NetHopper[3] | § 103 | 12–16 |
| Brandt, Demers,[4] and Alonso[5] | § 103 | 12–16 |

Apple Inc., EventBrite, Inc. and Starwood Hotels & Resorts Worldwide, Inc.[6] subsequently requested covered business method patent review of the same claims based on the grounds instituted in this proceeding and sought joinder with this

---

[2] Japanese Unexamined App. No. H10-247183 (published Sept. 14, 1998) (Ex. 1004) (certified translation, Ex. 1005, "Brandt").

3 NetHopper Version 3.2 User's Manual, 1–24 (1997) (Ex. 1006, "NetHopper").

[4] Alan Demers, et al., *The Bayou Architecture: Support for Data Sharing Among Mobile Users*, Mobile Computing Systems & Applications, 1995. Proceedings, Workshop on. IEEE, 1–7, 1995. (Ex. 1009, "Demers").

[5] Gustavo Alonso et al., *Exotica/FMDC: A Workflow Management System for Mobile and Disconnected Clients*, Databases & Mobile Computing, 28–45, 1996 (Ex. 1012, "Alonso").

6 The term Petitioner as used in this Decision collectively refers to Starbucks, Apple Inc., EventBrite, Inc. and Starwood Hotels & Resorts, Worldwide, Inc.

CBM2015-00091
Patent 6,384,850 B1

proceeding. CBM2016-00007, Paper 1, 2. We instituted reviewed on that petition and joined it with this proceeding. Paper 28.

Patent Owner filed a Corrected Patent Owner's Response. Paper 17 ("PO Resp."). Petitioner filed a Reply to Patent Owner's Response. Paper 19 ("Reply"). Patent Owner filed a Sur-Reply to Petitioner's Reply. Paper 24 (Sur-Reply); *see also* Paper 22 (Order authorizing Patent Owner's Sur-Reply). In addition, the parties filed cross motions seeking to exclude documents. *See* Paper 26 ("Pet. Mot. Excl."), Paper 25 ("PO Mot. Excl.").

An oral hearing was held on May 10, 2016. A transcript of the hearing is included in the record. Paper 37 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 12–16 of the '850 patent are unpatentable.

## B. *Related Proceedings*

The parties indicate that the '850 patent is the subject of the following district court case: *Ameranth, Inc. v. Starbucks Corp.,* No. 3-13-cv-01072 (S.D. Cal.) filed May 6, 2013. Pet. 2 (citing Ex. 1045). Petitioner notes that Patent Owner has asserted the '850 patent against thirty-five other defendants in a number of civil actions that have been consolidated into *Ameranth, Inc. v. Pizza Hut,* No. 3-11-cv-01810 (S.D. Cal.). *Id.* at 3.

In a previous proceeding before the Board, claims 1–11 of the '850 patent were held to be unpatentable. *Agilysys, Inc. v. Ameranth, Inc.,* Case CBM2014-00015 (PTAB Mar. 20, 2015) (Paper 36). Petitioner also filed a petition for covered business method patent review of a related patent, U.S. Patent No.

CBM2015-00091
Patent 6,384,850 B1

6,871,325 B1. *Starbucks Corp. v. Ameranth, Inc.,* Case CBM2015-00099. Patent Owner identifies numerous covered business method patent reviews (both pending and completed) that it states are related to this Petition. Paper 5 (Notice of Related Matters). The previous and pending related petitions are summarized in the table below.

| U.S. Patent No. | Previous CBM Reviews | Pending CBM Reviews |
|---|---|---|
| 6,384,850 B1 | CBM2014-00015<br>CBM2015-00080<br>CBM2015-00096 | |
| 6,871,325 B1 | CBM2014-00016<br>CBM2015-00082<br>CBM2015-00097 | CBM2015-00099 |
| 6,982,733 B1 | CBM2014-00013 | |
| 8,146,077 B1 | CBM2014-00014<br>CBM2015-00081<br>CBM2015-00095 | |
| 9,009,060 B2 | | CBM2016-00053 |

*C. The '850 Patent*

The '850 patent, titled "Information Management and Synchronous Communications System with Menu Generation" issued May 7, 2002 based on Application No. 09/400,413 filed September 21, 1999. Ex. 1001, at [21], [22], [45], [54]. The challenged claims are directed to an information management and synchronous communications system. *Id.* at 16:1–47. This system "results in a dramatic reduction in the amount of time, and hence cost, to generate and maintain computerized menus for, e.g., restaurants and other related applications that utilize non-PC-standard graphical formats, display sizes or applications." *Id.* at 3:26–30.

The system includes a central database, multiple handheld devices, and a web server. *Id*. at 3:59–63. It also includes an application programming interface

CBM2015-00091
Patent 6,384,850 B1

("API") that enables third parties, such as point-of-sale companies, affinity program companies, and internet content providers, to integrate fully with the computerized hospitality applications. *Id.* at 2:11–16; 3:64–67; 11:15–19. The system has a communications control module to "provide[] a single point of entry for all hospitality applications, e.g., reservations, frequent customer ticketing, wait lists, etc.[,] to communicate with one another wirelessly and over the Web." *Id.* at 4:5–8. This communications control module is a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol. *Id.* at 4:8–11; 11:24–30.

Claim 12 of the '850 patent is illustrative of the claims at issue and read as follows:

> 12. An information management and synchronous communications system for use with wireless handheld computing devices and the internet comprising:
>
> a. a central database containing hospitality applications and data,
>
> b. at least one wireless handheld computing device on which hospitality applications and data are stored,
>
> c. at least one Web server on which hospitality applications and data are stored,
>
> d. at least one Web page on which hospitality applications and data are stored,
>
> e. an application program interface, and
>
> f. a communications control module,
>
> wherein applications and data are synchronized between the central data base, at least one wireless handheld computing device, at least one Web server and at least one Web page; wherein the application program interface enables inte[]gration of outside applications with the hospitality applications and wherein the

CBM2015-00091
Patent 6,384,850 B1

> communications control module is an interface between the
> hospitality applications and any other communication protocol..

Ex. 1001, 16:1–22.

### D. Standing for Covered Business Method Patent Review

As stated in our Decision on Institution, Petitioner provided sufficient evidence and arguments to show that claim 12 of the '850 patent is sufficient to subject this patent to covered business method patent review. Dec. 6–9. We discern no reason to modify or further discuss in this Final Written Decision our determination regarding standing.

We do note, however, Patent Owner's improper attempt to incorporate by reference arguments made in its Preliminary Response (Paper 7) into the Patent Owner's Response. PO Resp. 1 n. 1 ("Patent Owner incorporates herein its Preliminary Response arguments regarding standing and preserves its right to appeal the Board's determination thereof."). Our Rules prohibit incorporating arguments by reference. 37 C.F.R. § 42.6(a)(3) states: "[a]rguments must not be incorporated by reference from one document into another document." Incorporation by reference circumvents our Rule limiting the pages in the Patent Owner response to 80 pages. *See* 37 C.F.R. § 42.24(b)(2).[7] Arguments that are not developed and presented in the Patent Owner Response, itself, are not entitled to consideration. *See* Paper 10, 3 (cautioning Patent Owner "that any arguments for patentability not raised [and fully briefed] in the response will be deemed waived.").

---

[7] Rule 42.24(b)(2) was amended, effective May 2, 2106. The Corrected Patent Owner's Response, however, was filed February 1, 2016, prior to that date and, thus, we refer to the prior version of 37 C.F.R. § 42.24(b)(2).

CBM2015-00091
Patent 6,384,850 B1

The only other argument raised in regards to standing is Patent Owner's statement that "Petitioner's standing argument merely references CBM2014-00015, and is thus insufficient." PO Resp. 1 n. 1. As explained in our Decision, we determined that the Petition established that claim 12 of the '850 patent was eligible for covered business method patent review. *See* Dec. 6–9. The standing analysis in CBM2014-00015 was directed to claim 1 of the '850 patent. *Agilysys, Inc. v. Ameranth, Inc.,* CBM2014-00015, slip. op. at 9–14 (PTAB Mar. 26, 2014) (Paper 20). Thus, Patent Owner's contentions regarding CBM2014-00015 are not applicable to this case.

## II. ANALYSIS

### A. *Claim Construction*

The Board interprets claims of unexpired patents using the broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.300(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation approach). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

#### 1. *"hospitality applications"*

Independent claim 12 recites "hospitality applications." Ex. 1001, 16:7–22. In our Institution Decision, we analyzed this term and determined that the

CBM2015-00091
Patent 6,384,850 B1

construction implied in a previous case "applications used to perform services or tasks in the hospitality industry" should also apply in this case.  Dec. 11 (citing *Agilysys, Inc. v. Ameranth, Inc.*, Case CBM2014-00014, slip op. at 16–17 (PTAB Mar. 26, 2014) (Paper 19)).  We also stated that the broadest reasonable interpretation of hospitality includes businesses such as car rental agencies, which provide services to travelers.  *Id.* at 12.  Patent Owner and Petitioner agree with this construction, but Patent Owner seeks clarification as to its scope.  PO Resp. 5; Reply 1–4.  Specifically, Patent Owner seeks to exclude car rental agencies from the construction.  PO Resp. 5.

According to Patent Owner, the invention of the '850 is directed to "the **traditional** restaurant processes" and as such, the construction of hospitality excludes both car rentals and the broader travel/tourism industry.  *Id*. at 7 (quoting Ex. 2044, 1).  Patent Owner contends that the specification shows that the recited term "hospitality" excluded travel and tourism.  *Id.* at 6–7.  In addition, Patent Owner argues that portions of the Dittmer reference (Ex. 1035) submitted with the Petition omitted key portions of the textbook that would have shown travel and tourism to be distinct from hospitality.  PO Resp. 7–8.  Patent Owner has placed the entire Dittmer textbook in evidence.  *See* Ex. 2040.

First, we start with the text of the '850 patent.  *See Microsoft Corp. v. Proxyconn, Inc*., 789 F.3d 1292, 1298 (Fed. Cir. 2015).  The specification discusses the use of "PDA type devices in the restaurant and hospitality fields." Ex. 1001, 1:57–58; *see also id* at 1:65–67 (noting that "substantial use of such devices in the restaurant and hospitality context has not occurred to date"); and 2:1–2 ("PDAs have not been quickly assimilated into the restaurant and hospitality industries").  Thus, we determine that the specification's repeated discussions of "restaurants and hospitality" indicate that the Patentee viewed restaurants and

hospitality as two distinct fields or industries. *See id.* There is a single mention of a "restaurant and hospitality industry." *Id.* at 3:40–43. This indicates that the Patentee viewed these distinct fields or industries as related and that one could broadly view restaurants and hospitality as part of the same industry. Thus, we find that the specification supports a construction of hospitality that includes but is not limited to the restaurant industry.

During the prosecution of a related patent, the Patentee stated that to one of ordinary skill in the art, "a hospitality software application is, *for example*, a piece of software used to provide operational solutions in hospitality industries *such as* restaurants and hotels concerning, for example, food ordering, menus, wait-lists and reservations." Ex. 2039, 7 (emphases added). Hotels are not discussed in the '850 patent, but according to the Patent Owner they are an example of a type of business that is included within the hospitality industry. *See* PO Resp. 6. We look to the specification to see if the Patentee provided insight as to what other businesses properly may be included within the construction of this term. The specification provides several generic examples of hospitality applications. Ex. 1001, 4:6–7 ("hospitality applications, e.g., reservations, frequent customer ticketing, wait lists, etc."). These applications, however, have utility in a broad range of fields (e.g., table reservation, rental car reservation, room reservation, etc.) and thus, we do not find this language to be limiting as to the proper construction of hospitality.

We then look to evidence outside of the patent and its prosecution history to gain additional insight into how one of ordinary skill in the art would have understood this term. In the Institution Decision, we cited a section of the Dittmer reference titled "A Definition of Hospitality." Dec. 11 (citing Ex. 1035, 5–6). We noted that Dittmer provided both a "traditional view" of hospitality and a broader

CBM2015-00091
Patent 6,384,850 B1

view. *Id.* The traditional view "refers to the act of providing food, beverages, or lodging to travelers." *Id.* Patent Owner urges that we adopt that view of the scope of the term. PO Resp. 7. In our Decision, we also noted the broader view that includes "services primarily to travelers in a broad sense of the term. By contrast, other service businesses ordinarily deal with customers who are local residents rather than travelers." Dec. 11–12 (quoting Ex. 1035, 6). We also cited Dittmer's statement that the definition of hospitality "is really quite broad" (*id*. at 12 (citing Ex. 1035, 7)) and Dittmer's listing car rental agencies as a business providing service to travelers (*id*. (citing Ex. 1035, 404)).

Patent Owner contends that Dittmer also includes statements that differentiate food, beverages, and lodging from travel and tourism. Specifically, Patent Owner relies upon the following statement found in Dittmer: "In this chapter and the two that follow, we will turn [] <u>from</u> the specifics of <u>food, beverage and lodging</u> operations to ***the <u>larger</u> industry, of which <u>hospitality</u> operations are a part; <u>travel and tourism</u>.***" PO Resp. 8 (quoting Ex. 2040, 396) (emphasis in original). According to Patent Owner, this shows that travel and tourism is a broad industry and hospitality is a subset of that industry. *Id.* Petitioner points out that Dittmer is a book titled "Dimensions of the Hospitality Industry" and it includes three chapters on travel and tourism, which it argues indicates that travel and tourism are a part of hospitality. Reply. 1.

Petitioner also provides declaration evidence from Dr. Mahmood A. Khan. *See* Ex. 1064. Dr. Khan is a professor in the Hospitality and Tourism Department at Virginia Polytechnic Institute and State University. *Id.* ¶ 1. He has over forty years of experience in the hospitality industry. *Id.* ¶ 1, App'x A. Dr. Khan testified that "the hospitality industry encompassed and included 'travel and tourism' (including car rentals)." *Id.* ¶ 15. According to Dr. Khan,

10

CBM2015-00091
Patent 6,384,850 B1

> Among the wide ranging services in the hospitability industry,
> transportation services, lodging services and services of food and
> beverages in connection with the needs of people away from home are
> fundamentally intertwined and practically inseparable for travelers.  It
> is difficult for people in the hospitability industry to image how one of
> those three types of services be separated from one another.

*Id.* ¶ 16.  He explained that car rental applications were integrated into centralized

systems for airline and hotel room reservations and provided examples of such

centralized systems that were available in 1999.  *Id.* ¶ 19.

Patent Owner challenges Dr. Khan's testimony by asserting that he is not a

computer scientist and not qualified to testify as to applications.  Tr. 94:13–95:20.[8]

This argument is misplaced.  Dr. Khan testimony goes to scope of the hospitality

industry as it would have been understood at the time of the invention of the '850

patent.  We find Dr. Khan to be qualified to opine as to the boundaries of the

hospitality industry and as to the types of applications that would be used within

that industry at the relevant time.

We find that the evidence supports the view that one of ordinary skill in the

art would have understood hospitality to be a broad term that includes travel and

tourism as well as hotels and restaurants.  As discussed above, we find that the

specification treats restaurants and hospitality as separate but related industries.

Patent Owner includes hotels and restaurants in its view of hospitality, however,

hotels and restaurants are part of travel and tourism.  *See, e.g.,* Ex. 2040, 403–04

(noting that "travel service providers" includes car rental companies, hotels, and

restaurants).  The specification focuses on hospitality industry problems involving

the use of paper based systems for "ordering, reservations and wait-list

---

[8] Petitioner submitted Dr. Khan's declaration along with its Reply.  Thus, Patent
Owner could not have addressed this declaration in its Patent Owner Response.

CBM2015-00091
Patent 6,384,850 B1

management." Ex. 1001, 1:21–24. Brandt describes ordering (specifying the type of car to be rented) (Ex. 1005 ¶ 90) and reservations (*id.* ¶¶ 89, 91) in the rental car context. Dittmer intertwines food, beverage, lodging, travel, and tourism because these industries are related and interdependent. Thus, we determine that the broadest reasonable interpretation of hospitality would include travel and tourism related businesses such as car rental businesses.

### 2. *"web page"*

We construed the term "web page" to mean "a document, with associated files for graphics, scripts, and other resources, accessible over the internet and viewable in a web browser" in our Decision on Institution. Dec. 10–11. Based on our review of the full record of this proceeding we see no reason to modify that construction. *See* PO Resp. 4–5; Reply 4.

### 3. *other terms*

Patent Owner proposes constructions for various other claim terms. *See* PO Resp. 3–15. We find, however, that these terms need no explicit construction. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

### B. *Proposed Grounds of Obviousness over Brandt and NetHopper*

Petitioner argues that claims 12–16 would have been obvious over the teachings of Brandt and NetHopper. Pet. 45–64. Patent Owner disputes Petitioner's contentions, arguing that these asserted grounds do not render obvious the challenged claims. PO Resp. 24–51. We have reviewed the Petition, the Patent Owner's Response, Petitioner's Reply, as well as the relevant evidence discussed in those papers and other record papers. As described in further detail below, we determine the record supports Petitioner's contentions and adopt Petitioner's contentions discussed below as our own. For reasons that follow, we

CBM2015-00091
Patent 6,384,850 B1

determine that Petitioner has shown by a preponderance of the evidence that claims 12–16 are unpatentable as obvious over the teachings of Brandt and NetHopper.

### *1. Overview of Brandt*

Brandt is a Japanese patent publication directed to "provid[ing] the capability to easily access many different application programs over the [world wide web ("WWW")] via a common user interface." Ex. 1005, Abstract. Figure 3 of Brandt is reproduced below.



# FIG. 3

Figure 3, reproduced above, is a block diagram of Brandt's system that allows access to a software application over the WWW. *Id.* at Fig. 3. Client workstation 210 "may be any computer that is capable of providing access to the WWW by using web browser 212 [including] handheld, portable or laptop computers, standard desktop computer systems, [and] Personal Digital Assistants (PDAs)." *Id.* ¶ 14. Data such as HTML code, graphics, audio, and Java applets may be transmitted to and displayed on the client workstation 210. *Id.* ¶ 16.

> Web server computer system 220 typically outputs pages of HTML data to WEB browser 212 in response to requests by web browser 212 that reflect action taken by the user at client workstation 210. In addition, as explained above, web server computer system 220 may output other types of data to web browser 212 as well.

13

*Id.* ¶ 17.  This data output to the client workstations may include dynamic web pages.  *Id.*  When a user submits a request over the WWW, the web server application receives data from web browser 212.  *Id.* ¶¶ 31, 79.  If the user request requires access to an application, the web server application will pass data to CGI 420.  *Id.* ¶ 80.  CGI 420 is a "Common Gateway Interface (CGI) module[].  CGI modules may be used as an interface between web server application 222 and other software applications."  *Id.* ¶ 19.  "CGIs allow web servers to distribute dynamic data from other software applications."  *Id.*  CGI 420 is a component of Gateway 332.  *Id.* ¶¶ 77–78.  Gateway 332 utilizes conversation identifiers "to control the flow of data between the various users and software application 342."  *Id.* ¶ 64.  Brandt's system also includes an API that is "used by program developers to provide access to certain features of a given software application.  Each application program will have APIs that allow third parties to access certain features, to interface the application program with other programs, and to provide access for end-users."  *Id.* ¶ 22.

The application of Brandt's system is explained through the description of an exemplary application, FlowMark.  *Id.* ¶ 75.  FlowMark is a work flow application that may be used in many contexts, but an example provided describes using FlowMark to implement and improve on the existing car rental process.  *Id.* ¶¶ 6, 78, 89–122.  In this example, the user submits data via a reservation form on the rental car agency's web site.  *Id.* ¶ 90.  The reservation form is generated from an HTML template sent from web server 222 to the browser on the client's device.  *Id.* ¶ 91.  The user uses the form generated from the HTML template to submit data that is transmitted to the web server.  *Id.*  The HTML template also may contain variables including variables to substitute or replicate Java script variables or templates.  *Id.* ¶¶ 95, 108.  The variables could be used to start the FlowMark

application or "retrieve information from different software applications." *Id.* An application may be invoked to perform a task such as querying FlowMark database 438 to determine if the person renting the car is an existing customer of the car rental agency, updating the database to indicate that a car has been reserved, or determining that a rental request should be routed to a human operator for further processing. *Id.* ¶¶ 101–102.

### 2. Overview of NetHopper

NetHopper is a user's manual that discusses NetHopper version 3.2. Ex. 1006. The NetHopper application is a web browser for the Newton® PDA. *Id.* at 1. Petitioner provides a Declaration from Wayne Yurtin, an author of NetHopper, in which he testifies regarding the public accessibility of the NetHopper manual. Ex. 1007 ¶¶ 18–21. NetHopper discloses a mobile browser that is capable of viewing most HTML web pages, storing pages for later viewing, storing bookmarks, submitting forms via an HTML page, and retrieving email. Ex. 1006, 1. NetHopper discusses using and creating HTML templates. *Id.* at 15, 17, 18.

### 3. Analysis of Asserted Ground of Obviousness over Brandt and NetHopper

#### (1) Independent Claim 12

Petitioner has established that one of ordinary skill in the art would have learned all of the limitations of claim 12 of the '850 patent from the teachings of Brandt and NetHopper. As discussed above, Brandt teaches a system that includes a central database, a wireless handheld device, a web server, and a web page. Pet. 49–52. Brandt also teaches the existence of hospitality applications and data on these elements. *Id*; Reply 5–6. Specifically, Petitioner points to the web based car rental application and database as teaching hospitality applications and data. Pet. 49–52; Ex. 1003 ¶¶ 172–173. Petitioner also directs us to Brandt's discussion of dynamic web pages as teaching the claimed hospitality applications and data. Ex.

CBM2015-00091
Patent 6,384,850 B1

1003 ¶ 165 (quoting Ex. 1005 ¶ 17 ("Web server application 222 may dynamically build output data (e.g., an HTML page) from parts that it retrieves from within memory within web server computer system 220 or from other computer systems, or may simply pass through an HTML page or other information that has been developed at an earlier time or by another computer.")); *see also id.* ¶ 169 (quoting Ex. 1005 ¶ 55 ("Gateway 332 then outputs the HTML template to web server 222 with the real data substituted for the substation variables (step 731). Web server application 222 then provides the web server output data to web browser 212 (step 733).").  Petitioner also points out that Brandt's web pages can include executable applications such as Java applets and/or JavaScript. Pet. 52 (citing Ex. 1005 ¶¶ 16, 107).[9]  Petitioner relies upon NetHopper's discussion of caching a web page to teach storage of applications and data on a handheld device. *Id.* at 49–50 (citing Ex. 1006, 17–18).  Petitioner argues that Brandt teaches the claimed synchronization through its discussion of HTML templates that include input and/or substitution variables. *Id.* at 55–56.  These variables are used to pass data between the components of the system. *Id.*  As noted in Brandt, the data transmitted between the elements of the system includes HTML code, graphics, audio, and Java applets. Ex. 1005 ¶ 16.  Brandt teaches an API to facilitate communication between its system and "other programs." *Id.* ¶ 22.  Brandt also teaches the claimed communications control module through its discussion of Application Gateway 332. *Id.* at 53–54.  Brandt's gateway includes CGI module 420 and FlowMark/Internet Gateway (FMIG) 430. *Id.* at 54 (citing Ex. 1005 ¶¶

---

[9] Patent Owner asserts that the Board *sua sponte* included Java in the asserted grounds. PO Resp. 31. We disagree. Petitioner cited Brandt's use of Java in the Petition and supporting declaration. *See* Pet. 52, Ex. 1003 ¶¶ 182–183. Thus, Petitioner brought forth this evidence in its case-in-chief and Patent Owner was on notice that evidence was being cited against its claims. Dec. 26.

CBM2015-00091
Patent 6,384,850 B1

77–78, 82–83, 87, Figs. 4, 10). Petitioner asserts that the gateway "enables communication over a network between the clients and the software applications." *Id.* (citing Ex. 1005 ¶¶ 56, 64, 68).

Patent Owner asserts that Brandt fails to teach a hospitality application. PO Resp. 28. This argument is premised on Patent Owner's construction of "hospitality." *Id.* As discussed above in Section II.A.1, we find that the proper construction of this term includes car rental and thus, we are persuaded that Brandt teaches a hospitality application as recited in the claim 12.

Patent Owner argues that the challenges based on Brandt should fail because Petitioner's asserted grounds would require a change in Brandt's principles of operation and Brandt teaches away from the synchronization core to the challenged claims. PO. Resp. 18–23. This argument is premised on Brandt's usage of a common user interface being inconsistent with the '850 patent's core purpose of providing synchronization and consistency across an entire system of handheld devices and non PC standard displays. *Id.* at 19. As we noted in the Decision to Institute, "[t]he claims at issue, however, are not directed to a user interface and instead focus on the back end communications between the various system elements." Dec. 30. Patent Owner asserts that it was error to exclude the user interface from the claims because "no system comprising the elements of claims 12–16 could be 'used' <u>without</u> a user interface." PO Resp. 22. It goes on to discuss the claims' need for a web browser, which Patent Owner describes as a user interface. *Id.* There are, however, many unclaimed elements that would be required for the implementation of the challenged claims. For example, the claims do not discuss a power source and one would unquestionably be required for such a device to operate. The issue here is whether the user interface is claimed as part of the invention described in the challenged claims. These claims make no

reference to any elements of a user interface. The claims are instead directed to "[a]n information management and synchronous communications system." Ex. 1001, 16:1–2. Any differences between Brandt's user interface and a user interface that may be described in the '850 patent does not preclude Brandt's communication system from rendering obvious the claimed communication system.

Patent Owner argues that the proposed combination does not teach a central database. PO Resp. 25–26. Specifically, Patent Owner asserts that Brandt lacks the "central" aspect of the claim language. *Id.* at 26. Brandt describes FlowMark database 438, which is used to store information relating to the rental car process. Ex. 1005 ¶ 78. Database 438 also includes application data such as process models and status information. *Id.* In addition, Petitioner's expert Dr. Abdelsalam Helal testified that at the time of the invention of the '850 patent that it was known to store business logic such as procedures, triggers, and constraints in a database. Ex. 1003 ¶ 156 (citing Ex. 1020, 8). Dr. Helal's testimony in conjunction with the disclosures of Brandt evidence that one of ordinary skill in the art would have found Brandt to teach a central database containing hospitality applications and data. We find that one of ordinary skill in the art would have learned the recited central database from Brandt's disclosure of a database central to the car reservation process that includes data relating to car rental and application logic such as process models, which "describe the process flow and activity" of the FlowMark transaction. *See* Ex. 1005 ¶ 76.

Patent Owner also asserts that the cited art fails to teach the claimed synchronization between the central database, wireless handheld computing device, web server, and web page. PO Resp. 27. Brandt includes web browser 212 that is displayed on client workstation 210. Ex. 1005, Fig. 3. "Brandt teaches

CBM2015-00091
Patent 6,384,850 B1

that client workstations may be any type of computer with a web browser, including handheld computers and PDAs." Pet. 49 (citing Ex. 1005 ¶ 14). Petitioner relies upon this teaching in conjunction with NetHopper's discussion of a PDA that caches web pages and interactive HTML forms on the device to teach the claimed wireless handheld computing device. *Id.* at 49–50; Reply 8–9; *see also* Tr. 42:15–17 ("The HTML pages can include executable code like JavaScript and Java applets, as I mentioned. The pages can have interactive forms."). Petitioner relies upon Brandt's web server, which serves static and dynamic HTML pages to teach the recited web server and its resident data and applications. Pet. 50–51. As to the recited web page and its data and applications, Petitioner cites to Brandt's static and dynamic web pages that may include HTML forms and Java applets and/or JavaScript. *Id.* at 52; Reply 7. As shown in Figures 3 and 4 of Brandt, the cited elements of Brandt are in communication with one another. *See* Ex. 1005, Figs. 3, 4. Petitioner contends that Brandt teaches synchronization through its discussion of using HTML templates and substitution variables to pass data between the cited elements of Brandt. Pet. 56. Brandt also includes a set of APIs, which facilitate the exchange of data between applications and clients in the system. *Id.*

Patent Owner asserts that the passage of data between these elements via HTML forms and substitution variables is not enough to meet the claim language because synchronization of the recited hospitality applications requires the transmission of an executable file. Tr. 55:24–56:10. When asked for support in the specification for this requirement, Patent Owner responded that the original claims of the '850 patent included synchronization and their status as original claims causes them to be self-supporting. *Id.* at 56:16–18. The Federal Circuit, however, has held that "[n]either the statute nor legal precedent . . . distinguishes

CBM2015-00091
Patent 6,384,850 B1

between original and amended claims." *Ariad Pharm., Inc. v. Eli Lilly & Co.,* 598
F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  Thus, while "many original claims
will satisfy the written description requirement, certain claims may not." *Id.* at
1349.  Despite Patent Owner's contentions, however, the question before us at this
time is not whether the claims have proper written description support, but rather
whether the claims should be interpreted to require this specific form of
synchronization.

As described in the specification, when a system is synchronized "the
different components are in equilibrium at any given time and an overall
consistency is achieved."  Ex. 1001, 2:23–26.  The synchronous communication
system "enables automatic updating of both wireless and internet menu systems
when a new menu item is added, modified or deleted from any element of the
system."  *Id.* at 3:1–5.  Synchronization allows full integration with hospitality
applications and real-time updating or batch processing performed periodically to
keep multiple sites in synch.  *Id.* at 3:59–4:4.  The example provided in the
specification notes that "a reservation made online can be automatically
communicated to the backoffice server and then synchronized with all the wireless
handheld devices wirelessly."  *Id.* at 4:18–21.

We find that the specification does not require the transmission of an
executable file.  The specification contemplates that synchronization will cause the
applications to be integrated and updated, but it does not indicate that an
executable file must be transmitted to meet these limitations.  We note that
applications also are data.  Such data includes instructions that can be executed to
assist in the performance of a task.  Tr. 18:20–19:3, 59:14–15; *see also* Ex. 2033,
27 ("computer code or instructions which perform or implement a specific
hospitality-related information processing task when executed"); Ex. 2031 ¶ 171

("Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function."). Thus, the passing of data that brings consistency or equilibrium to the code or instructions of the applications resident on the recited components would meet the recited limitations. Petitioner relies upon Brandt's scheme of passing data (including application data such as java) through HTML forms. Brandt's web pages pull data (which may include Java executables) from the data entered by the user on the handheld device and from the database. *See, e.g.,* Ex. 1005 ¶¶ 90–91 (data from the user), 78 (data from the database). This passage of information may occur through the use of HTML templates that include input and/or substitution variables. Pet. 55–56. Brandt's web server receives the dynamic web pages from the application gateway and transmits it to the user device. *See, e.g.* Ex. 1005 ¶¶ 31, 54–55. According to Petitioner, Brandt's approach provides for data consistency and that data throughout the system are updated on an as-needed basis. Pet. 57. Patent Owner asserts that updating data on an as-needed basis conflicts with the language of the claim and shows that Petitioner is attempting to read out the elements of this limitation. PO Resp. 27–28. We disagree because the specification contemplates periodic updating of the applications and data and we find that to be consistent with Brandt's on demand updating of data.

Patent Owner also asserts that Brandt does not require storage of data on the handheld device and thus, Brandt does not disclose synchronization of data stored on such device. *Id.* at 28. Petitioner, however, relies upon the combination of Brandt and NetHopper to teach the caching (storage) of web pages on a handheld device. Pet. 49–50. Patent Owner also argues that web page data does not teach the recited applications because an application resident on the handheld device

must be different from a web page.  PO Resp. 34–35.  We do not find this argument to be persuasive.  The handheld device is the hardware for use with the applications and data.  The specification does not require a particular type of application to be resident on the handheld device.  Petitioner relies upon Brandt's discussion of dynamically generated web pages.  Pet. 51–52.  These web pages may receive input in the form of applications, such as Java applets or JavaScript.  *Id.* at 52 (citing Ex. 1005 ¶¶ 16, 21, 107).  These web pages also receive application data.  *Id.* (citing Ex. 1005 ¶¶ 55, 57, 62).  We find that the cited web browser and cached web pages (including both data and application data such as dynamic web pages and java) teach the recited applications and data stored on a wireless handheld device.  In addition, an instance of a browser and cached data on a handheld device constitute a different set of applications and data from the instance of a browser and cached data on another device.  Thus, Brandt's system which is described as including devices such as desktop computers and PDAs would teach a system that includes a web page as viewed on a desktop computer that would be different from the set of applications and data on a handheld device.  As such, Brandt teaches that these instances may be synchronized and thus, we find that these disclosures teach the recited storage of applications and data and the recited synchronization.

Patent Owner argues that Petitioner reads out the requirement that the API enable integration of outside applications with the hospitality applications.  PO. Resp. 42–43.  Patent Owner asserts that the recited "outside applications" are third-party applications and this has not been taken into account by Petitioner's arguments.  *Id.* at 42.  In addition, Petitioner allegedly "incorrectly confuses the API to be part of 'messaging protocols.'"  *Id.*  Further, Patent Owner objects to the application of Brandt to this limitation because its "APIs provide only 'send' and

'receive' functions, and provide functionality only for communicating with a web browser." *Id.* at 43. Brandt teaches "APIs that allow *third parties* to access certain features, to interface the application program with *other programs*, and to provide access for end-users." Ex. 1005 ¶ 22 (emphases added). The APIs taught in Brandt are not limited to particular functionality, and the API descriptions provided in the text of the reference are "examples of APIs that are commonly found in many different software applications." *Id.* Thus, we are persuaded that Brandt would have taught one of ordinary skill in the art the recited "application program interface [that] enables integration of outside applications with the hospitality applications."

Finally, Patent Owner asserts that the cited art does not teach the communications control module. PO Resp. 43–48. According to Patent Owner, the claimed system must synchronize and integrate with HTTP and non-HTTP protocols. *Id.* at 44. Patent Owner argues that cited references also are insufficient because the only communication protocols discussed are those generated by web browsers. PO Resp. 45. Claim 12 recites that the communications control module "is an interface between the hospitality applications and any other communication protocol." Ex. 1001, 16:19–21. The specification further states that "[a] communications control program monitors and routes all communications to appropriate devices." *Id.* at 9:21–22. Petitioner relies upon Brandt's gateway module to teach the recited communication control module. Pet. 60. According to Petitioner the "centralized 'application gateway' . . . facilitates client access to and communication with the applications. [Ex. 1005] ¶ 31. The gateway receives user input and communicates with the applications to process that input and/or respond accordingly. *Id.* at ¶¶ 54–55." Pet. 45. The only specific protocol discussed in the specification is HTTP, a web based communications protocol. *See* Ex. 1001, 12:7–

CBM2015-00091
Patent 6,384,850 B1

12.  Thus, we do not find support for Patent Owner's assertion that non-HTTP protocols are required.  As to routing, Brandt discloses "the application gateway including the identifier mechanism, the identifier mechanism generating an identifier for each of the plurality of web browsers and routing data from the software application to the selected one of the plurality of web browsers that correspond to the identifier."  Ex. 1005, claim 7; Reply 12.  Patent Owner also argues that Brandt's gateway is not "functionally independent from Brandt's other software."  PO Resp. 46.  Brandt's gateway, however, may be both logically distinct (Ex. 1005 ¶ 56) and physically distinct from other components of Brandt's system (Ex. 1005 ¶ 35).  This evidence persuades us that one of ordinary skill in the art would have understood Brandt to teach the recited communications control module.

Thus, for all of the foregoing reasons, we are persuaded that Petitioner has shown by a preponderance of the evidence that all of the limitations of independent claim 12 were taught by the disclosures of Brandt and NetHopper.

*(2) Dependent Claims*

Claims 13–16 depend directly or indirectly from claim 12.  Petitioner has established that one of ordinary skill in the art would have learned all of the limitations of claims 13–16 of the '850 patent from the teachings of Brandt and NetHopper.  Claim 13 further recites that the communications control module provides a single point of entry for all hospitality applications and that the single point of entry allows synchronization so that the recited handheld device, web page, and database are consistent.  Petitioner relies upon Brandt's teaching of a gateway that provides an interface to "a plurality of software applications" and connects multiple clients to multiple applications.  Pet. 62.  Patent Owner reiterates its argument that the cited references do not teach hospitality applications or a

24

CBM2015-00091
Patent 6,384,850 B1

communications control module and thus, cannot teach a single point of entry for hospitality applications. PO Resp. 48–49. As discussed above, we are not persuaded by these arguments. Patent Owner also argues that Brandt is not designed to interface with multiple hospitality application. *Id.* Brandt, however, states that its gateway "interface[s] between a web server and a plurality of software applications." Ex. 1005 ¶ 96. We find Petitioner's interpretation of Brandt's teachings to be reasonable, and we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Brandt and NetHopper teach the limitations of claim 13.

Claims 14 and 15 recite the automatic communication of information from a web page (claim 14) or a handheld device (claim 15) to the central database and other system components. Petitioner argues that Brandt teaches these limitations through its discussion of submitting a reservation request from a web page via a handheld device and the reflection of that request in the database. Pet. 63–64. Patent Owner argues that there is no evidence that this information is communicated *automatically*. PO Resp. 49. According to Patent Owner, the broadest reasonable construction of automatic is "done or produced as if by machine." *Id.* at 12. We are persuaded that the term automatic is at least broad enough to encompass Patent Owner's proposed construction. Brandt recites that data moves between the handheld device and database via machines such as a web server. Ex. 1005 ¶ 14. Patent Owner argues that Brandt's teaching is insufficient because it states that "information ***may be*** communicated to a rental agent's wireless handheld computing device." PO Resp. 50 (citing Ex. 1005 ¶ 14). According to Patent Owner, the conditional language "may" indicates that there must be intervening action from a user. *Id.* Patent Owner's argument, however,

CBM2015-00091
Patent 6,384,850 B1

does not take into account other passages of Brandt that are explicit about the automation of its process.

> Alternatively, the FlowMark process model may specify that the car rental request should be routed to a human agent for further processing. In that case, the car rental request would show up on a FlowMark task list for the agent. *Alternatively, the entire process may be completely automated.* In either case, the car rental agent or activity program 432 processes the web client's car rental request and if the desired car is available, FlowMark database 438 will be updated to indicate that the car has been "reserved."

Ex. 1005 ¶ 102 (emphasis added); Reply 17. We find that Petitioner's interpretation of Brandt's teaching is reasonable. As such, we find that Petitioner has demonstrated by a preponderance of the evidence that Brandt and NetHopper teach the limitations of claims 14 and 15.

Claim 16 recites that the claimed synchronization be performed by digital data transmission. Patent Owner put forth no additional arguments in regards to claim 16. *See* PO Resp. 48–51. Petitioner's expert testified that Brandt disclosed digital transmissions including direct connections, internet connections, intranet connections, infrared connections, and high speed connections over T1 lines. Ex. 1003 ¶ 242 (citing Ex. 1005 ¶¶ 15, 86). Thus, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Brandt and NetHopper teach the limitations of claim 16.

### C.    *Proposed Obviousness Over Brandt, Demers, and Alonso*

Petitioner asserts that claims 12–16 would have been obvious over Brandt, Demers, and Alonso. Pet. 64–69. Patent Owner disputes Petitioner's contentions, arguing that these asserted grounds do not render obvious the challenged claims. PO Resp. 24–51. We have reviewed the Petition, the Patent Owner's Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers

CBM2015-00091
Patent 6,384,850 B1

and other record papers.  As described in further detail below, we determine the record supports Petitioner's contentions and adopt Petitioner's contentions discussed below as our own.  For reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 12–16 are unpatentable as obvious over the teachings of Brandt, Demers, and Alonso.

### 1.  Overview of Demers

Demers is a publication titled "The Bayou Architecture: Support for Data Sharing among Mobile Users."  Ex. 1009, 2.  "The Bayou System is a platform of replicated, highly available, variable-consistency, mobile databases on which to build collaborative applications."  *Id.*  The system is intended to run on portable machines including PDAs.  *Id.*  The intent was to present to mobile users what appears to be "a centralized, highly-available database service."  *Id.*  Demers discussed using anti-entropy protocols to perform reconciliation to synchronize file systems.  *Id.* at 3.  "Anti-entropy ensures that all copies of a database are converging towards the same state and will eventually converge to identical states if there are no new updates."  *Id.*  Eventually all servers in such a system will be in a "mutually consistent state."  *Id.*  In order to provide stability for database updates that may be occurring throughout the system "each Bayou database has one distinguished server, the 'primary,' which is responsible for committing writes. The other, 'secondary' servers tentatively accept writes and propagate them toward the primary using anti-entropy."  *Id.* at 5.

### 2.  Overview of Alonso

Alonso is a publication titled "Exocita/FMDC: A Workflow Management System for Mobile and Disconnected Clients."  Ex. 1012, 27.  Alonso discusses the same FlowMark application described in Brandt.  *Id.* at 29, 31.  One of the goals of the paper is to address methods to "maintain the overall correctness and

27

CBM2015-00091
Patent 6,384,850 B1

consistency of the processes being executed" on disconnected mobile devices. *Id.* at 28. Applications and data are loaded on "powerful portable and home desktop computers" that are then disconnected from the centralized server while users perform business tasks using the FlowMark application. *Id.* at 28–29. Performance of these tasks is described as a process that consists of activities and relevant data that is transferred between activities. *Id.* at 30. APIs are used to access and return data. *Id.* "[P]ersistent data resides in a single database server, ObjectStore." *Id.* at 32. Applications and data are stored and executed locally on the mobile devices. *Id.* at 34. When a user reconnects with the system, the central database is updated to reflect the work done on the mobile device. *Id.* at 35.

### 3. Analysis of Proposed Ground of Obviousness Over Brandt, Demers, and Alonso

Petitioner has established that one of ordinary skill in the art would have learned all of the limitations of claim 12 of the '850 patent from the teachings of Brandt, Demers, and Alonso. Petitioner relies upon the previously discussed disclosures of Brandt in conjunction with the teachings of Demers and Alonso regarding database synchronization and Alonso's teaching of an application locally resident on a mobile device. Thus, instead of relying on NetHopper to teach storing applications and data on a mobile computing device, Petitioner relies on Alonso's local client application that is updated and synchronized with the other mobile devices in the system and the central database. Pet. 66–67. Petitioner asserts that one of ordinary skill in the art would have been motivated to combine the teachings of these references because Brandt and Alonso are directed to increasing accessibility of the same FlowMark workflow management system. Petitioner contends that Demers's teaching also would have been combined with Brandt and Alonso because Demers is directed to a well-known project that those

CBM2015-00091
Patent 6,384,850 B1

skilled in the art would have looked to for teachings regarding mobile database replication. *Id.* at 65–66.

Patent Owner provided a combined response to both asserted grounds of obviousness and for reasons discussed above, we do not find persuasive Patent Owner's arguments that were directed to the disclosures of Brandt. Patent Owner's combined response did include arguments directed to the combination of Brandt, Demers, and Alonso, and we address those arguments in turn.

Patent Owner argues that by removing NetHopper and instead relying on the additional teachings of Demers and Alonso the cited combination lacks a web browser as would be required by Brandt's teaching. PO Resp. 17–18. Brandt's mobile devices were defined as "any computer that is capable[10] of providing access to the WWW by using web browser 212." Ex. 1005 ¶ 14. Demers discusses mobile devices connected to a network via "a wireless communication device, such as a cell modem or packet radio transceiver" or a computer with "a conventional modem requiring it to be physically connected to a phone line." Ex. 1009, 2. The computing devices in Alonso are connected via an unspecified network. *See* Ex.

---

[10] In our Institution Decision, we stated that "we are not persuaded that the devices discussed in Alonso and Demers would not be *capable* of providing access to the WWW via a web browser." Dec. 38. Patent Owner argued that this reduced the obviousness analysis to a mere determination of whether it was possible to do something. PO Resp. 32. This mischaracterizes our statement. The discussion of capability was limited to analysis of whether the devices in Demers and Alonso meet Brandt's definition of a mobile device. As described in Brandt, a device capable of providing access to the WWW via web browser could be a mobile device. Thus, the discussion of capability did not go to the ultimate issue of obviousness, but instead was an additional point of information indicating that the mobile devices of Demers and Alonso met the criteria for a mobile device in Brandt. We find that the evidence supports Petitioner's assertion that the mobile devices of Demers and Alonso fit the description of mobile devices in Brandt.

CBM2015-00091
Patent 6,384,850 B1

1012, Fig. 2.  Thus, according to Patent Owner's argument, without evidence of a web browser in Demers or Alonso Petitioner has not established that these teachings may be combined.  "[I]t is not necessary[, however,] that the inventions of the references be physically combinable to render obvious the invention under review."  *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1013 (Fed. Cir. 1983)); s*ee also In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures.").  The issue here is what one of ordinary skill in the art would have learned from the disclosures and not whether the references physically could operate as a unit.  *See KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 424 (2007).  Petitioner's evidence shows that one of ordinary skill in the art would have learned of a local software application that could be resident on a handheld device and would have seen this as a way to improve the functionality provided by Brandt because it would allow for the system to function during periods when the device may be disconnected from the network.  Pet. 65.  Specifically, one of skill in the art would have learned the usage of a local application from Alonso's teachings and would have combined that with Brandt's teaching of using the same FlowMark software to implement a hospitality application.  Demers would have supplemented these teachings by showing that the local application could be resident on a PDA and by providing a detailed teaching as to how data consistency and synchronization could be achieved on this disconnected device.  Thus, we are not persuaded by Patent Owner's arguments regarding the inability to combine the cited references due to a lack of a web browser in Demers or Alonso.

Patent Owner also asserts that the database teachings of Brandt, Demers, and Alonso may not be combined in a manner that would render obvious the claimed

CBM2015-00091
Patent 6,384,850 B1

centralized database.  PO Resp. 25–27.  Petitioner asserts that Brandt discloses a central database and that teaching is complemented by Demers's teaching of a "primary database" and Alonso's teaching of a central database.  Pet. 66. Demers's primary database is a database with particular responsibility for ensuring database synchronization and consistency.  Ex. 1009, 3, 5.  Data committed to the primary database is replicated throughout the system, and application settings can be used to determine whether a particular application would interact with any of the less reliable other databases in the system.  *Id.* at 5.  Thus, while Demers may have multiple databases there is a single centralized primary database with a particular responsibility for ensuring synchronization and consistency.  We find that Demers's primary database would teach the claimed central database.  Alonso discusses the use of FlowMark with all "persistent data resid[ing] in a single database server, ObjectStore."  Ex. 1012, 32.  Patent Owner relies upon another document's discussion of the Bayou system at issue in Alonso to support its argument that data in Alonso is not stored in a central database.  PO Resp. 26 (citing Ex. 2034, 1), 28 (citing same).  A reference, however, is relied upon for what it discloses.  That another document may discuss the underlying system in a different manner does not take away from the disclosures in the cited reference. This ground is based on the printed publication and not the underlying product, and as such, the proper inquiry is whether the cited publication teaches the claim element and not whether it can be shown that the underlying product may have a different structure.  As noted above, Alonso teaches a system with a single centralized database.  Ex. 1012, 32.

Patent Owner also asserts that Alonso is "antithetical to the claimed invention because it requires that a user of a client device 'lock' an activity so that no other user in the system can work on the activity."  PO Resp. 29 (citing Ex.

CBM2015-00091
Patent 6,384,850 B1

1012, 238). Petitioner contends that locking an item is not prohibited by the challenged claims. Reply 11. As described in Alonso, locking is performed to prevent users from concurrently working on the same item. Ex. 1012, 35. This prevents users from overwriting each other's updates before the information can be committed to the database. *Id.* We find that this would preserve the integrity of information in the database and thus, promote equilibrium and consistency required by the recited synchronization to the central database. As such, Alonso's database locking mechanism is not "antithetical to the claimed invention." Therefore, we are not persuaded by Patent Owner's arguments regarding the databases in Brandt, Demers, and Alonso.

Thus, for all of the foregoing reasons, Petitioner has demonstrated by a preponderance of the evidence that Brandt, Demers, and Alonso teach the limitations of claims 12–16.

### D.    *Objective Evidence of Non-Obviousness*

Patent Owner contends that objective factors including praise, industry awards, commercial success, copying, failure of others, and licensing confirm the non-obviousness of all challenged claims of the '850 patent. PO Resp. 51–80, Sur-Reply 1–5. Such evidence must be analyzed before determining whether any claim has been rendered obvious. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.,* 676 F.3d 1063, 1075–76 (Fed. Cir. 2012) (citing *Richardson-Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1483 (Fed. Cir. 1997)). We have considered Patent Owner's arguments and evidence concerning objective indicia of non-obviousness, but are not persuaded that it is sufficient to support a finding of non-obviousness when considered in light of Petitioner's showing that each and every limitation of the challenged claims was taught by the cited art. We note that Patent Owner has provided a large quantity of documents (more than 500

CBM2015-00091
Patent 6,384,850 B1

pages) in support of its contentions. We have reviewed the evidence of record and have found it to be insufficient. The discussion below summarizes that analysis.

### 1. Nexus

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham v. John Deere Co. of Kan. City,* 383 U.S. 1, 17–18 (1966). To be relevant, evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). Thus, to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining nonobviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

Patent Owner contends that the invention of claims 12–16 are coextensive with its 21st Century Restaurant™ ("21CR") system and, thus, a nexus is established between the merits of the claimed invention and its evidence of praise, awards, commercial success, copying, failure of others, and licensing. PO Resp. 54–64 (citing *Teva Pharm., Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013) ("There is a 'presumption of a nexus' when a product is 'coextensive' with a patent claim."). Patent Owner argues that Figures 1 and 6 of the '850 patent, as originally filed in the patent application, an annotated brochure of the 21CR system ("the 21CR Product Brochure), and other articles and evidence establish that its 21CR system is coextensive with the invention of claims 12–16. PO Resp. 53–63.

Petitioner argues that Patent Owner's evidence of nexus is insufficient because it is based on an oversimplified and inaccurate view of the challenged claims.  Reply 19.  The challenged claims are directed to "[a]n information management and synchronous communications system for use with wireless handheld computing devices."  Ex. 1001, 16:1–3.  Patent Owner argues that the 21CR system has a nexus to the "inventive 'synchronization, integration and consistency' of th[e] claims."  PO Resp. 55.  We find that these features are but a subset of the functionality provided by the 21CR system.

The Federal Circuit has found an exception to the presumption of nexus in cases where the patented invention is only a component of the product to which the asserted objective considerations are tied.  *Demaco*, 851 F.2d at 1392.  In this case, there are two aspects to the system disclosed by the '850 patent: menu generation and synchronous communication.  *See* Ex. 1001, 3:15–23.  The first aspect includes a "desktop software application that enables the rapid creation and building of a menu" (*id.* at col. 3:15–17) and is claimed in claims 1–11, which are not challenged in this proceeding.  Claims 12–16, which are challenged in this proceeding, are directed to the second aspect of the system, synchronous communication and are devoid of elements directed to menu generation.  *See id.* at 2:56–62; 3:1–5.

Figure 6, as originally filed, depicts an alleged screen shot of a communications control window of the 21CR system and Figure 1, as originally filed, depicts a screen shot of the menu generation system.  Ex. 2061.  Patent Owner alleges that the screen shots are of a live or operational 21CR system (PO Resp. 55), but does not provide any evidence of such.  Further, contrary to Patent Owner's argument that the 21CR system is coextensive with the invention of claims 12–16, originally filed Figure 1 depicts a menu generation wizard.  Claims

12–16 are devoid of elements directed to the menu wizard. In addition, these Figures do not include many of the aspects of the challenged claims such as the web server, web page, and API. Figures 1 and 6, thus, do not demonstrate persuasively that the 21CR system is coextensive with the invention of claims 12–16.

Further, as discussed in detail below, other evidence provided by Patent Owner suggests that the 21CR system is not coextensive with the invention of claims 12–16. Patent Owner has submitted documents describing a wide set of features in its 21CR system. For example, an article from Hospitality Technology Magazine stated that "[o]perators may process orders and payments, take inventory counts and manage guest-seating arrangements with the portable, handheld solution." Ex. 2062, 65. In addition, Patent Owner states that HostAlert, for which it won an award, is "a subset of the 21st Century Restaurant™ system/technology, inclusive of waitlisting, table management and reservations, but not including food and drink ordering." PO Resp. 70 (citing Ex. 2050). This indicates that the 21CR system includes additional features other than those of the challenged claims, such as matching a waiting party in a database to a newly available table in a restaurant, based on party size and longest wait-time or adding a customer to a sister restaurant's waiting list. *See* Ex. 2050, 6.

In addition to arguing that the 21CR system is coextensive with the claims 12–16, Patent Owner argues that the evidence of secondary considerations has a nexus with the "synchronization, integration, and consistency" features of claims 12–16, which are required by the wherein clause of claim 12. *See* PO Resp. 55. In the analysis below, we address whether the evidence of secondary considerations

CBM2015-00091
Patent 6,384,850 B1

has a sufficient nexus between the merits of the claimed invention and the evidence of secondary considerations.

### 2. *Licensing*

Licenses taken under the patent in suit may constitute evidence of non-obviousness; however, only little weight can be attributed to such evidence if the patentee does not demonstrate "a nexus between the merits of the invention and the licenses of record." *GPAC*, 57 F.3d at 1580 (citations omitted).

Patent Owner contends that the patents in the '850 family have been licensed by 44[11] companies, "the majority of these licenses occurring outside of litigation." PO Resp. 64, Sur-Reply 2. To support its contention, Patent Owner provides its own press releases announcing the licenses (Ex. 2003) and an amendment to a license with Agilysys, Inc. (Ex. 2048). Patent Owner argues that its press releases were jointly issued (PO. Resp. 64) and that "[t]he majority of these licenses occurred outside of litigation" (*id.*). When assessing Patent Owner's licensing evidence, "the relevant inquiry is whether there is a nexus between the patent and the licensing activity itself, such that the factfinder can infer that the licensing 'arose out of recognition and acceptance of the subject matter claimed' in the patent." *S. Ala. Med. Sci. Found. v. Gnosis S.P.A.*, 808 F.3d 823, 827 (Fed. Cir. 2015) (quoting *GPAC*, 57 F.3d at 1580)).

The Agilysys Amendment provides up to 425 licenses of Patent Owner's 21CR Software and related patents (including the '850 patent) for a fee of $85,000. Ex. 2048. This Amendment, however, is an update to an existing agreement that has not been put into evidence in this proceeding. Thus, we do not have evidence as to breadth of services provided under this agreement nor do we have evidence to

---

[11] In its Sur-Reply, Patent Owner asserts 46 licenses of the patents of the '850 family. Sur-Reply 2.

CBM2015-00091
Patent 6,384,850 B1

establish whether the overarching agreement was entered into for reasons related to the subject matter of the challenged claims.  None of the other forty or more purported license agreements were placed into evidence by Patent Owner.  Further, although Patent Owner states that most of the licenses occurred outside of litigation, Patent Owner provides no evidence to show that any of its licenses occurred outside of litigation.  Without such evidence that the licenses occurred outside of litigation, Patent Owner's argument is merely attorney argument and entitled to little weight.  *In re Geisler,* 116 F.3d 1465, 1470 (Fed. Cir. 1997).  Indeed, Agilysys, Inc. is listed as a defendant in a related matter on Patent Owner's mandatory notices.  Paper 5.  In addition, Petitioner provides evidence that purported licensees MenuSoft, Par, ChowNow, EMN8, MonkeyMedia, SubtleData, and TicketMob each has settled litigation with Patent Owner and thus, any agreements may be the product of litigation.  Reply 20 (citing Exs. 1088–1094).

As to the press releases, each describes a different set of functionality as the subject of the agreement.  For example, the press release purporting to announce an agreement with Jersey Mike's states that the license "includes mobile ordering, mobile frequency/rewards, delivery, mobile payments and other elements/fields critical to mobile/web deployments in the hospitality space."  Ex. 2048, 1.[12]  We note that none of these features are recited in the challenged claims.  The press release purporting to announce an agreement with Darden does not mention any specific patents as part of the agreement.  *Id.* at 3.  In addition, it notes that Patent Owner and Darden worked together to develop calorie and nutrition look-up features.  *Id.* at 4.

---

[12] This Exhibit does not include page numbers.  The numbers are based on our own count.

CBM2015-00091
Patent 6,384,850 B1

We are not persuaded that the evidence presented sufficiently establishes a nexus between the licensing and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of licensing overcomes Petitioner's showing of obviousness.

### 3. Commercial Success

Patent Owner argues that evidence of "substantial, widespread commercial success" demonstrates the non-obviousness of the claims 12–16. PO Resp. 66–68. Patent Owner argues that "the measure of the claimed invention's commercial success are the partnerships and/or licenses of its products and co-existent intellectual property, as a result of its May 1999 launch at the National Restaurant Association ("NRA") show." *Id.* at 67.

We are not persuaded that the evidence sufficiently establishes the alleged commercial success or that a nexus exists between the alleged commercial success and the merits of the claimed invention. For example, Patent Owner cites to the entirety of Exhibit 2029 to show that "[t]he 2004 and 2006 HT POS market reports and rankings show that Ameranth licensed 21CR to most of these leading POS companies, and achieved overwhelming market share." PO Resp. 67. Exhibit 2029 consists of two Hospitality Technology magazines ranking food service point-of-sale systems. The magazines do not show sufficiently that Patent Owner licensed its 21CR system to most of the leading point-of-sale companies or that Patent Owner achieved overwhelming market share. The magazines do not mention the 21CR system. Patent Owner also alleges that it has licenses with nearly all of the leading POS companies, but it has not placed these licenses into evidence so we do not have sufficient proof to establish whether and for what purpose any agreement was entered with any of these companies.

CBM2015-00091
Patent 6,384,850 B1

In addition, Patent Owner's submission of a purported draft of a term sheet for a non-consummated agreement with Micros does not establish that an industry leading company sought to partner with Patent Owner. *See* Ex. 2062, 128–129. This and the purported email directed to an individual at Micros at most establish that Patent Owner was "very excited about the prospect of working with MICROS." *Id.* at 132. These documents do not establish Micros's view of challenged claims or their subject matter. We find that a draft term sheet and purported communication with Micros are not evidence tending prove commercial success.

Patent Owner relies upon deposition testimony of Mr. John Harker to show commercial success, including "the incredible market reception that the 21CR system received at the May 1999 NRA show." PO Resp. 56–58 (citing Ex. 2045). For example, Mr. Harker testifies that tens of thousands walked by Ameranth's booth and hundreds stopped. Ex. 2045, 175:11–16. This, however, does not explain sufficiently what attracted people to Amaranth's display, nor does it establish that the 21CR product captured a significant market share as a result of the May 1999 NRA show, commercial success of the 21CR product, or that the merits of the challenged claims were the cause of the commercial success.

Patent Owner's press release describing a purported "undisclosed investment"[13] in Ameranth by Microsoft also is insufficient to show commercial

---

[13] Patent Owner provides a Declaration from Keith R. McNally, a named inventor of the '850 patent. Ex. 2062. This declaration was submitted to the USPTO as part of the prosecution of U.S. Patent No. 8,146,077 B1. *Id.* In this declaration, he stated that Microsoft made a multimillion dollar investment into Ameranth. *Id.* ¶ 3. Mr. McNally's declaration does not provide sufficient detail as to why such an investment would have made. Thus, we accord little weight to this declaration testimony.

CBM2015-00091
Patent 6,384,850 B1

success.  Ex. 2062, 135–137.  The press release does not mention the '850 patent and it provides no detail as to the purported agreement between Patent Owner and Microsoft other than to say that Microsoft obtained an undisclosed amount of equity in Ameranth, a privately held company.  *Id.* at 136.  Investments may be made in a company for any number of reasons, and we have no evidence of record indicating that the purported agreement was related to the substance of the challenged claims.

We are not persuaded that the evidence sufficiently establishes the alleged commercial success or that a nexus exists between the alleged commercial success and the merits of the claimed invention.  We, thus, give little weight to Patent Owner's argument that evidence of commercial success overcomes Petitioner's showing of obviousness.

### 4. Awards/Industry Praise

Industry praise for an invention may provide evidence of non-obviousness where the industry praise is linked to the claimed invention.  *See Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l. LLC,* 618 F.3d 1294, 1305 (Fed. Cir. 2010); *Asyst Techs., Inc. v. Emtrak, Inc.,* 544 F.3d 1310, 1316 (Fed. Cir. 2008).

First, according to Patent Owner, it was awarded four awards for its 21CR system and that these awards demonstrate the non-obviousness of claims 12–16.  PO Resp. 68–70; *see* Sur-Reply 4.

The first award is the Innovation of the Year Award from the European Hospitality Solutions Technology Show in 1999.  PO Rep. 69.  The cited pages of Exhibit 2062 are Patent Owner's own press release concerning the award.  The press release purports that the award was for its UltraPad™2700 and alleges that the UltraPad™2700 is the wireless hand-held computer of a number of Patent Owner's systems, including its 21CR system.  Ex. 2062, 95–96.  The press release,

CBM2015-00091
Patent 6,384,850 B1

however, fails to show sufficiently a nexus between the award for the UltraPad™2700 and the merits of the invention of the challenged claims.  It does not sufficiently describe how the UltraPad™2700 is integrated or synchronized with the 21CR system or that the award is for how the UltraPad™2700 is integrated or synced with the 21CR system.  Nor does it provide information regarding the award sufficient to assess whether the award is indicative of widespread praise from within the industry.

The second award is the Moby Award from Mobile Insights and the third award is the 2001 Computerworld Honors Program and Collection.  PO Resp. 69 (citing Ex. 2062, 140–41, 156–60).  Pages 140–41 of Exhibit 2062 are Patent Owner's own press release concerning the Moby Award and page 155 is a letter concerning the 2001 Computerworld Honors Program and Collection ("the Computerworld Honor").  According to the press release and letter, Patent Owner received these awards for the deployment of the 21CR system at the Improv Comedy Club in Dallas.  Ex. 2062, 141, 156.  The press releases state that the Moby Award "specifically recognizes the wireless handheld computer ticket authorization and seating assignment application" (*id.* at 141), and the letter states that the honor was for a "case study" of the Ameranth Wireless's Improv Comedy Club Solution but does not specifically mention any feature of the solution.  The press release and letter fail to show, sufficiently, a nexus been the Moby Award and the Computerworld Honor and the merits of the invention of the challenged claim.  A ticket authorization and seating assignment application is not a feature of the invention of the challenged claims.

With regards to the third award, the Patent Owner argues:

Noteworthy in this award was the express confirmation that the innovations, reflected in the challenged claims as illustrate above, were <u>not available from any other company</u>.  This award also shows

41

CBM2015-00091
Patent 6,384,850 B1

> that Tom Castillo, owner of the Improv, based his selection of
> Ameranth on the actual 21CR System demonstrated to him, at the
> May 1999 NRA show, thus confirming nexus of this award to that
> product/technology as it existed and was policy shown/demonstrated
> in May 1999.

PO Resp. 69–70.  The letter, however, contains no indication that the alleged

innovations, reflected in the challenged claims, were not available from any other

company or any mention of Tom Castillo or the basis of his selection.

The fourth award is a Microsoft Retail Application Developer (R.A.D.)

Award for Patent Owner's HostAlert system.  *See id*. at 70, Ex. 2050.  Patent

Owner alleges that HostAlert is "a subset of the 21st Century Restaurant™

system/technology, inclusive of waitlisting, table management and reservations,

but not including food and drink ordering."  *Id.* (citing Ex. 2050).  Patent Owner,

however, provides no evidence to support its assertion that HostAlert is a subset of

its 21CR system or that the subset includes the features of the challenged claims.

To the contrary, the article relied upon by Patent Owner indicates that HostAlert

includes additional features than those of the challenged claims, such as matching a

waiting party in a database to a newly available table in a restaurant, based on

party size and longest wait-time or adding a customer to a sister restaurant's

waiting list.  Ex. 2050, 6.

Second, Patent Owner argues that overwhelming industry praise for the

21CR system is evidence of non-obviousness.  PO Resp. 70–73.  Patent Owner

states that "[t]he hospitality market press and numerous nationally renowned

publications including the Wall Street Journal, Time Magazine and Harvard

Business review have praised [the 21CR system]."  PO Resp. 71.  Patent Owner,

however, does not provide a citation to any Wall Street Journal,[14] Time

Magazine,[15] or Harvard Business Review article in the record.

Patent Owner also refers to an article titled "Brainstorm Eases Restaurant

Ordering Process" on pages 165–67 of Exhibit 2062.  According to Patent Owner,

this article shows contemporaneous praise for its products.  PO Resp. 71.  The

article, however, merely provides Ameranth's views as to how its product may

save time in a restaurant along with statements from restauranteurs planning to test

the system or professing an interest in the field.  Ex. 2062, 166.  We do not find

this article to contain praise or acclaim for the subject matter of the challenged

claims.

Patent Owner, further, argues that for the Computerworld Honor, "Microsoft

founder Bill Gates personally nominated Ameranth with the praise that 'Ameranth

is one of the leading pioneers of the information age for the betterment of

mankind.'"  PO Resp. 71 (citing Ex. 2062, 151–53).  This purported quotation is

mentioned in several Ameranth press releases, but there is no evidence of this

statement in any documents from Microsoft or any industry publication.  *See* Ex.

---

[14] Page 162 of Exhibit 2062 purports to be a copy of an undated Wall Street Journal article.  This portion of the exhibit was not cited in Patent Owner's response.  It purports to describe feature of the 21CR system including the ability to email regular customers with special announcement or on special dates.  Ex. 2062, 162.

[15] Page 164 of Exhibit 2062 purports to be a copy of a Time Magazine article.  This portion of the exhibit was not cited in Patent Owner's response.  The discussion of Patent Owner's product appears in a short (approximately 100 word) article that describe the product as including the ability to permit waiters to process credit-card payments and print receipts right at the table.  Ex. 2062, 164.

CBM2015-00091
Patent 6,384,850 B1

2046, 2, 6; Ex. 2022 (Ex. A).  Thus, we give little weight to this purported praise from Bill Gates.

Patent Owner also argues that Marriott's vice-president Steve Glen and Harvard Business School Press also praised the 21CR system.  PO Resp. 72 (quoting Ex. 2062, 106–108 ("the Marriot Letter"); Ex. 2051 ("the Harvard Book")).  The Marriott Letter and the Harvard Book, however, praise features of the 21CR system that are not features of the challenged claims, such as "laser bar-code scanning of customer frequency cards," "wait-list management functions" (Ex. 2062, 107), and "payment processing" (Ex. 2051).

Patent Owner has not sufficiently shown that the four awards and the alleged industry praise are linked to the merits of the claimed invention.  We, thus, give little weight to Patent Owner's argument that evidence of awards and industry praise overcomes Petitioner's showing of obviousness.

### 5. Copying

"[C]opying by a competitor may be a relevant consideration in the secondary factor analysis." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (citing *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed.Cir.1984).  "[A] nexus between the copying and the novel aspects of the claimed invention must exist for evidence of copying to be given significant weight in an obviousness analysis." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012) (internal quotation omitted).

Patent Owner alleges that multiple entities have copied its 21CR system and this copying is evidence of nonobviousness.  PO Resp. 73–78.  To support its

44

allegations Patent Owner points to numerous statements from competitors and the testimony of Dr. Weaver. *Id.*

We are not persuaded that the evidence sufficiently establishes the alleged copying or that a nexus exists between the alleged copying and the merits of the claimed invention. Patent Owner cites to statements made by employees of competitors, who allegedly had knowledge of the 21CR system, and articles to show copying. PO Resp. 73–78 (citing, for example, Ex. 2009). This evidence, however, fails to establish copying or a nexus between the alleged copies and the merits of the claimed invention. For example, Patent Owner cites articles that discuss Starbucks's "mobile order and pay" system (Ex. 2009) and "ordering ahead and new payment features" (Ex. 2008). The articles, however, do not sufficiently describes Starbucks's mobile order and pay system as having the claimed synchronization, integration, and consistency features required by the wherein clause of claim 12 (i.e., the claimed communication control module and application program interface).

Further, Patent Owner relies upon the testimony of Dr. Weaver to show the Starbucks's system and certain pizza chains copied the relevant "synchronization, integration, and consistency" features of the challenged claims. Ex. 2041 ¶¶ 147, 151. We do not find Dr. Weaver's testimony to be persuasive or helpful. Dr. Weaver testifies that his opinion is based upon the evidence cited by Patent Owner and Starbucks's own materials on its "Mobile Order & Pay" system (*id.* ¶ 147) and his "review of their systems including their mobile apps" (*id.* ¶ 151). As discussed in the paragraph above, the evidence cited by Patent Owner does not sufficiently describe Starbucks's mobile order and pay system or the pizza chain's systems to establish that these systems are copies of the 21CR system. Further, Dr. Weaver's testimony that he reviewed Starbucks's and the pizza chain's systems is conclusory

CBM2015-00091
Patent 6,384,850 B1

with little or no elaboration on those systems. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *see also Rohm and Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) (nothing requires a fact finder to credit the inadequately explained testimony of an expert).

We are not persuaded that the evidence sufficiently establishes the alleged copying or that a nexus exists between the alleged copying and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of copying overcomes Petitioner's showing of obviousness.

### 6. Failure of Others

Patent Owner must show that any evidence of long-felt need "demonstrates both that a demand existed for the patented invention, and that others tried but failed to satisfy that demand." *Cyclobenzaprine*, 676 F.3d at 1082.

Patent Owner argues that many companies tried but failed to achieve synchronization and integration with point-of-sale systems and other third party systems and this failure by others is evidence of nonobviousness. PO Resp. 78–80. To support its allegation, Patent Owner points to numerous statements from employees of other companies and the testimony of Dr. Weaver. *Id.*

We are not persuaded that the evidence sufficiently establishes the alleged long-felt need and failure of others or that a nexus exists between the alleged long-felt need and failure of others and the merits of the claimed invention. Patent Owner cites to numerous exhibits as allegedly showing the failure of others. PO Resp. 78–80. For example, Exhibit 2001 is an email from a Food.com employee discussing a license agreement with Patent Owner and specifying the product and services it requires. This, however, does not show sufficiently that Food.com tried but failed to satisfy a demand for the patented invention. In addition, Patent

CBM2015-00091
Patent 6,384,850 B1

Owner states that "Food.com admitted it needed Ameranth's technology in its public release on July 16, 1999" (PO Resp. 78) but provides no citation to such a release in the record. We cannot consider evidence not adequately cited to in the record or not provided in the record. *DeSilva v. DiLeonardi*, 181 F.3d 865, 866-67 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record.") Without such evidence, Patent Owner's argument is merely attorney argument and entitled to little weight.

We are not persuaded that the evidence sufficiently establishes the alleged failure of others or that a nexus exists between the alleged failure of others and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of failure of others overcomes Petitioner's showing of obviousness.

### 7.   Conclusion as to Secondary Considerations

Patent Owner's evidence fails to sufficiently demonstrate commercial success, licensing, copying, and long-felt-but-unmet need for the claimed invention. We, thus, determine that the proffered evidence of objective indicia of non-obviousness is insufficient to overcome the previously discussed evidence establishing that every limitation from the challenge claims was taught by the cited references. Thus, we find that Petitioner has demonstrated by a preponderance of the evidence that the challenged claims would have been obvious over the cited references.

### E.    Motions to Exclude Evidence

Both Petitioner and Patent Owner filed motions to exclude evidence. Patent Owner moves to exclude certain paragraphs of Exhibit 1063 and the entirety of Exhibits 1065, 1067–1076, 1081, 1083–1085, 1095–1099, 1101, 1102 and 1106.

CBM2015-00091
Patent 6,384,850 B1

Paper 25. We do not rely on these exhibits in reaching our Decision and, thus, dismiss Patent Owner's motion to exclude these exhibits as moot.

Petitioner moves to exclude the entirety of Exhibits 2047–48, 2050, 2053, 2059, 2062 and 2077–78 and with the annotated portions of Exhibit 2047. Paper 26. We also dismiss Petitioner's motion to exclude these exhibits. Petitioner's motion to exclude theses exhibits is moot because we have found this evidence insufficient regardless of its admissibility.

## III. CONCLUSION

Based on the evidence and arguments, Petitioner has demonstrated by a preponderance of the evidence that claims 12–16 of the '850 patent would have been obvious over Brandt and NetHopper as well as the combination of Brandt, Demers, and Alonso.

## IV.   ORDER

For the reasons given, it is

ORDERED that claims 12–16 of U.S. Patent No. 6,384,850 B1 have been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Evidence is *dismissed*;

FURTHER ORDERED that Petitioner's Motion to Exclude Evidence is *dismissed;* and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

CBM2015-00091
Patent 6,384,850 B1

PETITIONER:
Bing Ai
Matthew C. Bernstein
Patrick McKeever
Yun L. Lu
PERKINS COIE LLP
Ai-ptab@perkinscoie.com
MBernstein@perkinscoie.com
PMcKeever@perkinscoie.com
LLu@perkinscoie.com


PATENT OWNER:

John W. Osborne
OSBORNE LAW LLC
josborne@osborneipl.com

Michael D. Fabiano
FABIANO LAW FIRM, P.C.
mdfabiano@fabianolawfirm.com

CBM2015-00091
CBM2016-00007

Date:  September 21, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

STARBUCKS CORP., APPLE, INC., EVENTBRITE, INC., and
STARWOOD HOTELS & RESORTS WORLDWIDE, INC.,
Petitioner

v.

AMERANTH, INC.
Patent Owner
_____

Case CBM2015-00091[1]
U.S. Patent No. 6,384,850
_____

**PATENT OWNER AMERANTH'S NOTICE OF APPEAL**

_____

[1] Case CBM2016-00007 has been joined with this proceeding.

## PATENT OWNER AMERANTH'S NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Ameranth, Inc. (Patent Owner), hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision in Case CBM2015-00091 and CBM2016-00007 that was entered on September 13, 2016 (Paper 38), and from all underlying findings, orders, decisions, rulings, and opinions in those Covered Business Method proceedings before the Patent Trial and Appeal Board.

Patent Owner further states, per 37 C.F.R. § 90.2(a)(3)(ii), that the issues presented on this appeal include, but are not limited to:  The decision of the Patent Trial and Appeal Board in the underlying proceedings that claims 12-16 of U.S. Patent No. 6,384,850 B1 are unpatentable under 35 U.S.C. § 103, along with any appealable finding, conclusion, or determination related in any way to that decision, and any other appealable issues decided adversely to Patent Owner in any orders, decisions, rulings, or opinions in CBM2015-00091 and/or CBM2016-00007.

A copy of this Notice of Appeal is being concurrently filed with the Patent Trial and Appeal Board, and three copies of this Notice of Appeal, plus the required docketing fees, are being filed with the Clerk's Office of the United States Court of Appeals for the Federal Circuit.

CBM2015-00091
CBM2016-00007

September 21, 2016                    Respectfully Submitted,

/John W. Osborne/
John W. Osborne
Lead Counsel for Patent Owner
USPTO Reg. No. 36,231
OSBORNE LAW LLC
33 Habitat Lane
Cortlandt Manor, NY 10567
josborne@osborneipl.com
Tel.:  914-714-5936
Fax:  914-734-7333

Michael D. Fabiano
Back-up Counsel for Patent Owner
USPTO Reg. No. 44,675
FABIANO LAW FIRM, P.C.
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
mdfabiano@fabianolawfirm.com
Tel.:  619-742-9631

CBM2015-00091
CBM2016-00007

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that true and correct copies of the foregoing PATENT OWNER

AMERANTH'S NOTICE OF APPEAL were submitted, as set forth below, on

September 21, 2016.

**1 copy, via hand delivery to:**
    Director of the U.S. Patent and Trademark Office
    c/o Office of the General Counsel, United States Patent and Trademark Office
    Madison Building East, Room 10-B-20
    600 Dulany Street
    Alexandria, VA 22314
**1 copy, via hand delivery, plus filing fee, to:**
    Clerk of Court, U.S. Court of Appeals for the Federal Circuit
    717 Madison Place, N.W.
    Washington, DC 20439
**1 copy, electronically via PTAB End-to-End System to:**
    Patent Trial and Appeal Board, U.S. Patent and Trademark Office
**1 copy each, via email, per agreement of the parties, to:**

| | |
|---|---|
| Bing Ai<br>PERKINS COIE LLP<br>11988 El Camino Real, Suite 350<br>San Diego, CA 92130<br>Ai-ptab@perkinscoie.com | Patrick N. McKeever<br>PERKINS COIE LLP<br>11988 El Camino Real, Suite 350<br>San Diego, CA 92130<br>PMcKeever@perkinscoie.com |
| Matthew C. Bernstein<br>PERKINS COIE LLP<br>11988 El Camino Real, Suite 350<br>San Diego, CA 92130<br>MBernstein@perkinscoie.com | Yun L. Lu<br>PERKINS COIE LLP<br>11988 El Camino Real, Suite 350<br>San Diego, CA 92130<br>LLu@perkinscoie.com |
| James M. Heintz<br>DLA PIPER LLP (US)<br>11911 Freedom Drive, Suite 300<br>Reston, VA 20190-5602<br>jim.heintz@dlapiper.com | Robert C. Williams<br>DLA PIPER LLP (US)<br>401 B Street, Suite 1700<br>San Diego, CA 92101<br>robert.williams@dlapiper.com |

September 21, 2016
                        */s/ Michael D. Fabiano /*
                        Michael D. Fabiano

Trials@uspto.gov                                    Paper 38
Tel: 571-272-7822                       Entered: September 13, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————————

STARBUCKS CORPORATION, APPLE, INC., EVENTBRITE INC., and
STARWOOD HOTELS &
RESORTS WORLDWIDE, INC.,
Petitioner,

v.

AMERANTH, INC.,
Patent Owner.
———————————

Case CBM2015-00099[1]
Patent 6,871,325 B1
———————————

Before MEREDITH C. PETRAVICK, RICHARD E. RICE, and
STACEY G. WHITE, *Administrative Patent Judges.*

WHITE, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
Covered Business Method Patent Review
*35 U.S.C. § 328 and 37 C.F.R. § 42.73*

———————————

[1] Case CBM2016-00006 has been joined with this proceeding.

CBM2015-00099
Patent 6,871,325 B1

# I.  INTRODUCTION

## A.  Background

Starbucks Corporation filed a Petition (Paper 2, "Pet.") requesting covered business method patent review of claims 11–13 and 15 ("challenged claims") of U.S. Patent No. 6,871,325 B1 (Ex. 1002, "the '325 patent") pursuant to § 18 of the Leahy-Smith America Invents Act ("AIA").  Ameranth, Inc. ("Patent Owner") filed a Preliminary Response.  Paper 7 ("Prelim. Resp.").

Pursuant to 35 U.S.C. § 324, we instituted this trial on the following grounds (Paper 9, "Dec."):

| References | Basis | Claims Challenged |
|---|---|---|
| Brandt,[2] NetHopper,[3] and Carter[4] | § 103 | 11–13 |
| Brandt, NetHopper, Carter, and Rossmann[5] | § 103 | 15 |
| Brandt, Demers,[6] Alonso,[7] and Carter | § 103 | 11–13 |
| Brandt, Demers, Alonso, Carter, and Rossmann | § 103 | 15 |

[2] Japanese Unexamined App. No. H10-247183 (published Sept. 14, 1998) (Ex. 1004) (certified translation, Ex. 1005, "Brandt").

3 NetHopper Version 3.2 User's Manual, 1–24 (1997) (Ex. 1006, "NetHopper").

4 European Unexamined App. No. EP 0845748A2, published June 3, 1998 (Ex. 1052, "Carter").

5 U.S. Patent No. 5,809,415, issued Sept. 5, 1998 (Ex. 1053, "Rossmann").

[6] Alan Demers, et al., *The Bayou Architecture: Support for Data Sharing Among Mobile Users*, Mobile Computing Systems & Applications, 1995. Proceedings,., Workshop on. IEEE, 1–7, 1995. (Ex. 1009, "Demers").

[7] Gustavo Alonso et al., *Exotica/FMDC: A Workflow Management System for Mobile and Disconnected Clients*, Databases & Mobile Computing, 28–45, 1996 (Ex. 1012, "Alonso").

CBM2015-00099
Patent 6,871,325 B1

Apple Inc., EventBrite, Inc. and Starwood Hotels & Resorts Worldwide, Inc.[8] subsequently requested covered business method patent review of the same claims based on the grounds instituted in this proceeding and sought joinder with this proceeding.  CBM2016-00006, Paper 1, 2.  We instituted reviewed on that petition and joined it with this proceeding.  Paper 28.

Patent Owner filed a Corrected Patent Owner's Response.  Paper 17 ("PO Resp.").  Petitioner filed a Reply to Patent Owner's Response.  Paper 19 ("Reply").  Patent Owner filed a Sur-Reply to Petitioner's Reply.  Paper 24 (Sur-Reply); *see also* Paper 22 (Order authorizing Patent Owner's Sur-Reply).  In addition, the parties filed cross motions seeking to exclude documents.  Paper 26 ("Pet. Mot. Excl.), Paper 25 ("PO Mot. Excl.").

An oral hearing was held on May 10, 2016.  A transcript of the hearing is included in the record.  Paper 37 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73.  For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 11–13 and 15 of the '325 patent are unpatentable.

### B.  Related Proceedings

The parties indicate that the '325 patent is the subject of the following district court case: *Ameranth, Inc. v. Starbucks Corp.,* No. 3-13-cv-01072 (S.D. Cal.) filed May 6, 2013.  Pet. 2 (citing Ex. 1045).  Petitioner notes that Patent Owner has asserted the '325 patent against thirty-five other defendants in a number of civil actions that have been consolidated into *Ameranth, Inc. v. Pizza Hut,* No. 3-11-cv-01810 (S.D. Cal.).  *Id.*

---

[8] The term Petitioner as used in this Decision collectively refers to Starbucks, Apple Inc., EventBrite, Inc. and Starwood Hotels & Resorts, Worldwide, Inc.

CBM2015-00099
Patent 6,871,325 B1

In a previous proceeding before the Board, claims 1–10 of the '325 patent were held to be unpatentable. *Agilysys, Inc. v. Ameranth, Inc.,* Case CBM2014-00016 (PTAB Mar. 20, 2015) (Paper 35). Petitioner also filed a petition for covered business method patent review of a related patent, U.S. Patent No. 6,384,850 B1. *Starbucks Corp., v. Ameranth, Inc.,* Case CBM2015-00091. Patent Owner identifies a number of covered business method patent reviews (both pending and completed) that it states are related to this Petition. Paper 4 (Notice of Related Matters). The previous and pending related petitions are summarized in the table below.

| U.S. Patent No. | Previous CBM Reviews | Pending CBM Reviews |
|---|---|---|
| 6,384,850 B1 | CBM2014-00015 CBM2015-00080 CBM2015-00096 | CBM2015-00091 |
| 6,871,325 B1 | CBM2014-00016 CBM2015-00082 CBM2015-00097 | |
| 6,982,733 B1 | CBM2014-00013 | |
| 8,146,077 B1 | CBM2014-00014 CBM2015-00081 CBM2015-00095 | |
| 9,009,060 B2 | | CBM2016-00053 |

*C. The '325 Patent*

The '325 patent, titled "Information Management and Synchronous Communications System with Menu Generation" issued March 22, 2005 based on Application No. 10/015,729 filed November 1, 2001. Ex. 1002, at [21], [22], [45], [54]. The challenged claims are directed to an information management and synchronous communications system. *Id.* at 17:4–18:31, 18:35–37. This system "results in a dramatic reduction in the amount of time, and hence cost, to generate

4

CBM2015-00099
Patent 6,871,325 B1

and maintain computerized menus for, e.g., restaurants and other related applications that utilize non-PC-standard graphical formats, display sizes or applications." *Id.* at 3:31–35.

The system includes a central database, multiple handheld devices, and a web server. *Id*. at 3:64–4:1. It also includes an application programming interface ("API") that enables third parties, such as point-of-sale companies, affinity program companies, and internet content providers, to integrate fully with the computerized hospitality applications. *Id.* at 2:16–21; 3:67–4:5; 11:29–33. The system has a communications control module to "provide[] a single point of entry for all hospitality applications, e.g., reservations, frequent customer ticketing, wait lists, etc. to communicate with one another wirelessly and over the Web." *Id*. at 4:10–13. This communications control module is a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol. *Id.* at 4:14–16; 11:38–44.

Claim 11 of the '325 patent is illustrative of the claims at issue and read as follows:

> 11. An information management and synchronous communications system for use with wireless handheld computing devices and the internet comprising:
>
> a. a central database containing hospitality applications and data,
>
> b. at least one wireless handheld computing device on which hospitality applications and data are stored,
>
> c. at least one Web server on which hospitality applications and data are stored,
>
> d. at least one Web page on which hospitality applications and data are stored,
>
> e. an application program interface, and

CBM2015-00099
Patent 6,871,325 B1

   f. a communications control module,

    wherein applications and data are synchronized between the central data base, at least one wireless handheld computing device, at least one Web server and at least one Web page; wherein the application program interface enables inte[]gration of outside applications with the hospitality applications and wherein the communications control module is an interface between the hospitality applications and any other communication protocol, wherein the synchronized data relates to orders.

*Id.* at 17:4–26.

### D. Standing for Covered Business Method Patent Review

As stated in our Decision on Institution, Petitioner provided sufficient evidence and arguments to show that claim 11 of the '325 patent is sufficient to subject this patent to covered business method patent review. Dec. 7–10. We discern no reason to modify or further discuss in this Final Written Decision our determination regarding standing.

We do note, however, Patent Owner's improper attempt to incorporate by reference arguments made in its Preliminary Response into the Patent Owner's Response. PO Resp. 1 n. 1 ("Patent Owner incorporates herein its Preliminary Response arguments regarding standing and preserves its right to appeal the Board's determination thereof."). Our Rules prohibit incorporating arguments by reference. 37 C.F.R. § 42.6(a)(3) states: "[a]rguments must not be incorporated by reference from one document into another document." Incorporation by reference circumvents our Rule limiting the pages in the Patent Owner response to 80 pages. *See* 37 C.F.R. § 42.24(b)(2).[9] Arguments that are not developed and presented in

_____

[9] Rule 42.24(b)(2) was amended, effective May 2, 2106. The Corrected Patent Owner's Response, however, was filed February 1, 2016, prior to that date and, thus, we refer to the prior version of 37 C.F.R. § 42.24(b)(2).

CBM2015-00099
Patent 6,871,325 B1

the Patent Owner Response, itself, are not entitled to consideration. *See* Paper 10, 3 (cautioning Patent Owner "that any arguments for patentability not raised and fully briefed in the response will be deemed waived.").

The only other argument raised in regards to standing is Patent Owner's statement that "Petitioner's standing argument merely references CBM2014-00016, and is thus insufficient." PO Resp. 1 n. 1. As explained in our Decision, we determined that the Petition established that claim 11 of the '325 patent was eligible for covered business method patent review. *See* Dec. 6–9. The standing analysis in CBM2014-00016 was directed to claim 1 of the '325 patent. *Agilysys, Inc. v. Ameranth, Inc.,* CBM2014-00016, slip. op. at 9–12 (PTAB Mar. 26, 2014) (Paper 20). Thus, Patent Owner's contentions regarding CBM2014-00016 are not applicable to this case.

## II. ANALYSIS

### A. Claim Construction

The Board interprets claims of unexpired patents using the broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.300(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation approach). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

CBM2015-00099
Patent 6,871,325 B1

    *1. "hospitality applications"*

  Independent claim 11 recites "hospitality applications." Ex. 1002, 17:7–22. In our Institution Decision, we analyzed this term and determined that the construction implied in a previous case "applications used to perform services or tasks in the hospitality industry" should also apply in this case. Dec. 11 (citing *Agilysys, Inc. v. Ameranth, Inc.*, Case CBM2014-00014, slip op. at 16–17 (PTAB Mar. 26, 2014) (Paper 19)). We also stated that the broadest reasonable interpretation of hospitality includes businesses such as car rental agencies, which provide services to travelers. *Id.* at 12. Patent Owner and Petitioner agree with this construction, but Patent Owner seeks clarification as to its scope. PO Resp. 5; Reply 1–4. Specifically, Patent Owner seeks to exclude car rental agencies from the construction. PO Resp. 5.

  According to Patent Owner, the invention of the '325 is directed to "the **traditional** restaurant processes" and as such, the construction of hospitality excludes both car rentals and the broader travel/tourism industry. *Id.* at 7–8 (quoting Ex. 2044, 1). Patent Owner contends that the specification shows that the recited term "hospitality" excluded travel and tourism. *Id.* at 6–7. In addition, Patent Owner argues that portions of the Dittmer reference (Ex. 1035) submitted with the Petition omitted key portions of the textbook that would have shown travel and tourism to be distinct from hospitality. PO Resp. 7–8. Patent Owner has placed the entire Dittmer textbook in evidence. *See* Ex. 2040.

  First, we start with the text of the '325 patent. *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015). The specification discusses the use of "PDA type devices in the restaurant and hospitality fields." Ex. 1002, 1:62–63; *see also id* at 2:3–5 (noting that "substantial use of such devices in the restaurant and hospitality context has not occurred to date"); and

2:6–7 ("PDAs have not been quickly assimilated into the restaurant and hospitality industries"). Thus, we determine that the specification's repeated discussions of "restaurants and hospitality" indicate that the Patentee viewed restaurants and hospitality as two distinct fields or industries. *See id.* There is a single mention of a "restaurant and hospitality industry." *Id.* at 3:45–47. This indicates that the Patentee viewed these distinct fields or industries as related and that one could broadly view restaurants and hospitality as part of the same industry. Thus, we find that the specification supports a construction of hospitality that includes but is not limited to the restaurant industry.

During the prosecution of a related patent, the Patentee stated that to one of ordinary skill in the art, "a hospitality software application is, *for example*, a piece of software used to provide operational solutions in hospitality industries *such as* restaurants and hotels concerning, for example, food ordering, menus, wait-lists and reservations." Ex. 2039, 7 (emphases added). Hotels are not discussed in the '325 patent, but according to the Patent Owner they are an example of a type of business that is included within the hospitality industry. *See* PO Resp. 6. We look to the specification to see if the Patentee provided insight as to what other businesses properly may be included within the construction of this term. The specification provides several generic examples of hospitality applications. Ex. 1002, 4:11–12 ("hospitality applications, e.g., reservations, frequent customer ticketing, wait lists, etc."). These applications, however, have utility in a broad range of fields (e.g. table reservation, rental car reservation, room reservation, etc.) and thus, we do not find this language to be limiting as to the proper construction of hospitality.

We then look to evidence outside of the patent and its prosecution history to gain additional insight into how one of ordinary skill in the art would have

CBM2015-00099
Patent 6,871,325 B1

understood this term.  In the Institution Decision, we cited a section of the Dittmer reference titled "A Definition of Hospitality."  Dec. 11 (citing Ex. 1035, 5–6).  We noted that Dittmer provided both a "traditional view" of hospitality and a broader view.  *Id.*  The traditional view "refers to the act of providing food, beverages, or lodging to travelers."  *Id.*  Patent Owner urges that we adopt that view of the scope of the term.  PO Resp. 7.  In our Decision, we also noted the broader view that includes "services primarily to travelers in a broad sense of the term.  By contrast, other service businesses ordinarily deal with customers who are local residents rather than travelers."  Dec. 11–12 (quoting Ex. 1035, 6).  We also cited Dittmer's statement that the definition of hospitality "is really quite broad" (*id.* at 12 (citing Ex. 1035, 7)) and Dittmer's listing car rental agencies as a business providing service to travelers (*id.* (citing Ex. 1035, 404)).

Patent Owner contends that Dittmer also includes statements that differentiate food, beverages, and lodging from travel and tourism.  Specifically, Patent Owner relies upon the following statement found in Dittmer:  "In this chapter and the two that follow, we will turn [] <u>from</u> the specifics of <u>food, beverage</u> <u>and lodging</u> operations to ***the <u>larger</u> industry, of which <u>hospitality</u> operations are*** ***<u>a part</u>; <u>travel and tourism</u>.***"  PO Resp. 8 (quoting Ex. 2040, 396) (emphasis in original).  According to Patent Owner, this shows that travel and tourism is a broad industry and hospitality is a subset of that industry.  *Id.*  Petitioner points out that Dittmer is a book titled "Dimensions of the Hospitality Industry" and it includes three chapters on travel and tourism, which it argues indicates that travel and tourism are a part of hospitality.  Reply. 1.

Petitioner also provides declaration evidence from Dr. Mahmood A. Khan. *See* Ex. 1064.  Dr. Khan is a professor in the Hospitality and Tourism Department at Virginia Polytechnic Institute and State University.  *Id.* ¶ 1.  He has over forty

years of experience in the hospitality industry.  *Id.* ¶ 1, App'x A.  Dr. Khan

testified that "the hospitality industry encompassed and included 'travel and

tourism' (including car rentals)."  *Id.* ¶ 15.  According to Dr. Khan,

> Among the wide ranging services in the hospitability industry,
> transportation services, lodging services and services of food and
> beverages in connection with the needs of people away from home are
> fundamentally intertwined and practically inseparable for travelers. It
> is difficult for people in the hospitability industry to image how one of
> those three types of services be separated from one another.

*Id.* ¶ 16.  He explained that car rental applications were integrated into centralized

systems for airline and hotel room reservations and provided examples of such

centralized systems that were available in 1999.  *Id.* ¶ 19.

Patent Owner challenges Dr. Khan's testimony by asserting that he is not a

computer scientist and not qualified to testify as to applications.  Tr. 94:13–

95:20.[10]  This argument is misplaced.  Dr. Khan testimony goes to scope of the

hospitality industry as it would have been understood at the time of the invention

of the '325 patent.  We find Dr. Khan to be qualified to opine as to the boundaries

of the hospitality industry and as to the types of applications that would be used

within that industry at the relevant time.

We find that the evidence supports the view that one of ordinary skill in the

art would have understood hospitality to be a broad term that includes travel and

tourism as well as hotels and restaurants.  As discussed above, we find that the

specification treats restaurants and hospitality as separate but related industries.

Patent Owner includes hotels and restaurants in its view of hospitality, however,

hotels and restaurants are part of travel and tourism.  *See, e.g.,* Ex. 2040, 403–04

---

[10] Petitioner submitted Dr. Khan's declaration along with its Reply.  Thus, Patent
Owner could not have addressed this declaration in its Patent Owner Response.

(noting that "travel service providers" includes car rental companies, hotels, and restaurants). The specification focuses on hospitality industry problems involving the use of paper based systems for "ordering, reservations and wait-list management." Ex. 1002, 1:27–28. Brandt describes ordering (specifying the type of car to be rented) (Ex. 1005 ¶ 90) and reservations (*id.* ¶¶ 89, 91) in the rental car context. Dittmer intertwines food, beverage, lodging, travel, and tourism because these industries are related and interdependent. Thus, we determine that the broadest reasonable interpretation of hospitality would include travel and tourism related businesses such as car rental businesses.

### 2. *"web page"*

We construed the term "web page" to mean "a document with associated files for graphics, scripts, and other resources, accessible over the internet and viewable in a web browser" in our Decision on Institution. Dec. 10–11. Based on our review of the full record of this proceeding we see no reason to modify that construction. See PO Resp. 4; Reply 4.

### 3. *other terms*

Patent Owner proposes constructions for various other claim terms. *See* PO Resp. 3–20. We find, however, that these terms need no explicit construction. *See Vivid Techs., Inc., v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999).

### B. *Asserted Obviousness over Brandt, NetHopper, Carter, and Rossmann*

Petitioner argues that claims 11–13 would have been obvious over the teachings of Brandt, NetHopper, and Carter, and claim 15 would have been obvious over Brandt, NetHopper, Carter, and Rossmann. Pet. 47–64.[11] Patent

---

Petitioner's heading indicates that claims 11–13 are asserted to be unpatentable over Brandt, NetHopper, and Carter. Pet. 47; *see also* Ex. 1003 ¶ 150 (providing details from Petitioner's Declarant regarding the obviousness of claims 11–13 over

CBM2015-00099
Patent 6,871,325 B1

Owner disputes Petitioner's contentions, arguing that these asserted grounds do not render obvious the challenged claims.  PO Resp. 24–51.  We have reviewed the Petition, the Patent Owner's Response, Petitioner's Reply, as well as the relevant evidence discussed in those papers and other record papers.  As described in further detail below, we determine the record supports Petitioner's contentions and adopt Petitioner's contentions discussed below as our own.  For reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that that claims 11–13 would have been obvious over the teachings of Brandt, NetHopper, and Carter, and claim 15 would have been obvious over Brandt, NetHopper, Carter, and Rossmann.

### 1. Overview of Brandt

Brandt is a Japanese patent publication directed to "provid[ing] the capability to easily access many different application programs over the [world wide web ("WWW")] via a common user interface."  Ex. 1005, Abstract.  Figure 3 of Brandt is reproduced below.

---

Brandt, NetHopper, and Carter).  The Petition also includes mentions of Rossmann's teachings throughout this section, but those mentions are described as providing additional rationale for combining Rossmann with the other references.  *See, e.g.,* Pet. 48 (noting a "common or related teaching provides a reason or motivation to combine Brandt, NetHopper, Carter, and Rossmann.").  We view these mentions of Rossmann as part of Petitioner's argument as to the unpatentability of claim 15 and being directed to the motivation to combine Rossmann with Brandt, NetHopper, and Carter for claim 15.

CBM2015-00099
Patent 6,871,325 B1



# FIG. 3

Figure 3, reproduced above, is a block diagram of Brandt's system that allows access to a software application over the WWW. *Id.* at Fig. 3. Client workstation 210 "may be any computer that is capable of providing access to the WWW by using web browser 212 [including] handheld, portable or laptop computers, standard desktop computer systems, [and] Personal Digital Assistants (PDAs)." *Id.* ¶ 14. Data such as HTML code, graphics, audio, and Java applets may be transmitted to and displayed on the client workstation 210. *Id.* ¶ 16.

> Web server computer system 220 typically outputs pages of HTML data to WEB browser 212 in response to requests by web browser 212 that reflect action taken by the user at client workstation 210. In addition, as explained above, web server computer system 220 may output other types of data to web browser 212 as well.

*Id.* ¶ 17. This data output to the client workstations may include dynamic web pages. *Id.* When a user submits a request over the WWW, the web server application receives data from web browser 212. *Id.* ¶¶ 31, 79. If the user request requires access to an application, the web server application will pass data to CGI 420. *Id.* ¶ 80. CGI 420 is a "Common Gateway Interface (CGI) module[]. CGI modules may be used as an interface between web server application 222 and other software applications." *Id.* ¶ 19. "CGIs allow web servers to distribute dynamic

14

data from other software applications." *Id.* CGI 420 is a component of Gateway 332. *Id.* ¶¶ 77–78. Gateway 332 utilizes conversation identifiers "to control the flow of data between the various users and software application 342." *Id.* ¶ 64. Brandt's system also includes an API that is "used by program developers to provide access to certain features of a given software application. Each application program will have APIs that allow third parties to access certain features, to interface the application program with other programs, and to provide access for end-users." *Id.* ¶ 22.

The application of Brandt's system is explained through the description of an exemplary application, FlowMark. *Id.* ¶ 75. FlowMark is a work flow application that may be used in many contexts, but an example provided describes using FlowMark to implement and improve on the existing car rental process. *Id.* ¶¶ 6, 78, 89–122. In this example, the user submits data via a reservation form on the rental car agency's web site. *Id.* ¶ 90. The reservation form is generated from an HTML template sent from web server 222 to the browser on the client's device. *Id.* ¶ 91. The user uses the form generated from the HTML template to submit data that is transmitted to the web server. *Id.* The HTML template also may contain variables including variables to substitute or replicate Java script variables or templates. *Id.* ¶¶ 95, 108. The variables could be used to start the FlowMark application or "retrieve information from different software applications." *Id.* An application may be invoked to perform a task such as querying FlowMark database 438 to determine if the person renting the car is an existing customer of the car rental agency, updating the database to indicate that a car has been reserved, or determining that a rental request should be routed to a human operator for further processing. *Id.* ¶¶ 101–102.

### 2. Overview of NetHopper

NetHopper is a user's manual that discusses NetHopper version 3.2. Ex. 1006. The NetHopper application is a web browser for the Newton® PDA. *Id.* at 1. Petitioner provides a Declaration from Wayne Yurtin, an author of NetHopper, in which he testifies regarding the public accessibility of the NetHopper manual. Ex. 1007 ¶¶ 18–21. NetHopper discloses a mobile browser that is capable of viewing most HTML web pages, storing pages for later viewing, storing bookmarks, submitting forms via an HTML page, and retrieving email. Ex. 1006, 1. NetHopper discusses using and creating HTML templates. *Id.* at 15, 17, 18.

### 3. Overview of Carter

Carter is a European patent publication titled "A Method and Apparatus for Performing Computer-Based On-Line Commerce Using an Intelligent Agent." Ex. 1052. Carter describes a user buying goods or services through the user's computer by linking the computer with sellers via a computer network. *Id.* at 1:5–9. Sellers and service providers may place their goods and services for sale by placing catalogues listing product descriptions, pricing, and availability on the web. *Id.* at 2:52–58. The user interacts with a software program known as an intelligent agent and provides the agent with sufficient information to select for purchase desired goods or to reserve desired services such as hotel, rental car, and restaurant reservations. *Id.* at 3:44–52, 4:25–35. The intelligent agent reviews the offerings available from various service providers and makes a preliminary decision as to which service provider will be used. *Id.* at 8:48–55. This information regarding preliminary selections is stored in memory without being committed to the service provider's server. *Id.* at 8:53–55. The agent reviews the business's policies and makes a final decision to book the selected service on the service provider's server. *Id.* at 9:12–17. Carter lists a number of queries and

commands that may be directed to the service provider's server such as inquiries regarding the details of goods and services; inquiries regarding the availability and cost of goods and services; inquiries regarding the current status of an order; and commands such as make, cancel, or confirm a reservation, and make or cancel a waitlist reservation. *Id.* at 10:13–11:8.

### 4. Overview of Rossmann

Rossmann is a U.S. patent titled, "Method and Architecture for an Interactive Two-Way Data Communication Network." Ex. 1053, [54]. In Rossmann, a two-way data communication device such as a two-way pager communicates with a server on a computer network. *Id.* at Abstract. Rossmann utilizes a client module to transmit messages to a server on an internal network or over the internet. *Id.* at 2:30–36.

### 5. Analysis

Petitioner has established that one of ordinary skill in the art would have learned all of the limitations of claims 11–13 of the '325 patent from the teachings of Brandt, NetHopper, and Carter. Claims 11–13 share common limitations and differ only by the limitations in the final wherein clause as to the specific type of data being synchronized. The common limitations will be discussed first and then the limitations regarding the type of synchronized data will be addressed.

As discussed above, Brandt teaches a system that includes a central database, a wireless handheld device, a web server, and a web page. Pet. 48–52. Brandt also teaches the existence of hospitality applications and data on these elements. *Id.* Specifically, Petitioner points to the car rental application and database as teaching hospitality applications and data. *Id*; Ex. 1003 ¶¶ 172–173. Petitioner also directs us to Brandt's discussion of dynamic web pages as teaching the claimed hospitality applications and data. Ex. 1003 ¶ 172 (quoting Ex. 1005

CBM2015-00099
Patent 6,871,325 B1

¶ 17 ("Web server application 222 may dynamically build output data (e.g., an HTML page) from parts that it retrieves from within memory within web server computer system 220 or from other computer systems, or may simply pass through an HTML page or other information that has been developed at an earlier time or by another computer.")); *see also id.* ¶ 176 (quoting Ex. 1005 ¶ 55 ("Gateway 332 then outputs the HTML template to web server 222 with the real data substituted for the substation variables (step 731). Web server application 222 then provides the web server output data to web browser 212 (step 733).")). Petitioner also points out that Brandt's web pages can include executable applications such as Java applets and/or JavaScript. Pet. 52 (citing Ex. 1005 ¶¶ 16, 107).[12] Petitioner relies upon NetHopper's discussion of caching a web page to teach storage of applications and data on a handheld device. *Id*. at 49–50 (citing Ex. 1006, 17–18). Petitioner argues that Brandt teaches the claimed synchronization through its discussion of HTML templates that include input and/or substitution variables. *Id.* at 55–56. These variables are used to pass data between the components of the system. *Id.* As noted in Brandt, the data transmitted between the elements of the system includes HTML code, graphics, audio, and Java applets. Ex. 1005 ¶ 16. Brandt teaches an API to facilitate communication between its system and "other programs." *Id.* ¶ 22. Brandt also teaches the claimed communications control module through its discussion of Application Gateway 332. Pet. 53–55. Brandt's gateway includes CGI module 420 and FlowMark/Internet Gateway (FMIG) 430. *Id.* at 53–54 (citing Ex. 1005 ¶¶ 77–78, 82–83, 87, Figs. 4, 10). Petitioner asserts

---

[12] Patent Owner asserts that the Board *sua sponte* included Java in the asserted grounds. PO Resp. 21. We disagree. Petitioner cited Brandt's use of Java in the Petition and supporting declaration. *See* Pet. 52, Ex. 1003 ¶¶ 190–191. Thus, Petitioner brought forth this evidence in its case-in-chief and Patent Owner was on notice that evidence was being cited against its claims. Dec. 26.

that the gateway "enables communications over a network between clients and the software applications." *Id.* at 54–55 (citing Ex. 1005 ¶¶ 56, 64, 68).

As to the claim 11, the disclosures of Carter and Brandt teach synchronized data related to orders. Brandt teaches synchronized data related to orders by its discussion of ordering a rental car. *Id.* at 62 (citing Ex. 1005 ¶ 90). Carter teaches sending inquiries to a server to obtain information about the current status of an order, the details of a good or service available for purchase, and to make a purchase. *Id.* (citing Ex. 1052, 10:28–31, 10:33–35, 11:54–12:2).

As to claim 12, the disclosures of Carter and Brandt teach synchronized data related to waitlists. Brandt teaches synchronized data related to waitlists by its discussion of pending car reservations. *Id.* at 62–63 (citing Ex. 1005 ¶¶ 112, 116, Figs. 18–22). Petitioner argues that "[t]he list of pending requests is a waitlist because no car has been selected yet and it may be the case that no car will be available." *Id.* at 63. Carter teaches sending inquiries to a server to obtain information about a waitlist reservation and to make or cancel a waitlist reservation. *Id.* (citing Ex. 1052, 10:33–35, 11:3–11:8).

As to claim 13, the disclosures of Carter and Brandt teach synchronized data related to reservations. Brandt teaches synchronized data related to reservations by its discussion of rental car reservation data received from clients and relayed to rental agents. *Id.* at 63 (citing Ex. 1005 ¶ 94). Carter teaches sending inquiries to a server to obtain information about the current status of a reservation. *Id.* (citing Ex. 1052, 10:33–50).

Patent Owner asserts that Brandt fails to teach a hospitality application. PO Resp. 27–28. This argument is premised on Patent Owner's construction of "hospitality." *Id.* As discussed above in Section II.A.1, we find that the proper construction of this term includes car rental and thus, we are persuaded that Brandt

teaches a hospitality application as recited in the challenged claims. In addition, Patent Owner argues that Brandt's teachings are inapplicable to the ordering of claim 11, waitlists of claim 12, and reservations of claim 13 because that recited limitations are limited to the restaurant context. *Id.* at 14–18, 51–52. We are not persuaded that the '325 patent's view of ordering is so narrow. The specification provides several generic examples of hospitality applications. Ex. 1002, 4:11–12 ("hospitality applications, e.g., reservations, frequent customer ticketing, wait lists, etc."). The listed examples are not limited to the restaurant context and we will not import such a requirement into the claims. Further, the specification is explicit in stating that this purported invention is for use with "restaurants and applications. *Id.* at 1:11–14.

Patent Owner argues that the challenges based on Brandt should fail because Petitioner's asserted grounds would require a change in Brandt's principles of operation and Brandt teaches away from the synchronization core to the challenged claims. PO Resp. 21–27. This argument is premised on Brandt's usage of a common user interface being inconsistent with the '325 patent's core purpose of providing synchronization and consistency across an entire system of handheld devices and non PC standard displays. *Id.* at 21–22. As we noted in the Decision to Institute, "[t]he claims at issue, however, are not directed to a user interface and instead focus on the back end communications between the various system elements." Dec. 33. Patent Owner asserts that it was error to exclude the user interface from the claims because "no system comprising the elements of [claims 11–13] could be 'used' <u>without</u> a user interface." PO Resp. 24–25. It goes on to discuss the claims' need for a web browser, which Patent Owner describes as a user interface. *Id.* There are, however, many unclaimed elements that would be required for the implementation of the challenged claims. For example, the claims

do not discuss a power source and one would unquestionably be required for such a device to operate. The issue here is whether the user interface is claimed as part of the invention described in the challenged claims. These claims make no reference to any elements of a user interface. The claims are instead directed to "[a]n information management and synchronous communications system." Ex. 1002, 17:4–5. Any differences between Brandt's user interface and a user interface that may be described in the '325 patent does not preclude Brandt's communication system from rendering obvious the claimed communication system.

Patent Owner argues that the proposed combination does not teach a central database. PO Resp. 27–28. Specifically, Patent Owner asserts that Brandt lacks the "central" aspect of the claim language. *Id.* at 26. Brandt describes FlowMark database 438, which is used to store information relating to the rental car process. Ex. 1005 ¶ 78. Database 438 also includes application data such as process models and status information. *Id.* In addition, Petitioner's expert Dr. Abdelsalam Helal testified that at the time of the invention of the '325 patent that it was known to store business logic such as procedures, triggers, and constraints in a database. Ex. 1003 ¶ 161 (citing Ex. 1020, 8). Dr. Helal's testimony in conjunction with the disclosures of Brandt evidence that one of ordinary skill in the art would have found Brandt to teach a central database containing hospitality applications and data. We find that one of ordinary skill in the art would have learned the recited central database from Brandt's disclosure of a database central to the car reservation process that includes data relating to car rental and application logic such as process models, which "describe the process flow and activity" of the FlowMark transaction. *See* Ex. 1005 ¶ 76.

CBM2015-00099
Patent 6,871,325 B1

Patent Owner also asserts that the cited art fails to teach the claimed synchronization between the central database, wireless handheld computing device, web server, and web page.  PO Resp. 30.  Brandt includes web browser 212 that is displayed on client workstation 210.  Ex. 1005, Fig. 3.  "Brandt teaches that client workstations may be any type of computer with a web browser, including handheld computers and PDAs."  Pet. 49 (citing Ex. 1005 ¶ 14). Petitioner relies upon this teaching in conjunction with NetHopper's discussion of a PDA that caches web pages and interactive HTML forms on the device to teach the claimed wireless handheld computing device.  *Id.* at 49–50; Reply 8–9; *see also* Tr. 42:15–17 ("The HTML pages can include executable code like JavaScript and Java applets, as I mentioned.  The pages can have interactive forms.").  Petitioner relies upon Brandt's web server, which serves static and dynamic HTML pages to teach the recited web server and its resident data and applications.  Pet. 50–51.  As to the recited web page and its data and applications, Petitioner cites to Brandt's static and dynamic web pages that may include HTML forms and Java applets and/or JavaScript.  *Id.* at 52; Reply 7.  As shown in Figures 3 and 4 of Brandt, the cited elements of Brandt are in communication with one another.  *See* Ex. 1005, Figs. 3, 4.  Petitioner contends that Brandt teaches synchronization through its discussion of using HTML templates and substitution variables to pass data between the cited elements of Brandt.  Pet. 56.  Brandt also includes a set of APIs, which facilitate the exchange of data between applications and clients in the system.  *Id.*

Patent Owner asserts that the passage of data between these elements via HTML forms and substitution variables is not enough to meet the claim language because synchronization of the recited hospitality applications requires the transmission of an executable file.  Tr. 55:24–56:10.  When asked for support in

CBM2015-00099
Patent 6,871,325 B1

the specification for this requirement, Patent Owner responded that the original claims of the '325 patent included synchronization and their status as original claims causes them to be self-supporting. *Id.* at 56:16–18. The Federal Circuit, however, has held that "[n]either the statute nor legal precedent . . . distinguishes between original and amended claims." *Ariad Pharms. v. Eli Lilly & Co.,* 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Thus, while "many original claims will satisfy the written description requirement, certain claims may not." *Id.* at 1349. Despite Patent Owner's contentions, however, the question before us at this time is not whether the claims have proper written description support, but rather whether the claims should be interpreted to require this specific form of synchronization.

As described in the specification, when a system is synchronized "the different components are in equilibrium at any given time and an overall consistency is achieved." Ex. 1002, Abstract, 1:64–2:37, 3:64–4:28. The synchronous communication system "enables automatic updating of both wireless and internet menu systems when a new menu item is added, modified or deleted from any element of the system." *Id.* at 3:7–10. Synchronization allows full integration with hospitality applications and real-time updating or batch processing performed periodically to keep multiple sites in synch. *Id.* at 3:59–4:4. The example provided in the specification notes that "a reservation made online can be automatically communicated to the backoffice server and then synchronized with all the wireless handheld devices wirelessly." *Id.* at 4:23–28.

We find that the specification does not require the transmission of an executable file. The specification contemplates that synchronization will cause the applications to be integrated and updated, but it does not indicate that an executable file must be transmitted to meet these limitations. We note that applications also are data. Such data includes instructions that can be executed to

assist in the performance of a task.  Tr. 18:20–19:3, 59:14–15; *see also* Ex. 2033, 27 ("computer code or instructions which perform or implement a specific hospitality-related information processing task when executed"); Ex. 2031 ¶ 171 ("Computer program in the present context means any expression, in any language, code or notation, of a set of instructions intended to cause a system having an information processing capability to perform a particular function.").  Thus, the passing of data that brings consistency or equilibrium to the code or instructions of the applications resident on the recited components would meet the recited limitations.  Petitioner relies upon Brandt's scheme of passing data (including application data such as java) through HTML forms.  Brandt's web pages pull data (which may include Java executables) from the data entered by the user on the handheld device and from the database.  *See, e.g.,* Ex. 1005 ¶¶ 90–91 (data from the user), 78 (data from the database).  This passage of information may occur through the use of HTML templates that include input and/or substitution variables.  Pet. 55–56.  Brandt's web server receives the dynamic web pages from the application gateway and transmits it to the user device.  *See, e.g.* Ex. 1005 ¶¶ 31, 54–55.  According to Petitioner, Brandt's approach provides for data consistency and that data throughout the system are updated on an as-needed basis.  Pet. 57.  Patent Owner asserts that updating data on an as-needed basis conflicts with the language of the claim and shows that Petitioner is attempting to read out the elements of this limitation.  PO Resp. 30–31.  We disagree because the specification contemplates periodic updating of the applications and data and we find that to be consistent with Brandt's on demand updating of data.

Patent Owner also asserts that Brandt does not require storage of data on the handheld device and thus, Brandt does not disclose synchronization of data stored on such device.  *Id.* at 31.  Petitioner, however, relies upon the combination of

CBM2015-00099
Patent 6,871,325 B1

Brandt and NetHopper to teach the caching (storage) of web pages on a handheld device. Pet. 44–45, 49. Patent Owner also argues that web page data does not teach the recited applications because an application resident on the handheld device must be different from a web page. PO Resp. 34–35. We do not find this argument to be persuasive. The handheld device is the hardware for use with the applications and data. The specification does not require a particular type of application to be resident on the handheld device. Petitioner relies upon Brandt's discussion of dynamically generated web pages. Pet. 51–52. These web pages may receive input in the form of applications, such as Java applets or JavaScript. *Id.* at 52 (citing Ex. 1005 ¶¶ 16, 21, 107). These web pages also receive application data. *Id.* (citing Ex. 1005 ¶¶ 55, 57, 62). We find that the cited web browser and cached web pages (including both data and application data such as dynamic web pages and java) teach the recited applications and data stored on a wireless handheld device. In addition, an instance of a browser and cached data on a handheld device constitute a different set of applications and data from the instance of a browser and cached data on another device. Thus, Brandt's system which is described as including devices such as desktop computers and PDAs would teach a system that includes a web page as viewed on a desktop computer that would be different from the set of applications and data on a handheld device. As such, Brandt teaches that these instances may be synchronized and thus, we find that these disclosures teach the recited storage of applications and data and the recited synchronization.

Patent Owner argues that Petitioner reads out the requirement that the API enable integration of outside applications with the hospitality applications. PO. Resp. 42–43. Patent Owner asserts that the recited "outside applications" are third-party applications and this has not been taken into account by Petitioner's

CBM2015-00099
Patent 6,871,325 B1

arguments. *Id.* at 42. In addition, Petitioner allegedly "incorrectly confuse[s] the API to be part of 'messaging protocols.'" *Id.* at 45. Further, Patent Owner objects to the application of Brandt to this limitation because its "APIs provide only 'send' and 'receive' functions, and provide functionality only for communicating with a web browser." *Id.* at 46. Brandt teaches "APIs that allow *third parties* to access certain features, to interface the application program with *other programs*, and to provide access for end-users." Ex. 1005 ¶ 22 (emphases added). The APIs taught in Brandt are not limited to particular functionality, and the APIs descriptions are provided in the text of the reference are "examples of APIs that are commonly found in many different software applications." *Id.* Thus, we are persuaded that Brandt would have taught one of ordinary skill in the art the recited "application program interface [that] enables integration of outside applications with the hospitality applications."

Finally, Patent Owner asserts that the cited art does not teach the communications control module. PO Resp. 43–48. According to Patent Owner, the claimed system must synchronize and integrate with HTTP and non-HTTP protocols. *Id.* at 47. Patent Owner argues that cited references also are insufficient because the only communication protocols discussed are those generated by web browsers. *Id.* at 48. Claims 11–13 recite that the communications control module "is an interface between the hospitality applications and any other communications protocol." The specification further states that "[a] communications control program monitors and routes all communications to appropriate devices." Ex. 1002, 9:35–36. Petitioner relies upon Brandt's gateway module to teach the recited communication control module. Pet. 60. According to Petitioner the "centralized 'application gateway' . . . facilitates client access to and communication with the applications. [Ex. 1005] ¶ 31. The gateway receives user

input and communicates with the applications to process that input and/or respond accordingly. *Id*. at ¶¶ 54–55." Pet. 43. The only specific protocol discussed in the specification is HTTP, a web based communications protocol. *See* Ex. 1002, 12:19–23. Thus, we do not find support for Patent Owner's assertion that non-HTTP protocols are required. As to routing, Brandt discloses "the application gateway including the identifier mechanism, the identifier mechanism generating an identifier for each of the plurality of web browsers and routing data from the software application to the selected one of the plurality of web browsers that correspond to the identifier." Ex. 1005, ¶ 126 (claim 7); Reply 13–14. Patent Owner also argues that Brandt's gateway is not "functionally independent from Brandt's other software." PO Resp. 48. Brandt's gateway, however, may be both logically distinct (Ex. 1005 ¶ 56) and physically distinct from other components of Brandt's system (*id* ¶ 35). This evidence persuades us that one of ordinary skill in the art would have understood Brandt to teach the recited communications control module.

Thus, for all of the foregoing reasons, we are persuaded that Petitioner has shown by a preponderance of the evidence that all of the limitations of independent claims 11–13 were taught by the disclosures of Brandt and NetHopper.

With respect to the dependent claim 15, we have reviewed Petitioner's supporting evidence and determine that Petitioner demonstrated by a preponderance of the evidence that all of the limitations of claim 15 are taught by the cited art. Claim 15 depends from claims 11, 12, or 13 and further recites "wherein the data is sent to a wireless paging device." Petitioner relies upon Rossmann's teaching of a wireless paging device to teach this limitation. Pet. 64 (citing Ex. 1053, 3:46–52, 14:6–15:7). Petitioner also argues that Brandt's client device also includes PDAs and computers that would have been considered to be

CBM2015-00099
Patent 6,871,325 B1

wireless paging devices.  *Id.* (citing Ex. 1005 ¶ 14).  Patent Owner does not independently rebut Petitioner's allegations regarding this claim.  PO Resp. 18. We find that Petitioner has demonstrated by a preponderance of the evidence that all of the limitations of claim 15 would have been taught by the cited references.

Thus, for all of the foregoing reasons we are persuaded that Petitioner has shown sufficiently that claims 11–13 would have been rendered obvious by teachings of Brandt, NetHopper, and Carter, and claim 15 would have been rendered obvious by the teachings of Brandt, NetHopper, Carter, and Rossmann.

C.     *Obviousness Over Brandt, Demers, Alonso, Carter, and Rossmann*

Petitioner asserts that claims 11–13 would have been obvious over Brandt, Demers, Alonso, and Carter and claim 15 and claim 15 would have been obvious over the teachings of Brandt, Demers, Alonso, and Carter.  Pet. 64–70.  Patent Owner disputes Petitioner's contentions, arguing that these asserted grounds do not render obvious the challenged claims.  PO Resp. 24–51.  We have reviewed the Petition, the Patent Owner's Response, and Petitioner's Reply, as well as the relevant evidence discussed in those papers and other record papers.  As described in further detail below, we determine the record supports Petitioner's contentions and adopt Petitioner's contentions discussed below as our own.  For reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that that claims 11–13 are unpatentable as obvious over the teachings of Brandt, Demers, Alonso, and Carter and claim 15 is unpatentable as obvious over the teachings of Brandt Demers, Alonso, Carter, and Rossmann.

1. *Overview of Demers*

Demers is a publication titled "The Bayou Architecture: Support for Data Sharing among Mobile Users."  Ex. 1009, 2.  "The Bayou System is a platform of replicated, highly available, variable-consistency, mobile databases on which to

CBM2015-00099
Patent 6,871,325 B1

build collaborative applications." *Id.* The system is intended to run on portable machines including PDAs. *Id.* The intent was to present to mobile users what appears to be "a centralized, highly-available database service." *Id.* Demers discussed using anti-entropy protocols to perform reconciliation to synchronize file systems. *Id.* at 3. "Anti-entropy ensures that all copies of a database are converging towards the same state and will eventually converge to identical states if there are no new updates." *Id.* Eventually all servers in such a system will be in a "mutually consistent state." *Id.* In order to provide stability for database updates that may be occurring throughout the system "each Bayou database has one distinguished server, the 'primary,' which is responsible for committing writes. The other, 'secondary' servers tentatively accept writes and propagate them toward the primary using anti-entropy." *Id.* at 5.

##### 2. *Overview of Alonso*

Alonso is a publication titled "Exocita/FMDC: A Workflow Management System for Mobile and Disconnected Clients." Ex. 1012, 27. Alonso discusses the same FlowMark application described in Brandt. *Id.* at 29, 31. One of the goals of the paper is to address methods to "maintain the overall correctness and consistency of the processes being executed" on disconnected mobile devices. *Id.* at 28. Applications and data are loaded on "powerful portable and home desktop computers" that are then disconnected from the centralized server while users perform business tasks using the FlowMark application. *Id.* at 28–29. Performance of these tasks is described as a process that consists of activities and relevant data that is transferred between activities. *Id.* at 30. APIs are used to access and return data. *Id.* "[P]ersistent data resides in a single database server, ObjectStore." *Id.* at 32. Applications and data are stored and executed locally on

CBM2015-00099
Patent 6,871,325 B1

the mobile devices. *Id.* at 34. When a user reconnects with the system, the central database is updated to reflect the work done on the mobile device. *Id.* at 35.

### 3. Analysis

Petitioner has established that one of ordinary skill in the art would have learned all of the limitations of claims 11–13 and 15 of the '325 patent from the teachings of the cited references. Petitioner relies upon the previously discussed disclosures of Brandt, Carter, and Rossmann in conjunction with the teachings of Demers and Alonso regarding database synchronization and Alonso's teaching of an application locally resident on a mobile device. Thus, instead of relying on NetHopper to teach storing applications and data on a mobile computing device, Petitioner relies on Alonso's local client application that is updated and synchronized with the other mobile devices in the system and the central database. Pet. 66–67. Petitioner asserts that one of ordinary skill in the art would have been motivated to combine the teachings of these references because Brandt and Alonso are directed to increasing accessibility of the same FlowMark workflow management system. Petitioner contends that Demers's teaching also would have been combined with Brandt and Alonso because Demers is directed to a well-known project that those skilled in the art would have looked to for teachings regarding mobile database replication. *Id.* at 65–66.

Patent Owner provided a combined response to both asserted grounds of obviousness and for reasons discussed above, we do not find persuasive Patent Owner's arguments that were directed to the disclosures of Brandt. Patent Owner's combined response did include arguments directed to the combination of Brandt, Demers, Alonso, and Carter, and we address those arguments in turn.

Patent Owner argues that by removing NetHopper and instead relying on the additional teachings of Demers and Alonso the cited combination lacks a web

CBM2015-00099
Patent 6,871,325 B1

browser as would be required by Brandt's teaching. PO Resp. 20–21. Brandt's mobile devices were defined as "any computer that is capable of providing access to the WWW by using web browser 212." [13] Ex. 1005 ¶ 14. Demers discusses mobile devices connected to a network via "a wireless communication device, such as a cell modem or packet radio transceiver" or a computer with "a conventional modem requiring it to be physically connected to a phone line." Ex. 1009, 2. The computing devices in Alonso are connected via an unspecified network. *See* Ex. 1012, Fig. 2. Thus, according to Patent Owner's argument, without evidence of a web browser in Demers or Alonso Petitioner has not established that these teachings may be combined. "[I]t is not necessary[, however,] that the inventions of the references be physically combinable to render obvious the invention under review." *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1013 (Fed. Cir. 1983)); *see also In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures."). The issue here is what one of ordinary skill in the art would have learned from the disclosures and

---

[13] In our Institution Decision, we stated that "we are not persuaded that the devices discussed in Alonso and Demers would not be *capable* of providing access to the WWW via a web browser." Dec. 38. Patent Owner argued that this reduced the obviousness analysis to a mere determination of whether it was possible to do something. PO Resp. 35. This mischaracterizes our statement. The discussion of capability was limited to analysis of whether the devices in Demers and Alonso meet Brandt's definition of a mobile device. As described in Brandt, a device capable of providing access to the WWW via web browser could be a mobile device. Thus, the discussion of capability did not go to the ultimate issue of obviousness, but instead was an additional point of information indicating that the mobile devices of Demers and Alonso met the criteria for a mobile device in Brandt. We find that the evidence supports Petitioner's assertion that the mobile devices of Demers and Alonso fit the description of mobile devices in Brandt.

not whether the references physically could operate as a unit. *See KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 424 (2007). Petitioner's evidence shows that one of ordinary skill in the art would have learned of a local software application that could be resident on a handheld device and would have seen this as a way to improve the functionality provided by Brandt because it would allow for the system to function during periods when the device may be disconnected from the network. Pet. 65. Specifically, one of skill in the art would have learned the usage of a local application from Alonso's teachings and would have combined that with Brandt's teaching of using the same FlowMark software to implement a hospitality application. Demers would have supplemented these teachings by showing that the local application could be resident on a PDA and by providing a detailed teaching as to how data consistency and synchronization could be achieved on this disconnected device. Thus, we are not persuaded by Patent Owner's arguments regarding the inability to combine the cited references due to a lack of a web browser in Demers or Alonso.

Patent Owner also asserts that the database teachings of Brandt, Demers, and Alonso may not be combined in a manner that would render obvious the claimed centralized database. PO. Resp. 28–29. Petitioner asserts that Brandt discloses a central database and that teaching is complemented by Demers's teaching of a "primary database" and Alonso's teaching of a central database. Pet. 66. Demers's primary database is a database with particular responsibility for ensuring database synchronization and consistency. Ex. 1009, 3, 5. Data committed to the primary database is replicated throughout the system, and application settings can be used to determine whether a particular application would interact with any of the less reliable other databases in the system. *Id.* at 5. Thus, while Demers may have multiple databases there is a single centralized primary database with a

particular responsibility for ensuring synchronization and consistency. We find that Demers's primary database would teach the claimed central database. Alonso discusses the use of FlowMark with all "persistent data resid[ing] in a single database server, ObjectStore." Ex. 1012, 32. Patent Owner relies upon another document's discussion of the Bayou system at issue in Alonso to support its argument that data in Alonso is not stored in a central database. PO Resp. 29 (citing Ex. 2034, 1), 31–32 (citing same). A reference, however, is relied upon for what it discloses. That another document may discuss the underlying system in a different manner does not take away from the disclosures in the cited reference. This ground is based on the printed publication and not the underlying product, and as such, the proper inquiry is whether the cited publication teaches the claim element and not whether it can be shown that the underlying product may have a different structure. As noted above, Alonso teaches a system with a single centralized database. Ex. 1012, 32.

Patent Owner also asserts that Alonso is "antithetical to the claimed invention because it requires that a user of a client device 'lock' an activity so that no other user in the system can work on the activity." PO Resp. 32 (citing Ex. 1012, 238). Petitioner contends that locking an item is not prohibited by the challenged claims. Reply 11. As described in Alonso, locking is performed to prevent users from concurrently working on the same item. Ex. 1012, 36. This prevents users from overwriting each other's updates before the information can be committed to the database. *Id.* We find that this would preserve the integrity of information in the database and thus, promote equilibrium and consistency required by the recited synchronization to the central database. As such, Alonso's database locking mechanism is not "antithetical to the claimed invention."

CBM2015-00099
Patent 6,871,325 B1

Therefore, we are not persuaded by Patent Owner's arguments regarding the databases in Brandt, Demers, and Alonso.

Thus, for all of the foregoing reasons, Petitioner has demonstrated by a preponderance of the evidence that Brandt, Demers, and Alonso teach the limitations of claims 11–13 and 15.

### D.    Objective Evidence of Non-Obviousness

Patent Owner contends that objective factors including praise, industry awards, commercial success, copying, failure of others, and licensing confirm the non-obviousness of all challenged claims of the '325 patent. PO Resp. 52–80, Sur-Reply 1–5. Such evidence must be analyzed before determining whether any claim has been rendered obvious. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.,* 676 F.3d 1063, 1076 (Fed. Cir. 2012) (citing *Richardson-Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1483 (Fed. Cir. 1997)). We have considered Patent Owner's arguments and evidence concerning objective indicia of non-obviousness, but are not persuaded that it is sufficient to support a finding of non-obviousness when considered in light of Petitioner's showing that each and every limitation of the challenged claims was taught by the cited art. We note that Patent Owner has provided a large quantity of documents (more than 500 pages) in support of its contentions. We have reviewed the evidence of record and have found it to be insufficient. The discussion below summarizes that analysis.

### 1. Nexus

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham v. John Deere Co. of Kan. City,* 383 U.S. 1, 17–18 (1966). To be relevant, evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir.

CBM2015-00099
Patent 6,871,325 B1

2011).  Thus, to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations.  *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995).  "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining nonobviousness.  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

Patent Owner contends that the invention of claims 11–13 and 15 are coextensive with its 21st Century Restaurant™ ("21CR") system and, thus, a nexus is established between the merits of the claimed invention and its evidence of praise, awards, commercial success, copying, failure of others, and licensing.  PO Resp. 55–64 (citing *Teva Pharm., Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1372 (Fed. Cir. 2013) ("There is a 'presumption of a nexus' when a product is 'coextensive' with a patent claim.").  Patent Owner argues that Figures 1 and 6 of the '325 patent, as originally filed in the patent application, an annotated brochure of the 21CR system ("the 21CR Product Brochure), and other articles and evidence establish that its 21CR system is coextensive with the invention of challenged claims.  PO Resp. 53–63.

Petitioner argues that Patent Owner's evidence of nexus is insufficient because it is based on an oversimplified and inaccurate view of the challenged claims.  Reply 18–19.  The challenged claims are directed to "[a]n information management and synchronous communications system for use with wireless handheld computing devices."  Ex. 1002, 17:4–5.  Patent Owner argues that the 21CR system has a nexus to the "inventive 'synchronization, integration and consistency' of th[e] claims."  PO Resp. 56.  We find that these features are but a subset of the functionality provided by the 21CR system.

CBM2015-00099
Patent 6,871,325 B1

The Federal Circuit has found an exception to the presumption of nexus in cases where the patented invention is only a component of the product to which the asserted objective considerations are tied. *Demaco*, 851 F.2d at 1392. In this case, there are two aspects to the system disclosed by the '325 patent: menu generation and synchronous communication. *See* Ex. 1002, 3:15–23. The first aspect includes a "desktop software application that enables the rapid creation and building of a menu" (*id.* at col. 3:15–17) and is claimed in claims 1–10, which are not challenged in this proceeding. Claims 11–15, some of which are challenged in this proceeding, are directed to the second aspect of the system, synchronous communication and are devoid of elements directed to menu generation. *See id.* at 2:56–62, 3:1–5.

Figure 6, as originally filed, depicts an alleged screen shot of a communications control window of the 21CR system and Figure 1, as originally filed, depicts a screen shot of the menu generation system. Ex. 2061. Patent Owner alleges that the screen shots are of a live or operational 21CR system (PO Resp. 56), but does not provide any evidence of such. Further, contrary to Patent Owner's argument that the 21CR system is coextensive with the invention of the challenged claims, originally filed Figure 1 depicts a menu generation wizard. The challenged claims are devoid of elements directed to the menu wizard. In addition, these Figures do not include many of the aspects of the challenged claims such as the web server, web page, and API. Figures 1 and 6, thus, do not demonstrate persuasively that the 21CR system is coextensive with the invention of the challenged claims.

Further, as discussed in detail below, other evidence provided by Patent Owner suggests that the 21CR system is not coextensive with the invention of the challenged claims. Patent Owner has submitted documents describing a wide set

CBM2015-00099
Patent 6,871,325 B1

of features in its 21CR system.  For example, an article from Hospitality Technology Magazine stated that "[o]perators may process orders and payments, take inventory counts and manage guest-seating arrangements with the portable, handheld solution."  Ex. 2062, 65.  In addition, Patent Owner states that HostAlert, for which it won an award, is "a subset of the 21st Century Restaurant™ system/technology, inclusive of waitlisting, table management and reservations, but not including food and drink ordering."  PO Resp. 70 (citing Ex. 2050).  This indicates that the 21CR system includes additional features other than those of the challenged claims, such as matching a waiting party in a database to a newly available table in a restaurant, based on party size and longest wait-time or adding a customer to a sister restaurant's waiting list.  *See* Ex. 2050, 6.

In addition to arguing that the 21CR system is coextensive with the challenged claims, Patent Owner argues that the evidence of secondary considerations has a nexus with the "synchronization, integration, and consistency" features of the challenged claims, which are required by the wherein clauses of claims 11–13.  *See* PO Resp. 56.  In the analysis below, we address whether the evidence of secondary considerations has a sufficient nexus between the merits of the claimed invention and the evidence of secondary considerations.

## 2. *Licensing*

Licenses taken under the patent in suit may constitute evidence of non-obviousness; however, only little weight can be attributed to such evidence if the patentee does not demonstrate "a nexus between the merits of the invention and the licenses of record."  *GPAC*, 57 F.3d at 1580 (citations omitted).

CBM2015-00099
Patent 6,871,325 B1

Patent Owner contends that the patents in the '325 family have been licensed by 44[14] companies, "the majority of these licenses occurring outside of litigation." PO Resp. 64, Sur-Reply 3.  To support its contention, Patent Owner provides its own press releases announcing the licenses (Ex. 2003) and an amendment to a license with Agilysys, Inc. (Ex. 2048).  Patent Owner argues that its press releases were jointly issued (PO Resp. 64) and that "[t]he majority of these licenses occur[ed] outside [of] litigation" (*id.*).  When assessing Patent Owner's licensing evidence, "the relevant inquiry is whether there is a nexus between the patent and the licensing activity itself, such that the factfinder can infer that the licensing 'arose out of recognition and acceptance of the subject matter claimed' in the patent."  *S. Ala. Med. Sci. Found. v. Gnosis S.P.A.*, 808 F.3d 823, 827 (Fed. Cir. 2015) (quoting *GPAC*, 57 F.3d at 1580)).

The Agilysys Amendment provides up to 425 licenses of Patent Owner's 21CR Software and related patents (including the '325 patent) for a fee of $85,000.  Ex. 2048.  This Amendment, however, is an update to an existing agreement that has not been put into evidence in this proceeding.  Thus, we do not have evidence as to breadth of services provided under this agreement nor do we have evidence to establish whether the overarching agreement was entered into for reasons related to the subject matter of the challenged claims.  None of the other forty or more purported license agreements were placed into evidence by Patent Owner.  Further, although Patent Owner states that most of the licenses occurred outside of litigation, Patent Owner provides no evidence to show that any of its licenses occurred outside of litigation.  Without such evidence that the licenses occurred outside of litigation, Patent Owner's argument is merely attorney argument and

---

[14] In its Sur-Reply, Patent Owner asserts 46 licenses of the patents of the '325 family.  Sur-Reply 2.

CBM2015-00099
Patent 6,871,325 B1

entitled to little weight. *In re Geisler,* 116 F.3d 1465, 1470 (Fed. Cir. 1997).
Indeed, Agilysys, Inc. is listed as a defendant in a related matter on Patent Owner's
mandatory notices. Paper 5. In addition, Petitioner provides evidence that
purported licensees MenuSoft, Par, ChowNow, EMN8, MonkeyMedia,
SubtleData, and TicketMob each has settled litigation with Patent Owner and thus,
any agreements may be the product of litigation. Reply 19 (citing Exs. 1088–
1094).

As to the press releases, each describes a different set of functionality as the
subject of the agreement. For example, the press release purporting to announce an
agreement with Jersey Mike's states that the license "includes mobile ordering,
mobile frequency/rewards, delivery, mobile payments and other elements/fields
critical to mobile/web deployments in the hospitality space." Ex. 2048, 1.[15] We
note that none of these features are recited in the challenged claims. The press
release purporting to announce an agreement with Darden does not mention any
specific patents as part of the agreement. *Id.* at 3. In addition, it notes that Patent
Owner and Darden worked together to develop calorie and nutrition look-up
features. *Id.* at 4.

We are not persuaded that the evidence presented sufficiently establishes a
nexus between the licensing and the merits of the claimed invention. We, thus,
give little weight to Patent Owner's argument that evidence of licensing overcomes
Petitioner's showing of obviousness.

### 3. Commercial Success

Patent Owner argues that evidence of "substantial, widespread commercial
success" demonstrates the non-obviousness of the challenged claims. PO Resp.

---

15 This Exhibit does not include page numbers. The numbers are based on our
own count.

CBM2015-00099
Patent 6,871,325 B1

66–68 (emphases omitted).  Patent Owner argues that "the measures of the claimed invention's 'commercial success' are the partnerships and/or licenses of its products and co-existent intellectual property, as a result of its May 1999 launch at the NRA [(National Restaurant Association )] show."  *Id.* at 67.

We are not persuaded that the evidence sufficiently establishes the alleged commercial success or that a nexus exists between the alleged commercial success and the merits of the claimed invention.  For example, Patent Owner cites to the entirety of Exhibit 2029 to show that "[t]he 2004 and 2006 HT POS market reports and rankings show that Ameranth licensed 21CR to most of these leading POS companies, and achieved overwhelming market share."  PO Resp. 67.  Exhibit 2029 consists of two Hospitality Technology magazines ranking food service point-of-sale systems.  The magazines do not show sufficiently that Patent Owner licensed its 21CR system to most of the leading point-of-sale companies or that Patent Owner achieved overwhelming market share.  The magazines do not mention the 21CR system.  Patent Owner also alleges that it has licenses with nearly all of the leading POS companies, but it has not placed these licenses into evidence so we do not have sufficient proof to establish whether and for what purpose any agreement was entered with any of these companies.

In addition, Patent Owner's submission of a purported draft of a term sheet for a non-consummated agreement with Micros does not establish that an industry leading company sought to partner with Patent Owner.  *See* Ex. 2062, 128–129.  This and the purported email directed to an individual at Micros at most establish that Patent Owner was "very excited about the prospect of working with MIRCOS."  *Id.* at 132.  These documents do not establish Micros's view of challenged claims or their subject matter.  We find that a draft term sheet and

CBM2015-00099
Patent 6,871,325 B1

purported communication with Micros are not evidence tending prove commercial success.

Patent Owner relies upon deposition testimony of Mr. John Harker to show commercial success, including "the incredible market reception that the 21CR system received at the May 1999 NRA show." PO Resp. 56–58 (citing Ex. 2045). For example, Mr. Harker testifies that tens of thousands walked by Ameranth's booth and hundreds stopped. Ex. 2045, 175:11–16 (page 200_. This, however, does not explain sufficiently what attracted people to Amaranth's display, nor does it establish that the 21CR product captured a significant market share as a result of the May 1999 NRA show, commercial success of the 21CR product, or that the merits of the challenged claims were the cause of the commercial success.

Patent Owner's press release describing a purported "undisclosed investment"[16] in Ameranth by Microsoft also insufficient to show commercial success. Ex. 2062, 135–137. The press release does not mention the '325 patent and it provides no detail as to the purported agreement between Patent Owner and Microsoft other than to say that Microsoft obtained an undisclosed amount of equity in Ameranth, a privately held company. *Id.* at 136. Investments may be made in a company for any number of reasons and we have no evidence of record indicating that the purported agreement was related to the substance of the challenged claims.

---

[16] Patent Owner provides a Declaration from Keith R. McNally, a named inventor of the '325 patent. Ex. 2062. This declaration was submitted to the USPTO as part of the prosecution of U.S. Patent No. 8,146,077 B1. *Id.* In this declaration, he stated that Microsoft made a multimillion dollar investment into Ameranth. *Id.* ¶ 3. Mr. McNally's declaration does not provide sufficient detail as to why such an investment would have made. Thus, we accord little weight to this declaration testimony.

CBM2015-00099
Patent 6,871,325 B1

We are not persuaded that the evidence sufficiently establishes the alleged commercial success or that a nexus exists between the alleged commercial success and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of commercial success overcomes Petitioner's showing of obviousness.

### 4. Awards/Industry Praise

Industry praise for an invention may provide evidence of non-obviousness where the industry praise is linked to the claimed invention. *See Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l. LLC,* 618 F.3d 1294, 1305 (Fed. Cir. 2010); *Asyst Techs., Inc. v. Emtrak, Inc.,* 544 F.3d 1310, 1316 (Fed. Cir. 2008).

First, according to Patent Owner, it was awarded four awards for its 21CR system and that these awards demonstrate the non-obviousness of claims 11–13 and 15. PO Resp. 68–70.

The first award is the Innovation of the Year Award from the European Hospitality Solutions Technology Show in 1999. *Id.* at 69. The cited pages of Exhibit 2062 are Patent Owner's own press release concerning the award. The press release purports that the award was for its UltraPad™2700 and alleges that the UltraPad™2700 is the wireless hand-held computer of a number of Patent Owner's systems, including its 21CR system. Ex. 2062, 95–96. The press release, however, fails to show sufficiently a nexus between the award for the UltraPad™2700 and the merits of the invention of the challenged claims. It does not sufficiently describe how the UltraPad™2700 is integrated or synchronized with the 21CR system or that the award is for how the UltraPad™2700 is integrated or synced with the 21CR system. Nor does it provide information

regarding the award sufficient to assess whether the award is indicative of widespread praise from within the industry.

The second award is the Moby Award from Mobile Insights and the third award is the 2001 Computerworld Honors Program and Collection. PO Resp. 69 (citing Ex. 2062, 140–141, 156–160). Pages 140–141 of Exhibit 2062 are Patent Owner's own press release concerning the Moby Award and page 155 is a letter concerning the 2001 Computerworld Honors Program and Collection ("the Computerworld Honor"). According to the press release and letter, Patent Owner received these awards for the deployment of the 21CR system at the Improv Comedy Club in Dallas. Ex. 2062, 141, 157. The press releases state that the Moby Award "specifically recognizes the wireless handheld computer ticket authorization and seating assignment application" (*id.* at 141), and the letter states that the honor was for a "case study" of the Ameranth Wireless's Improv Comedy Club Solution but does not specifically mention any feature of the solution. The press release and letter fail to show, sufficiently, a nexus been the Moby Award and the Computerworld Honor and the merits of the invention of the challenged claim. A ticket authorization and seating assignment application is not a feature of the invention of the challenged claims.

With regards to the third award, the Patent Owner argues:

Noteworthy in this award was the express confirmation that the innovations, reflected in the challenged claims as illustrate above, were <u>not available from any other company</u>. This award also shows that Tom Castillo, owner of the Improv, based his selection of Ameranth on the actual 21CR System demonstrated to him, at the May 1999 NRA show, thus confirming nexus of this award to that

CBM2015-00099
Patent 6,871,325 B1

> product/technology as it existed and was policy shown/demonstrated
> in May 1999.

PO Resp. 69–70. The letter, however, contains no indication that the alleged innovations, reflected in the challenged claims, were not available from any other company or any mention of Tom Castillo or the basis of his selection.

The fourth award is a Microsoft Retail Application Developer (R.A.D.) Award for Patent Owner's HostAlert system. *See id.* at 70, Ex. 2050. Patent Owner alleges that HostAlert is "a subset of the 21st Century Restaurant™ system/technology, inclusive of waitlisting, table management and reservations, but not including food and drink ordering." *Id.* (citing Ex. 2050). Patent Owner, however, provides no evidence to support its assertion that HostAlert is a subset of its 21CR system or that the subset includes the features of the challenged claims. To the contrary, the article relied upon by Patent Owner indicates that HostAlert includes additional features than those of the challenged claims, such as matching a waiting party in a database to a newly available table in a restaurant, based on party size and longest wait-time or adding a customer to a sister restaurant's waiting list. Ex. 2050, 6.

Second, Patent Owner argues that overwhelming industry praise for the 21CR system is evidence of non-obviousness. PO Resp. 70–73. Patent Owner states that "[t]he hospitality market press and numerous nationally renowned publications including the Wall Street Journal, Time Magazine and Harvard Business review have praised [the 21CR system]." PO Resp. 70–71. Patent

CBM2015-00099
Patent 6,871,325 B1

Owner, however, does not provide a citation to any Wall Street Journal,[17] Time Magazine,[18] or Harvard Business Review article in the record.

Patent Owner also refers to an article titled "Brainstorm Eases Restaurant Ordering Process" on pages 165–67 of Exhibit 2062. According to Patent Owner, this article shows contemporaneous praise for its products. PO Resp. 71. The article, however, merely provides Ameranth's views as to how its product may save time in a restaurant along with statements from restauranteurs planning to test the system or professing an interest in the field. Ex. 2062, 166. We do not find this article to contain praise or acclaim for the subject matter of the challenged claims.

Patent Owner, further, argues that for the Computerworld Honor, "Microsoft founder Bill Gates personally nominated Ameranth with the praise that 'Ameranth is one of the leading pioneers of the information age for the betterment of mankind.'" PO Resp. 71 (citing Ex. 2062, 151–53). This purported quotation is mentioned in several Ameranth press releases, but there is no evidence of this statement in any documents from Microsoft or any industry publication. *See* Ex.

---

[17] Page 162 of Exhibit 2062 purports to be a copy of an undated Wall Street Journal article. This portion of the exhibit was not cited in Patent Owner's response. It purports to describe feature of the 21CR system including the ability to email regular customers with special announcement or on special dates. Ex. 2062, 162.

[18] Page 164 of Exhibit 2062 purports to be a copy of a Time Magazine article. This portion of the exhibit was not cited in Patent Owner's response. The discussion of Patent Owner's product appears in a short (approximately 100 word) article that describe the product as including the ability to permit waiters to process credit-card payments and print receipts right at the table. Ex. 2062, 164.

45

CBM2015-00099
Patent 6,871,325 B1

2046, 2, 6; Ex. 2022 (Ex. A).  Thus, we give little weight to this purported praise from Bill Gates.

Patent Owner also argues that Marriott's vice-president Steve Glen and Harvard Business School Press also praised the 21CR system.  PO Resp. 71–72 (quoting Ex. 2062, 106–108 ("the Marriot Letter"); Ex. 2051 ("the Harvard Book)).  The Marriott Letter and the Harvard Book, however, praise features of the 21CR system that are not features of the challenged claims, such as "laser bar-code scanning of customer frequency cards," "wait-list management functions" (Ex. 2062, 107), and "payment processing" (Ex. 2051).

Patent Owner has not sufficiently shown that the four awards and the alleged industry praise are linked to the merits of the claimed invention.  We, thus, give little weight to Patent Owner's argument that evidence of awards and industry praise overcomes Petitioner's showing of obviousness.

### 5. Copying

"[C]opying by a competitor may be a relevant consideration in the secondary factor analysis." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (citing *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984).  "[A] nexus between the copying and the novel aspects of the claimed invention must exist for evidence of copying to be given significant weight in an obviousness analysis." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012) (internal quotation omitted).

Patent Owner alleges that multiple entities have copied its 21CR system and this copying is evidence of nonobviousness.  PO Resp. 73–78.  To support its

CBM2015-00099
Patent 6,871,325 B1

allegations Patent Owner points to numerous statements from competitors and the testimony of Dr. Weaver. *Id.*

We are not persuaded that the evidence sufficiently establishes the alleged copying or that a nexus exists between the alleged copying and the merits of the claimed invention. Patent Owner cites to statements made by employees of competitors, who allegedly had knowledge of the 21CR system, and articles to show copying. PO Resp. 73–78 (citing, for example, Ex. 2009). This evidence, however, fails to establish copying or a nexus between the alleged copies and the merits of the claimed invention. For example, Patent Owner cites articles that discuss Starbucks's "mobile order and pay" system (Ex. 2009) and "ordering ahead and new payment features" (Ex. 2008). The articles, however, do not sufficiently describes Starbucks's mobile order and pay system as having the claimed synchronization, integration, and consistency features required by the wherein clause of claim 11 (i.e., the claimed communication control module and application program interface).

Further, Patent Owner relies upon the testimony of Dr. Weaver to show the Starbucks's system and certain pizza chains copied the relevant "synchronization, integration, and consistency" features of the challenged claims. Ex. 2041 ¶¶ 147, 151. We do not find Dr. Weaver's testimony to be persuasive or helpful. Dr. Weaver testifies that his opinion is based upon the evidence cited by Patent Owner and Starbucks's own materials on its "Mobile Order & Pay" system (*id.* ¶ 147) and his "review of their systems including their mobile apps" (*id.* ¶ 151). As discussed in the paragraph above, the evidence cited by Patent Owner does not sufficiently describe Starbucks's mobile order and pay system or the pizza chain's systems to establish that these systems are copies of the 21CR system. Further, Dr. Weaver's testimony that he reviewed Starbucks's and the pizza chain's systems is conclusory

47

CBM2015-00099
Patent 6,871,325 B1

with little or no elaboration on those systems. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *see also Rohm and Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) (nothing requires a fact finder to credit the inadequately explained testimony of an expert).

We are not persuaded that the evidence sufficiently establishes the alleged copying or that a nexus exists between the alleged copying and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of copying overcomes Petitioner's showing of obviousness.

### 6. *Failure of Others*

Patent Owner must show that any evidence of long-felt need "demonstrates both that a demand existed for the patented invention, and that others tried but failed to satisfy that demand." *Cyclobenzaprine*, 676 F.3d at 1082.

Patent Owner argues that many companies tried but failed to achieve synchronization and integration with point-of-sale systems and other third party systems and this failure by others is evidence of nonobviousness. PO Resp. 78–80. To support its allegation, Patent Owner points to numerous statements from employees of other companies and the testimony of Dr. Weaver. *Id.*

We are not persuaded that the evidence sufficiently establishes the alleged long-felt need and failure of others or that a nexus exists between the alleged long-felt need and failure of others and the merits of the claimed invention. Patent Owner cites to numerous exhibits as allegedly showing the failure of others. PO Resp. 78–80. For example, Exhibit 2001 is an email from a Food.com employee discussing a license agreement with Patent Owner and specifying the product and services it requires. This, however, does not show sufficiently that Food.com tried but failed to satisfy a demand for the patented invention. In addition, Patent

CBM2015-00099
Patent 6,871,325 B1

Owner states that "Food.com admitted it needed Ameranth's technology in its public release on July 16, 1999" (PO Resp. 78) but provides no citation to such a release in the record. We cannot consider evidence not adequately cited to in the record or not provided in the record. *DeSilva v. DiLeonardi*, 181 F.3d 865, 866-67 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record.")  Without such evidence, Patent Owner's argument is merely attorney argument and entitled to little weight.

We are not persuaded that the evidence sufficiently establishes the alleged failure of others or that a nexus exists between the alleged failure of others and the merits of the claimed invention. We, thus, give little weight to Patent Owner's argument that evidence of failure of others overcomes Petitioner's showing of obviousness.

### 7.  Conclusion as to Secondary Considerations

Patent Owner's evidence fails to sufficiently demonstrate commercial success, licensing, copying, and long-felt-but-unmet need for the claimed invention. We, thus, determine that the proffered evidence of objective indicia of non-obviousness is insufficient to overcome the previously discussed evidence establishing that every limitation from the challenge claims was taught by the cited references. Thus, we find that Petitioner has demonstrated by a preponderance of the evidence that the challenged claims would have been obvious over the cited references.

### E.    Motions to Exclude Evidence

Both Petitioner and Patent Owner filed motions to exclude evidence. Patent Owner moves to exclude certain paragraphs of Exhibit 1063 and the entirety of Exhibits 1065, 1067–1075, 1081, 1083–1085, 1095–1099, 1101, 1102, and 1106.

CBM2015-00099
Patent 6,871,325 B1

Paper 25. We do not rely on these exhibits in reaching our Decision and, thus, dismiss Patent Owner's motion to exclude these exhibits as moot.

Petitioner moves to exclude the entirety of Exhibits 2047–2048, 2050, 2053, 2059, 2062 and 2077–2078 and with the annotated portions of Exhibit 2047. Paper 26. We also dismiss Petitioner's motion to exclude these exhibits. Petitioner's motion to exclude theses exhibits is moot because we have found this evidence insufficient regardless of its admissibility.

## III. CONCLUSION

Based on the evidence and arguments, Petitioner has demonstrated by a preponderance of the evidence that claims 11–13 and 15 of the '325 patent would have been obvious over Brandt and NetHopper as well as the combination of Brandt, Demers, and Alonso.

## IV. ORDER

For the reasons given, it is

ORDERED that claims 11–13 and 15 of U.S. Patent No. 6,871,325 B1 have been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Evidence is *dismissed*;

FURTHER ORDERED that Petitioner's Motion to Exclude Evidence is *dismissed;* and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

CBM2015-00099
Patent 6,871,325 B1

PETITIONER:
Bing Ai
Patrick McKeever
Matthew C. Bernstein
Yun L. Lu
PERKINS COIE LLP
Ai-ptab@perkinscoie.com
PMcKeever@perkinscoie.com
MBernstein@perkinscoie.com
LLu@perkinscoie.com

PATENT OWNER:

John W. Osborne
OSBORNE LAW LLC
josborne@osborneipl.com

Michael D. Fabiano
FABIANO LAW FIRM, P.C.
mdfabiano@fabianolawfirm.com

CBM2015-00099
CBM2016-00006

Date: September 21, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

STARBUCKS CORP., APPLE, INC., EVENTBRITE, INC., and
STARWOOD HOTELS & RESORTS WORLDWIDE, INC.,
Petitioner

v.

AMERANTH, INC.
Patent Owner

———————

Case CBM2015-00099[1]
U.S. Patent No. 6,871,325

———————

## PATENT OWNER AMERANTH'S NOTICE OF APPEAL

2016 SEP 21 PM 2:33
OFFICE OF THE
GENERAL COUNSEL
U.S. PATENT
AND
TRADEMARK OFFICE

---

[1] Case CBM2016-00006 has been joined with this proceeding.

## PATENT OWNER AMERANTH'S NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Ameranth, Inc. (Patent Owner), hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision in Case CBM2015-00099 and CBM2016-00006 that was entered on September 13, 2016 (Paper 38), and from all underlying findings, orders, decisions, rulings, and opinions in those Covered Business Method proceedings before the Patent Trial and Appeal Board.

Patent Owner further states, per 37 C.F.R. § 90.2(a)(3)(ii), that the issues presented on this appeal include, but are not limited to: The decision of the Patent Trial and Appeal Board in the underlying proceedings that claims 11-13 and 15 of U.S. Patent No. 6,871,325 B1 are unpatentable under 35 U.S.C. § 103, along with any appealable finding, conclusion, or determination related in any way to that decision, and any other appealable issues decided adversely to Patent Owner in any orders, decisions, rulings, or opinions in CBM2015-00099 and/or CBM2016-00006.

A copy of this Notice of Appeal is being concurrently filed with the Patent Trial and Appeal Board, and three copies of this Notice of Appeal, plus the required docketing fees, are being filed with the Clerk's Office of the United States Court of Appeals for the Federal Circuit.

1

CBM2015-00099
CBM2016-00006

September 21, 2016                    Respectfully Submitted,

/John W. Osborne/
John W. Osborne
Lead Counsel for Patent Owner
USPTO Reg. No. 36,231
OSBORNE LAW LLC
33 Habitat Lane
Cortlandt Manor, NY 10567
josborne@osborneipl.com
Tel.:  914-714-5936
Fax:  914-734-7333

Michael D. Fabiano
Back-up Counsel for Patent Owner
USPTO Reg. No. 44,675
FABIANO LAW FIRM, P.C.
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
mdfabiano@fabianolawfirm.com
Tel.:  619-742-9631

CBM2015-00099
CBM2016-00006

## CERTIFICATE OF FILING AND SERVICE

I certify that true and correct copies of the foregoing PATENT OWNER

AMERANTH'S NOTICE OF APPEAL were submitted, as set forth below, on

September 21, 2016.

**1 copy, via hand delivery to:**
Director of the U.S. Patent and Trademark Office
c/o Office of the General Counsel, United States Patent and Trademark Office
Madison Building East, Room 10-B-20
600 Dulany Street
Alexandria, VA  22314

**1 copy, via hand delivery, plus filing fee, to:**
Clerk of Court, U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC  20439

**1 copy, electronically via PTAB End-to-End System to:**
Patent Trial and Appeal Board, U.S. Patent and Trademark Office

**1 copy each, via email, per agreement of the parties, to:**

| | |
|---|---|
| Bing Ai<br>PERKINS COIE LLP<br>11988 El Camino Real, Suite 350<br>San Diego, CA 92130<br>Ai-ptab@perkinscoie.com | Patrick N. McKeever<br>PERKINS COIE LLP<br>11988 El Camino Real, Suite 350<br>San Diego, CA 92130<br>PMcKeever@perkinscoie.com |
| Matthew C. Bernstein<br>PERKINS COIE LLP<br>11988 El Camino Real, Suite 350<br>San Diego, CA 92130<br>MBernstein@perkinscoie.com | Yun L. Lu<br>PERKINS COIE LLP<br>11988 El Camino Real, Suite 350<br>San Diego, CA 92130<br>LLu@perkinscoie.com |
| James M. Heintz<br>DLA PIPER LLP (US)<br>11911 Freedom Drive, Suite 300<br>Reston, VA 20190-5602<br>jim.heintz@dlapiper.com | Robert C. Williams<br>DLA PIPER LLP (US)<br>401 B Street, Suite 1700<br>San Diego, CA 92101<br>robert.williams@dlapiper.com |

September 21, 2016                    */s/ Michael D. Fabiano /*
                                     Michael D. Fabiano